UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LUCAS DESLANDE,

                    Plaintiff,

            v.                          25 Civ. 4630 (KPF)

FORTREA HOLDINGS, INC., *et al.*

                                        Oral Argument

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        September 3, 2025
                                        10:00 a.m.

Before:

                    HON. KATHERINE POLK FAILLA,

                                        District Judge

                         APPEARANCES

ROBBINS GELLER RUDMAN & DOWD LLP
     Attorneys for Movant Construction Industry Laborers
Pension Fund and City of Pontiac Reestablished General
Employees' Retirement System
BY:  DAVID A. ROSENFELD

POMERANTZ LLP
     Attorneys for Movant Nova Scotia Public Service
Superannuation Plan and Nova Scotia Teachers' Pension Plan
BY:  MATTHEW L. TUCCILLO
     ALEXANDER HOOD


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
     Attorneys for Defendants
BY:  ROBERT A. FUMERTON
     JEFFREY S. GEIER
     JEMMA CURTIN

THE DEPUTY CLERK:  In the matter of *Deslande v. Fortrea Holdings, Inc. et al*, counsel, please state your name for the record, beginning with plaintiffs.

MR. TUCCILLO:  Your Honor, Matthew Tuccillo, Pomerantz LLP, representing the Nova Scotia plan.

MR. SHILOH:  Good morning, your Honor.

Alexander Hood, Pomerantz LLP on behalf of the same parties.

THE COURT:  Okay.  Thank you.

MR. ROSENFELD:  Good morning, your Honor David Rosenfeld from Robbins Geller Rudman & Dowd on behalf of the Construction Industry Laborers Pension Fund and the City of Pontiac Reestablished General Employees Retirement System.

THE COURT:  I think, for convenience, you wanted me to refer to them as the institutional investors, but I have several institutional investors.

If I use that term, will the parties understand to whom I'm referring.

MR. TUCCILLO:  Your Honor can proceed as you wish.

THE COURT:  You're very kind.  Thank you very much.

MR. ROSENFELD:  Thank you, your Honor.

THE COURT:  And good morning to you, sir.

And at the back table, please.  Thank you.

MR. GEIER:  Good morning, your Honor.

Jeffrey Geier, Skadden Arps, for the defendants.

Also with me is Robert Fumerton and Jemma Curtin from Skadden Arps.

THE COURT:  Good morning.  Thanks so much.

MR. FUMERTON:  Good morning, your Honor.

THE COURT:  TO whom should I be directing my questions this morning?

MR. GEIER:  That would be me, your Honor, Jeffrey Geier.

THE COURT:  Thank you so much.

All right.  We're here for several purposes and the first is to consider competing motions for the appointment of lead plaintiff and lead plaintiff's counsel.  And there were, initially, four applicants, and I believe we're now down to two with what I will refer to as the Nova Scotia entities and what I will refer to as the individual investors, Mr. Rosenfeld's clients.

So, let me do this.  Mr. Rosenfeld, let me speak with you first.  I think I understand your submissions to suggest that both groups of plaintiffs could be lead plaintiff's counsel in this case but that your clients are preferable; am I correct?

MR. ROSENFELD:  That's correct, your Honor.

THE COURT:  Okay.  I believe some of this is covered in your submission, but I'd like you to tease it out a little bit more.

MR. ROSENFELD:  Sure.

THE COURT:  I think it is acknowledged that your clients, as a group, lost more than Mr. Tuccillo's clients as a group.  But I believe what he's suggesting is that if you disaggregate the plaintiffs, there are individual plaintiffs with greater losses.  And more than that, I think there's a concern -- and I think Judge Rakoff discussed it in one of his decisions -- about the sort of, for lack of a better term, shotgun wedding to get your clients to work together.

So, why don't you just engage with me on those issues.  Thank you.

MR. ROSENFELD:  Thank you, your Honor.

First of all, I would just like to correct one point and that is, your Honor, that my clients, both collectively and individually, have the largest financial interest, so -- at least one of my clients.  The Construction Industry Laborers Pension Fund alone claims a loss of $390,000, which is substantially more than each one of the individual Nova Scotia client plans and almost as much as them collectivity.

THE COURT:  Okay.  Fair.  Thank you.

MR. ROSENFELD:  And I would also like to point out, your Honor, regarding the *Lax* factor analysis --

THE COURT:  Yes.

MR. ROSENFELD:  -- that was misstated in Mr. Tuccillo's brief where he described one of the *Lax* factors

as, the funds expended as one of the factors, and he reported a claim of $1.14 million worth of Nova Scotia funds when, in fact, that Lax factor is net funds expended, which takes into account what was received after you sold the shares, reducing that claim for him to $440,000, which is less than the net funds expended for the institutional investors of $750,000.

So, there is no *Lax* factor called, funds expended.

THE COURT:  And sir, I should have asked this question as well, if you'll excuse me for interrupting.

I began by asking whether you believe, legally, either plaintiffs could be appointed.

I guess I should also have asked, it did not appear to me that the parties disputed what the proper framework was for the analysis or for a lead plaintiff and a lead plaintiff's counsel, that it was the *Lax* factors and that it was, as well, a sort of a preliminary inquiry into Rule 23.

You're now telling me that the parties aren't disagreeing with the factors.  You might be disagreeing with certain arguments made under those factors; yes, sir?

MR. ROSENFELD:  Correct.  In other words, we're not disputing that the *Lax* factors should be considered.  The *Lax* factors are set out in the *Lax* case, and what has been described in Mr. Tuccillo's brief is not the *Lax* factors.

THE COURT:  Okay.  Fair enough.

MR. ROSENFELD:  And that also goes to two factors: the

funds expended, as well as the net shares purchased when, again, also, he says you should look at the net shares purchased as of the first disclosure, whereas the case law that's cited -- well, actually, it was in our reply brief, which was not given leave to amend, but there are several cases in this district which talk about net shares purchased are considered as of the last day of the class period.

Here, there were three partial -- there were three disclosures, two earlier disclosures and a final disclosure at the end of the class period.  The Nova Scotia funds sold out all of their shares after the first disclosure of the three.

Our clients held through all three disclosures, and the courts say that for the net shares purchased analysis, you look at what shares are still being held on the last day of the class period.

So, Mr. Tuccillo did an analysis in his brief which does not reflect the shares held at the end of the class period.  Rather, he picked what shares were held after his client sold, which is not what the cases say, how they interpret that *Lax* factor.

THE COURT:  Okay.

Why don't you give it and talk about the issue that was raised by the Nova Scotia proposed plaintiffs, which is this idea that your two clients are sort of joined together in an artificial sense, for purposes of serving as lead plaintiff,

that there can be concerns.  I can have concerns that they might not work harmoniously in this case or that they might come to a point in the litigation where their views may diverge.

MR. ROSENFELD:  May I make one point before we get there?

THE COURT:  Yes, you may.

MR. ROSENFELD:  I just wanted to point out that under the PSLRA --

THE COURT:  Can I just ask you to slow down, so I can take better notes?

MR. ROSENFELD:  Sure.  Under PSLRA, there are sequential steps that need to be followed in order to determine who is the most adequate plaintiff.  And what the Court is supposed to do is first supposed to look at the lead plaintiff movant that claims the largest financial interest and then conduct an analysis of whether or not that plaintiff is adequate and typical to represent the rest of the class.

So, it's not a question of who is the best plaintiff. The question is:  Is the presumptive plaintiff, who is the one who claims to have the largest financial interest, is that plaintiff adequate and typical and good enough, as they say, to represent the interests of the class.

So, once a lead plaintiff claims to have the largest financial interest, the Court's analysis is supposed to focus

on that plaintiff and that plaintiff alone, or that plaintiff group alone, and determine whether or not that plaintiff should be the lead plaintiff.

So here, given that our clients claimed the largest financial interest, both in terms of losses and under the *Lax* factors, it's appropriate for the Court to consider their motion and decide whether or not they would be a sufficient plaintiff to represent the interests of the class.

And I point out, your Honor, as our clients set forth in their declaration in connection with this case, both plaintiffs made a determination to pursue this case together based on their past experience serving as co-lead plaintiffs together with other institutional investors, not themselves. They have not worked together in other litigations, but they have worked with other institutional investors in other cases. They enjoyed that experience, and they requested here to do that as well and work together in this instance.

They do have a shared investment advisor who purchased Fortrea stock for them, so this is not coming out of nowhere. Their purchases are known to be somewhat connected, and when there is discovery in this case and determination about how those shares were purchased and sold, it will focus on the investment advisors who made those purchases.  They have similar trading patterns, and these were all factors that they considered in deciding to pursue the case together.  They have

comparable losses, six figure losses.  And they did have --
they did confer about case leadership and oversight and decide
to pursue this case together.

I would point out, as well, that these concerns that
the Nova Scotia plans now come up with or came up with to
describe the concern about two institutional investors who do
not have a preexisting relationship acting together as lead
plaintiff despite their larger financial interest is somewhat
belied by their own actions taken recently in a case called
*Shannahan v. FTAI Aviation*, in which the Nova Scotia plans
filed a non-opposition to a lead plaintiff motion that was
filed by a group of two institutional investors who had no
prelitigation relationship but claimed a large financial
interest, just like we do here.

So, no too long ago, I believe the lead plaintiff
order in that case came out in the middle of July -- so this is
less than two months ago -- they filed a non-opposition to a
motion filed by two institutional investors that did not appear
to have a prelitigation relationship.  And they were certainly
okay with it over there, so it kind of begs the question why
all of a sudden they have that concern over here.

And you have two institutional investors with
experience serving as lead plaintiff in cases.  They're
prepared to work together.  They have worked together so far in
this case.  There's really nothing in the record to show that

they are not adequate to represent the case.

And in fact, I would also point out, one of the Nova Scotia sister funds, Nova Scotia Health Employees Pension Plan in another case called *Palm Tran Investors v. Emergent Biosciences*, which is in the District of Maryland, in that case, they also sought appointment together with a Fort Lauderdale pension plan that it had no prelitigation relationship with, and they sought to be appointed lead plaintiff together there.

And they argued, actually, against a group of two related institutional investors. And that cite, your Honor, is 2021 WL 6072812 at *5.

So your Honor, our client is the most adequate plaintiff under the framework set forth in the PSLRA. It has the largest financial interest under any metric both collectively, and the construction fund, individually, has the largest financial interest as well.

As far as loss is concerned, then under three of the four *Lax* factors, it also has the largest financial interest individually. As a whole, the institutional investor group wins on all four, but individually, the construction fund has three of the four *Lax* factors, including loss, which is the most heavily weighed. It has the largest financial interest under that analysis.

Lastly, I would point out one thing, and that is that

the two Nova Scotia funds, it's a little unclear to us from their declarations what the authority is of the entity that moved on their behalf. Because in their papers, in their declarations, they described that each one of them has an independent board that would need to make decisions here. There's a nine-person board. Another board is made up of 12 directors and one independent chair. And it's unclear if they would need the settlement authority of those separate boards to pursue any settlement in this case.

It's just not clear from their papers what their role is, who would be deposed on behalf of the fund, who is acting on behalf of the fund, whether the entity that signed the declaration actually has the fiduciary obligation under Canadian law. I just don't know.

But my point is that that fund is not just simply just one entity; it is two different entities with two separate boards who, I presume, have fiduciary duties to their members, and each one of those boards would have to make decisions regarding this litigation, which is really no different than our clients.

THE COURT: All right. Thank you very much.

MR. ROSENFELD: Thank you, your Honor.

THE COURT: Let me please, sir, is it Mr. Tuccillo? Will I be hearing from you or Mr. Hood?

MR. TUCCILLO: Yes, it will be me.

THE COURT:  Go ahead, please, sir.

Thank you so much.

MR. TUCCILLO:  Unless your Honor wants to start with a question, I'd love to just address a few of the factual statements.

THE COURT:  I would actually wish that you address the factual statements, so go ahead.  Thank you.

MR. TUCCILLO:  A lot to unpack there.

So, the declaration argument that we just heard, clearly waived.  Right?  It wasn't presented in the opening brief, the opposition, or even the unauthorized reply, but that being said --

THE COURT:  Well, that's my point.  I didn't quite authorize the reply.  I cut them off at the knees.

MR. TUCCILLO:  It wasn't even in there, but it's much ado about nothing.  The Nova Scotia plans are two statutorily-created pension funds.  They are clearly sister funds.  And Nova Scotia pension is the statutorily-created service corporation whose sole *raison d'etre* is to operate these pension funds.  If you go to the NS pension website, which I invite your Honor to do, you will then see two links to those two funds.  They are as intertwined as they could possibly be.

We've even put in the declaration where they have shares through trusts that they co-own.  We didn't move on

that; it was too complicated.  But, they co-mingle investments.  They are sister funds in the truest sense of the word.

And as Pension has statutory and contractual authority that we put in our declarations -- it was not questioned until 30 seconds ago, but there's no basis for it.  It's exhaustively detailed in the certifications.

And as pension clearly has the ability to enter into contracts, like my retainer, they have the authority to enter into litigation.  And unlike our counterparts here, you have clarity on who you're dealing with.  NS Pension is the entity overseeing both funds.  The Chief Investment Officer, Steve Mahoney -- who I spoke to yesterday -- is the signatory on everything they've submitted to the Court.

My name, you will become familiar with.  I am the only partner at Pomerantz that you will have to deal with.  So far, I've dealt with three in the last week from our opposing party here.  One partner called me.  One partner wrote a letter about it.  A third partner here is talking to you about it.

So this gets into -- I mean, we're starting sort of in the back rather than the front, but we have to.

And by the way, NSHEP entity, the Nova Scotia Health Employees Pension Plan, another client of my firm, was misrepresented as a sister fund.  The only reason they would be called a sister is because they both have the word "Nova Scotia" in their names.  That is a different entity.

But the case referenced, *Emergent*, was one of mine, recently settled for $40 million.  In that case, ironically, this counsel was arguing sort of the opposite.  We were in opposite roles.  They had funds that they were arguing were more related, and we had funds that we were saying were good enough.

But it bears noting, that was four years ago.  It was in the District of Maryland.  All of the Judge Rakoff authorities that we cite to you that you're referencing accurately today, inapplicable.  Different circumstances.

But really, at core, your Honor's tasked with appointing, as lead plaintiff, the member or members of the purported class that the Court determines to be the most capable of adequately representing the interests of the class, i.e. the most adequate plaintiff.

You're going to hear divergent views of these metrics. And we've all been at this long enough to realize there's case authority, and I'll cite it to you, on many of these *Lax* points.  There's cases that support most views on most of these factors, and there's several that support our view on all of them.

That's all in service, right, of the finding out who is the most adequate plaintiff.  What entity or group will best represent the interests of the class?  What is the most coherent?

The declarations that have been submitted have yet, even when challenged and even when there was an unauthorized second attempt, they have yet to articulate how will these two unrelated funds function?  What do they do if they disagree?  Are they going to do anything other than to defer to this counsel or the other law firm that hasn't even made an appearance yet, isn't in front of your Honor today, Asher Kelly, unclear role on the papers.  There's two law firms, not one.

And how will all of this function?  Even when challenged there's no clear answer, whereas I'm giving you perfectly clear what would happen on the Nova Scotia side.

THE COURT:  I'm just going to ask you to pause for a moment.  Two responses to that, please, sir.

MR. TUCCILLO:  Sure.

THE COURT:  First is that Mr. Rosenfeld suggested to me today that it's much easier than we're all making it to be. I look for the investor with the biggest losses, and then I see whether they are adequate and typical and that I shouldn't worry myself with some of these more marginal issues that you're raising to me.  So that's question one.

Question two is, this is not my first securities class action either as practitioner or as judge.  I've had co-plaintiffs before that are not related, so I'm not -- I guess what you're saying is:  It might be a strike against

them, but it's not disqualifying.

MR. TUCCILLO:  It's concerning.  And when you talk about the very authorities that your Honor raised here -- Judge Rakoff in *Petrobas* and many others in our papers, which I know you've read -- there's scrutiny to apply.  You don't just skip to what the biggest number is.

The first step is, do you even credit the group. Because we can all hobble together whoever we'd like and get the number bigger, and bigger and yell the loudest about the number.  But the first step is:  Wait, is this even a group? Is this coherent?  Are you giving me anything other than boilerplate --

THE COURT:  And that's where in *Lax*, sir?

MR. TUCCILLO:  That's not in *Lax*, but before you get to *Lax*, you have to figure out what is the movant whose number you're going to assess.  Are you considering these things together or separate?

THE WITNESS:  *Lax* does not create an assumption that any hodgepodge of things that come in just get looked *pro forma* at whatever number they articulate.  The first step, is this going to be credited as a group or separate, that's exactly what happened in Petrobas, the case you referenced without naming it.

THE COURT:  Yes.

MR. TUCCILLO:  Where the third-place investor jumped

to the front because the first two groups were discredited, and the *Lax* factors proceeded from there, and it reached a different conclusion.

So, respectfully, I think you have to start by saying what are we even comparing in terms of the movant. You then go to the *Lax* factors. And with due respect, I think that what was been presented is not declaratively so in the way that it was said here.

First of all, we cite the *Silverberg* case, our opposition a 3-4 which says: Not lost, but shares retained is the most determinative factor, because it's a better indication of skin in the game, *et cetera*. So it's not necessarily the case that loss, quote on quote, is the biggest and best.

But when you look at net funds and total funds, for example, I can cite, to your Honor, three cases off the bat: *Choy*, 2023 WL 2585979; *Kukkadapu*, 2016 WL 6820734; *Salinger*, 2019 WL 6873807. These are all cases of my firm where we've used total funds as part of the *Lax* presentation.

In our view, in some respects, it gives a better look because net funds, really, is just an amalgam of two other *Lax* factors. It doesn't add anything, typically. It's claimed loss plus shares retained at the end of the class period.

Total investment, how much money did you actually put in, is a reflection of how often you're investing, how much you're investing, *et cetera*, so we've put that in. Those

numbers have been cited by the courts and proved lead plaintiffs.

There's sort of a --

THE COURT:  Are those situations in which there was a contested battle for lead plaintiff, or was it a situation in which your client was put forward and it was accepted, and you then presented the reasons why, because I --

MR. TUCCILLO:  They were contested, but not on this point.

THE COURT:  Okay.  Well, that might matter.  I'm not sure I've heard the Second Circuit speak to the issues that you were saying use total funds instead of --

MR. TUCCILLO:  Correct.  Nor is the PSLRA clear.

THE COURT:  You don't get to talk over me, sir.

MR. TUCCILLO:  I apologize.

THE COURT:  I mean, I understand what you're saying, but it seems more theoretical and aspirational than something some court has adopted in a thoughtful opinion really getting into these issue.  I mean, perhaps these cases you've just cited to me go to that level and actually discuss the preference for total funds instead of net, but I'm not sure I've seen it.

MR. TUCCILLO:  I wouldn't say a preference.

THE COURT:  All right.

MR. TUCCILLO:  The PSLRA, you know, it passed when I

was in college, so I can't speak to it one way or the another, but it's not a model of clarity.  It left to the court's and *Lax* -- for whatever reason, back when it was decided -- sort of articulated the first test, and then it's kind of branched from there.  And courts view them in, I would say, flexible but based ways, right?  There's sort of the starting point and then there's what did the courts do.

On net shares and retained shares, I am -- much more firmly am I going to say what I'm about to say -- it is just flat wrong that there's any requirement that you have to retain those shares through all of the correctives.  It is equally wrong that that gives rise to any sort of unique defense.  And I will cite authorities that are squarely on point with that: *Evolus*, 2021 WL 4251957; *Darish*, 2021 WL 1026567; *Gentiva*, 281 F.R.D. at 116, 117, and these say that -- for example, in *Evolus*, a movant who sold shares after the first of two corrective disclosures still had established proximate loss as long as the other corrective disclosures are related to the same fraud, can adequately lead the case, and was appointed lead.

Similarly, in *Darish*, when a movant who had plausibly alleged lost causation based only the first corrective does not face unique defenses, can adequately represent investors that also held shares past other correctives that are related to the same fraud.

And as we all know, some my colleagues only do this stage and you never see them again. I do everything, cradle to grave. Once this case starts, the next step is going to be, we're going to see if there are other correctives that weren't pled in the initial complaint. We can add some. You can drop some. The class period changes. This is a snapshot in time that we're speaking about today.

And really, I have every reason to believe that they, like me, are -- our interest is to maximize the class' return. Their argument boiled down is, well, your clients care more about one corrective than others. But the same is really true for them.

If you run the trades over each of the three correctives, most of their losses come from the third; right? So, should I say, well, they're going to be dis-incentivized to spend as much time on the first one or the second one? Not really. Because what we are all going to do if we were appointed lead, we exercise our fiduciary duties to the class, is to maximize class-wide recovery.

What you have to do is just appoint a lead plaintiff who will run this case more coherently, who will run this case more efficiently. You can add class representatives later, is and when the need arises, for any number of reasons.

That's at a stage a year and a half to two years from now; right? And that can happen for any number of reasons.

Perhaps the spin-off shares, which are baked into the guts of this case, perhaps those become an issue, and they haven't addressed it. We really haven't addressed it, even though we could, but maybe we have to add a class rep for that. That's all for a future date.

Today, clearly, under the cases I just cited you, we are perfectly within bounds to say that our retained share count is the highest one. We are perfectly within bounds to say there is no unique defense that arises.

And I really don't love when other folks at my table, not the other table, start raising the spectre of unique defenses and questioning corrective disclosures, because we have a unity of interest here. I would never say that one of these correctives is weaker than the other. I think they're great, and I'll probably find a few more.

Our job here is to make sure that the class as a whole is best and most strongly represented. Among other reasons, that's why our papers are already litigating against the other table on things like document retention, *et cetera*.

So, that really covers the *Lax* factors. I think I've covered much of the arguments that were directed at us.

I think the inescapable reality is that these funds really have no prior existing relationship at all. They maybe had a phone call, maybe. We're not sure. There's no clear plan on how they will lead, how they will resolve disputes.

There's absolutely no indication, whatsoever, of what the second law firm is doing. There's not even, really, an indication of which partner at Robbins Geller is going to be doing what I'm going now. If you have another hearing, I'll still be here. I'm not sure if Mr. Rosenfeld will be.

As to the FTAI matter, just to close the loop on that one, the Nova Scotia plans were in third place on that one. We didn't lead a single *Lax* factor. There were two groups of institutional investors ahead of us. It was not the correct case to raise concerns, and we weren't even the second place litigant to do so.

So, it's not a question of, you know, thou shall treat all cases the same. We are not seeing the coherent plan here. It really does seem like an amalgam of numbers to cite numbers to your Honor but not cite a plan or an approach.

And having conferred with our clients, they wanted to stick it out and see how it fared. And they can obviously offer something that is to the class's benefit.

Whether your Honor chooses that is your decision.

THE COURT: Thank you very much.

Mr. Rosenfeld, what is the situation with appointment of counsel. Were I to select your clients, what would be the legal team behind them?

MR. ROSENFELD: Your Honor, I would be the legal team behind them.

THE COURT:  Okay.

MR. ROSENFELD:  The Asher Kelly firm is fund counsel to the City of Pontiac.  They're not securities litigators. They're just listed because they represent the fund as fund outside counsel, so they're on the papers for that reason.

THE COURT:  Okay.  All right.

Thank you.

My friends at the back table, I assume you don't have a horse in this race, at least not at this stage, but I'll hear from you if you think otherwise.

MR. GEIER:  No, that's exactly right, your Honor.

THE COURT:  Okay.  Thank you.

Please give me a moment.  Thank you.

(Pause)

THE COURT:  Thank you very much for your patience.  I want to thank my friends at the front table -- even those who have not spoken -- for the written submissions and the oral presentations today which gave me the clarity that I needed.

Ultimately, considering the PSLRA and the *Lax* factors, I am going to go to the institutional investors at this time, though, certainly, Mr. Tuccillo made a great set of arguments for his clients and for himself as a lead plaintiff.

I do want to underscore something that Mr. Tuccillo said, which is:  I do find it very strange in this setting to have plaintiffs fighting each other while the defense folks

watched from the back table.  But that is where we are at this stage.

I do think either group could serve as lead plaintiff, but I actually do think that the institutional investors are the better plaintiffs here, because of the larger set of losses and also the transactions involving more of the corrective disclosures.

I understand it's not disqualifying, but I just prefer the transactions that they have.

Now, we've talked a lot this morning about Judge Rakoff.  He's almost always right and certainly when he speaks about securities issues, I have to think about what he's saying very carefully.  But in my own experience with securities class actions, as both practitioner and as judge, I really haven't seen the problems where co-plaintiffs, co-lead plaintiffs have no prior relationship with each other.  Just hasn't posed a problem in my cases.  I don't think it's going to pose a problem here, particularly given the shared investment advisor, the common trading patterns, and the shared law firm.

So, again, considering everything, I believe that the constitutional investors are the preferred lead plaintiffs under the PSLRA, and I'm going to appoint them.  As a result, I'm appointing their counsel as well.

But the reason I was asking questions, Mr. Rosenfeld, about who you'd be working with is, I am always concerned, in

this setting, that there will be a sort of a full employment act for lawyers based on this case, and I don't want that to be. So, I'm warning you in advance that I will look very carefully at any legal bills that are submitted to me for my review.

Given that, and again, with thanks to everyone who spoke this morning, for my friends at the back table, the issues that you raised are no longer issues; correct?

MR. GEIER: I believe that's correct, your Honor. Those provisions were only in the Nova Scotia proposed order.

THE COURT: All right. Mr. Rosenfeld, it seems to me that the next step is preparing a consolidated amended class action complaint and, I fear, a motion to dismiss practice.

Do you agree?

MR. ROSENFELD: I do agree, your Honor.

I believe there's a stipulation on file that provides 14 days to submit a schedule.

THE COURT: There is.

MR. ROSENFELD: Okay.

THE COURT: And I was wondering where that's still something that can be done.

MR. ROSENFELD: It can be done by plaintiffs, sure.

THE COURT: All right. Then it will be done by the defendants, because they're nodding vigorously in the back.

MR. GEIER: Absolutely, your Honor.

THE COURT:  Terrific.  All right.

Then, thank you all very much.

I'll hear from you or see you in 14 days.

Thanks.

We're adjourned.

MR. ROSENFELD:  Thank you, your Honor.

MR. TUCCILLO:  Thank you, your Honor.

(Adjourned)