UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| LUCAS DESLANDE, Individually and on Behalf of All Others Similarly Situated, | : | Civil Action No. 1:25-cv-04630-KPF |
|  | : |  |
|  | : | <u>CLASS ACTION</u> |
| Plaintiff, | : |  |
|  | : | AMENDED CLASS ACTION COMPLAINT |
| vs. | : | FOR VIOLATIONS OF THE FEDERAL |
|  | : | SECURITIES LAWS |
| FORTREA HOLDINGS INC., THOMAS PIKE, and JILL MCCONNELL, | : |  |
|  | : | JURY TRIAL DEMANDED |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

Lead Plaintiffs Construction Industry Laborers Pension Fund ("CILPF") and City of Pontiac Reestablished General Employees' Retirement System ("Pontiac," and with CILPF, "Lead Plaintiffs"), allege the following based upon personal knowledge as to Lead Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiffs' attorneys, which included, among other things: (i) a review and analysis of Securities and Exchange Commission ("SEC") filings made by Fortrea Holdings, Inc. ("Fortrea" or the "Company"); (ii) a review and analysis of other publicly available information, including press releases issued by Fortrea, transcripts of Fortrea conference calls, analyst reports on Fortrea, and news articles concerning Fortrea; (iii) a review and analysis of other available materials relating to Fortrea; and (iv) interviews with former Fortrea employees. The investigation of Lead Plaintiffs' attorneys is continuing, yet certain additional facts supporting these allegations are known only to Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons and entities other than Defendants that purchased or otherwise acquired Fortrea common stock between July 5, 2023 and February 28, 2025, inclusive (the "Class Period") against the Company and certain of its current and former executive officers (together, "Defendants," as further defined below) seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      Defendant Fortrea is a global contract research organization ("CRO") that provides clinical trial management solutions pursuant to contracts with its customers. The Company primarily serves pharmaceutical, biotechnology, and medical device companies.

3.      Prior to the Class Period, on July 28, 2022, Labcorp Holdings Inc. ("Labcorp"), a global life sciences company, announced it would spin off its Clinical Development and Commercialization Services business into a new entity called Fortrea (the "Spin-Off").  The Spin-Off was completed in June 2023, and Fortrea began operating as an independent publicly-traded CRO.

4.      Immediately after the Spin-Off, Defendants touted their backlog of contracts awarded to Fortrea prior to the Spin-Off (the "Pre-Spin Projects"), which was supposed to serve as a strong foundation for Fortrea's future revenue.  Defendants emphasized to investors how the Pre-Spin Projects "extend over multiple years," claiming that Fortrea's "long-term contract durations give [Fortrea] confidence and visibility into [its] future revenues."

5.      Defendants even reviewed and modified Fortrea's backlog to remove certain projects that would not produce revenue going forward – yet they did not disclose that the Pre-Spin Projects, many late in their life cycle, already had "a lot of hours in them" and, under their terms, would provide less revenue and less profitability on an annual basis.  Nonetheless, based, in part, on the purported revenue that supposedly would be generated in 2024 from the Pre-Spin Projects, Defendants guided investors towards lofty revenue targets for 2024.

6.      Additionally, in connection with the Spin-Off, Labcorp and Fortrea entered into several transition services agreements (the "TSA" or "TSAs") wherein Fortrea agreed to pay Labcorp to provide certain transitional services, including information technology ("IT") applications, network and security support and hosting, and finance, human resources, marketing, and other administrative support.

7.      Following the Spin-Off, Fortrea's selling, general, and administrative expenses ("SG&A") were significantly higher than its peers, which negatively impacted EBITDA margin.

SG&A continued to increase throughout the Class Period.  Thus, decreasing SG&A was of the utmost importance to Defendants during the Class Period.  As Defendants explained, lowering SG&A was "critical for [Fortrea] to be competitive with [its] peers."

8.    Fortrea's ever-increasing SG&A was due in large part to the TSAs.  Prior to and throughout the Class Period, Defendants falsely and repeatedly told investors they had devised "detailed TSA exit plans" designed to save costs and improve margins by investing in developing Fortrea's own infrastructure (the "TSA Exit Strategy") by the end of 2024.

9.    Pursuant to the TSA Exit Strategy, either Fortrea would build its own infrastructure necessary to run the business, or it would procure this infrastructure from third-party service providers.

10.    Critical to the success of the TSA Exit Strategy, however, was that Fortrea replace the costs it was paying to Labcorp with **lower** costs, either by developing infrastructure in-house or by obtaining services from a third-party provider.  As Defendants explained, Fortrea needed to identify and implement "a replacement system or technology or process that is **more cost effective**" than the service provided by Labcorp under a given TSA.[1]

11.    Thus, it was critical during the Class Period for Fortrea to procure lower cost infrastructure to run its business independently.  That is why Defendants repeatedly and falsely told investors during the Class Period that once Fortrea exited the majority of the TSAs by the end of 2024, SG&A would materially decrease – Defendants wanted investors to believe that Fortrea had a clear path to lowering SG&A by the end of 2024.  As defendant Pike put it, SG&A was "interrelated with exiting the TSAs as we continue to be on the infrastructure of our former parent company

---

[1]    All emphasis in quotations in this Complaint is added, except as otherwise noted.

through 2024," and investors would see the benefits "emerging as through the year, but primarily late in the year as we exit the TSAs."

12.     The services provided by Labcorp to Fortrea, however, were provided ***at cost*** pursuant to the TSA, meaning Labcorp was not charging additional markups.  In order for Fortrea to save money by exiting the TSAs, Defendants would have needed to implement services ***cheaper than at the cost provided by Labcorp***.  This was not possible, however, because Defendants contracted with third-party service providers – Cognizant Technology Solutions Corporation ("Cognizant") and Accenture plc ("Accenture") – to implement and support these necessary services; this meant that Fortrea merely shifted from paying Labcorp pursuant to the TSAs to paying these third-party service providers.

13.     Indeed, even as Fortrea's payments to Labcorp incrementally decreased throughout the Class Period, SG&A remained elevated – meaning Defendants saw, in real time, that the TSA Exit Strategy was failing.

14.     Nevertheless, Defendants repeatedly highlighted to investors that the TSA Exit Strategy would cause Fortrea to see "the benefit of the anticipated cost reduction initiatives and TSA exits late in the year," meaning that the benefits of the TSA Exit Strategy would be realized once the TSAs were exited.  Defendants promised "real margin improvement" in the second half of 2024, "in particular" from the TSA exits, because the cost reductions were "heavily dependent upon exit of the TSA agreement."  Thus, Defendants assured investors that the TSA Exit Strategy, once completed by the end of 2024, would create immediate cost savings – not, as later revealed, an initial hurdle ***to first begin*** implementing other programs to save costs.

15.     Based on the material misrepresentations and omissions made throughout the Class Period, Defendants assured investors that the TSA Exit Strategy would lower SG&A by the end of

- 4 -

2024. Defendants therefore guided investors to an adjusted EBITDA margin of 13% by the end of 2024 and through 2025, because Fortrea would no longer be burdened by "arduous" TSA expenses.

16.    Defendants' statements regarding the Pre-Spin Projects and TSA Exit Strategy were false and/or misleading when made. As alleged herein, Defendants knew, or recklessly disregarded, that Fortrea could not replace TSA costs with lower cost infrastructure, meaning the TSA Exit Strategy would merely replace SG&A related to the TSAs with similar or higher SG&A, not lower. Defendants also knew, or recklessly disregarded, that the Pre-Spin Projects would not provide meaningful future revenue, because most of the revenue associated with those projects had already dried up.

17.    FE1, a former Fortrea employee who participated in weekly meetings to discuss the TSA Exit Strategy and track the projected costs for each individual TSA, confirmed that defendant McConnell personally approved every budget overage for payments to Cognizant. Indeed, FE1 recounted that defendant McConnell personally approved budget overages for payments to Cognizant on numerous occasions.

18.    FE2, a former Fortrea employee who was personally responsible for obtaining signatures for the engagement agreement with Cognizant, confirmed that the TSA Exit Strategy would not cause the Company's SG&A to decrease because Fortrea was already receiving many of these services from Labcorp *at cost* pursuant to the TSAs. Indeed, in or about July 2023, FE2 was shown cost models approved by defendant McConnell showing that the engagement with Cognizant would take *three or more years* for the Company to realize SG&A savings after exiting the TSAs.

19.    As for the Pre-Spin Projects, Defendants admittedly engaged in a comprehensive review and restatement of Fortrea's backlog shortly after the Spin-Off, meaning they knew or were reckless in not knowing that, under their terms, the Pre-Spin Projects would not produce meaningful

revenue in 2024.  Additionally, as confirmed by FE1, it was common knowledge throughout the organization since the time of the Spin-Off that the backlog of Pre-Spin Projects simply was not producing enough revenue to carry the Company.

20.    Defendants' web of lies unraveled throughout 2024 and into early 2025.  First, on August 12, 2024, Defendants announced Fortrea's financial results for the second quarter ended June 30, 2024 ("2Q24").  Revenue was below what the market had expected due to, *inter alia*, "lower new business awards in the pre-spin period" and "later stage and longer duration studies"; and adjusted EBITDA was negatively impacted by, *inter alia*, "higher SG&A costs post spin to support operations as a public company."  Additionally, Defendants revealed that the Company could not achieve the previously targeted 13% adjusted EBITDA margin for the fourth quarter ended December 31, 2024 ("4Q24"), lowering guidance for 4Q24 and full-year 2025 ("FY25") to 11%–12%.  On this news, Fortrea's common stock price dropped by 20%.

21.    Then, on September 25, 2024, Jefferies Equity Research published a report on Fortrea (the "September 2024 Jefferies Report") with the paragraph heading "**TSA Cost Savings Not as Material as One Might Think**" (emphasis in original).  As the report explained, Fortrea's much-hyped future margin improvements were illusory – the product of double counting.  As further explained in the report, adjusted EBITDA is calculated ***without*** one-time transition costs such as IT infrastructure.  Hence, exiting the TSAs would have no material impact on adjusted EBITDA margin, because "once TSAs are exited, [Fortrea] will just be replacing TSA costs with internal operating costs."  On this news, Fortrea's common stock price fell another 12%.

22.    Fortrea's stock value continued to decline over the following months.  Finally, on March 3, 2025 (the first trading day after the end of the Class Period), Defendants were forced to

fully admit that the TSA Exit Strategy was a colossal failure and that the Pre-Spin Projects would not be generating meaningful revenue in the near term.

23.     Specifically, on March 3, 2025, Defendants announced Fortrea's financial results for 4Q24 and full year 2024.  Adjusted EBITDA margin for the quarter was just 8% – far below what Wall Street expected – due in part to runaway expenses.  Despite having fully exited the TSAs by the end of 2024, Fortrea was no closer to reining in SG&A costs.

24.     Defendants also revealed that the previously touted Pre-Spin Projects were "late in their life cycle" and had "less revenue and less profitability than expected for 2025."  As defendant Pike explained, those projects were "extended out over time" and had "a lot of hours in them already," causing them to "burn" – meaning produce revenue – "more slowly."  Analysts could only guess as to why Defendants waited nearly *two years* after the Spin-Off to share this information.

25.     Due to these "inefficiencies in the pre-spin portfolio" and "inherited SG&A costs," Defendants reduced FY25 adjusted EBITDA margin guidance to around 7%.

26.     On the news of disappointing 4Q24 results and reduced FY25 guidance, Fortrea's common stock price plummeted by 25%.

**JURISDICTION AND VENUE**

27.     Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5.

28.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

29.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Dissemination of materially false and misleading information by Defendants occurred in this District.

30.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, either directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

31.     CILPF purchased or otherwise acquired Fortrea common stock during the Class Period, as set forth in its certification previously filed with the Court and incorporated herein by reference, and was damaged thereby.  ECF No. 36-2.

32.     Pontiac purchased or otherwise acquired Fortrea common stock during the Class Period, as set forth in its certification previously filed with the Court and incorporated herein by reference, and was damaged thereby.  *Id.*

33.     Defendant Fortrea is a Delaware corporation with its principal executive offices in Durham, North Carolina.  Fortrea's common stock trades on the Nasdaq Global Select Market ("NASDAQ") securities exchange under the ticker symbol "FTRE."  According to Fortrea's Form 8-K dated June 29, 2023, which was filed with the SEC after the market closed on July 3, 2023, and signed and/or certified by defendants Thomas Pike and Jill McConnell (the "July 2023 Form 8-K"), approximately 88.6 million shares of Fortrea common stock were distributed pursuant to the Spin-Off.

34.     Defendant Thomas Pike ("Pike") served as Fortrea's President, CEO, and Chairman of the Board at all relevant times.

35.     Defendant Jill McConnell ("McConnell") has served as Fortrea's CFO at all relevant times.

36.     Defendants Pike and McConnell are collectively referred to herein as the "Individual Defendants."

37.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or board meetings and committees thereof and via reports and other information provided to them in connection therewith.

38.     Each of the above officers of Fortrea, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Each of the Individual Defendants was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, was aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

39.     As officers and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, and which is governed by the provisions of the federal securities laws, each of the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market

price of the Company's publicly-traded stock would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

40. Each of the Individual Defendants participated in the drafting, preparation, and/or approval of the various public shareholder and investor reports and other communications complained of herein and was aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and was aware of their materially false and misleading nature. Because of their executive and managerial positions and/or board membership with Fortrea, the Individual Defendants each had access to the adverse undisclosed information about Fortrea's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Fortrea and its business materially false and misleading.

41. Each of the Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, was able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained herein.

42. Each defendant is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Fortrea common stock and by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i)

deceived the investing public regarding Fortrea's financial reporting, business, operations and management and the intrinsic value of Fortrea's common stock; and (ii) caused Lead Plaintiffs and the Proposed Class to purchase Fortrea publicly-traded common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Fortrea and its Business

43.    Fortrea is a global CRO that provides biopharmaceutical product and medical device development solutions to pharmaceutical, biotechnology and medical device customers. According to the Company's Form 10-K for FY24, which was signed by Defendants and filed on March 3, 2025 (the "FY24 Form 10-K"), Fortrea is "a recognized leader in clinical pharmacology, known for first-in human and exploratory clinical pharmacology studies as well as biopharma label support studies."

44.    "Clinical Development" is Fortrea's largest offering in terms of annual revenue. The Company has clinical research units in Leeds, U.K.; Dallas, Texas; Daytona, Florida; and Madison, Wisconsin.

45.    The Company claims to have the "scale and expertise to advise, design and deliver its customers' programs, projects and programs globally" as well as "a portfolio of projects that extend over multiple years[.]" The Company represents that its "longer-term contract durations give [it] confidence and visibility into . . . future revenues."

### The Spin-Off

46.    On July 28, 2022, Labcorp announced that its Board of Directors authorized LabCorp to pursue a spin-off of its wholly owned Clinical Development business to Labcorp shareholders through a tax-free transaction.

47.    According to Labcorp's Executive Vice President and CFO during a June 6, 2023 Fortrea Investor Day, Labcorp's board of directors underwent "a strategic review" with the help of

"outside advisors" to evaluate, among other things, Labcorp "from a structural standpoint." Following this review, Labcorp's board of directors "decided to effectuate the spin of the clinical development business, or Fortrea, . . . creating two publicly traded companies that would both be much more focused in its areas . . . of expertise."

48.    As part of the announcement, Labcorp noted that "there [would] be ongoing transition and commercial arrangements to provide for a seamless delivery of services to the customers and other stakeholders of the Labcorp and the Clinical Development business[.]"

49.    On January 9, 2023, defendant Pike joined Labcorp as president and CEO of its Clinical Development business, and the Company announced that defendant Pike would serve as the CEO and Chairman of the Board of the independent, publicly traded company following the Spin-Off.

50.    On February 9, 2023, Labcorp announced that the new company to be formed by the planned spin-off of its Drug Development Clinical Development business would be called Fortrea.

51.    The Spin-Off was completed on June 30, 2023, when Labcorp completed the distribution of 100% of the shares of the common stock of Fortrea to Labcorp common stockholders on a pro rata basis. Pursuant to the Spin-Off, Labcorp shareholders received one share of Fortrea common stock for every one share of Labcorp common stock held on June 20, 2023. Fortrea began trading on the NASDAQ as an independent company on July 3, 2023.

**Fortrea Enters into the Transition Services Agreements**

52.    Pursuant to the Spin-Off, Fortrea entered into the TSAs, a series of agreements wherein Fortrea and Labcorp agreed to provide each other certain transitional services. The Spin-Off was reported in the July 2023 Form 8-K. According to the Company's Form 10-Q for the fiscal second quarter ended June 30, 2023 ("2Q23"), filed with the SEC on August 14, 2023 (the "2Q23 Form 10-Q"), Labcorp agreed to provide Fortrea with support for the Company's enterprise

functions, most notably IT applications, network and security support and hosting as well as finance, human resources, marketing and other administrative support.

53.    In consideration for the services provided by Labcorp, Fortrea agreed to pay fees based on the direct and indirect costs associated with rendering those services, at no less than cost. The TSAs would not extend later than June 30, 2025, two years after the effective date of the Spin-Off.

54.    Thus, following the Spin-Off, Fortrea agreed to pay Labcorp for certain services related to necessary software, applications, and other support for Fortrea to operate its businesses. Fortrea would pay for these services while working to eventually implement its own infrastructure so that it could operate completely independent of Labcorp once the TSAs ended.

55.    This infrastructure included, *inter alia*, procuring and implementing enterprise resource planning, customer relationship management, and other information systems necessary to run Fortrea's businesses.

**Defendants Falsely Represented that Fortrea's Strong Backlog of Pre-Spin Projects Would Provide a Strong Foundation for Future Revenue**

56.    Prior to the start of the Class Period and the Spin-Off, Defendants touted to investors and analysts that Fortrea had "a large backlog" of Pre-Spin Projects that would provide a strong foundation for future revenues.

57.    As explained in Fortrea's Form 10-K for the fiscal year ended December 31, 2023 ("FY23"), filed with the SEC on March 13, 2024 (the "FY23 Form 10-K"), Fortrea's backlog "consists of anticipated future revenue from business awards that either have not started, or that are in process and have not been completed."

58.     During an Investor Day for Fortrea on June 6, 2023, defendant Pike told investors that when investors "look at [Fortrea's] backlog, you're looking at a company that has revenue in years to come[.]"

59.     Because Defendants highlighted Fortrea's backlog to investors *before* the Spin-Off, references to the backlog post-Spin-Off necessarily relate to the Pre-Spin Projects.  In fact, most of Fortrea's backlog during the Class Period came from the Pre-Spin Projects.  Backlog at the beginning of the Class Period was about $7 billion, and by the end it was $7.7 billion.  Fortrea's revenue over that same period averaged about $680 million per quarter (ranging from a high of $713.8 million in 3Q23 to a low of $651 million in 1Q25).  Dividing Fortrea's quarterly revenue by backlog yields a conversion rate of about 9% per quarter.  For example, analysts noted that Fortrea's backlog conversion rate was 9.0% in 2Q24 and 9.2% in 3Q24.  Given a quarterly conversion rate of 9% and a Class Period spanning fewer than seven quarters (from 3Q23 to the middle of 1Q25), Fortrea converted at most 60% of its backlog – even under an unrealistically conservative FIFO assumption.  Hence, at all relevant times, the Pre-Spin Projects constituted a material portion of Fortrea's backlog.

60.     By touting this backlog as a source of "revenue in years to come," Defendants conditioned investors to believe the Pre-Spin Projects would meaningfully contribute to the Company's revenues in each year.  Indeed, shortly after the Spin-Off, on August 7, 2023, an analyst characterized Fortrea's backlog as "healthy," reflecting reliance on Defendants' representations.

61.     Thus, by the start of the Class Period, investors and analysts were led by Defendants to believe that Fortrea possessed a strong backlog of Pre-Spin Projects that would produce meaningful revenue for the Company on an annual basis, including in the near term.

62.    On July 3, 2023, the first day following the Spin-Off, Defendants filed the July 2023 Form 8-K announcing, *inter alia*, the completion of the Spin-Off.  Also in the July 2023 Form 8-K, Defendants discussed Fortrea's backlog of Pre-Spin Projects that would produce revenue for the Company post-spin, telling investors that Fortrea has "a portfolio of projects that extend over multiple years" and that Fortrea's "longer-term contract durations give [Fortrea] ***confidence and visibility into [its] future revenues*.**"

63.    During the August 14, 2023 earnings call to discuss the Company's second quarter financial results for 2Q23 (the "2Q23 Earnings Call"), Defendants again chose to speak about the Company's backlog of Pre-Spin Projects.  Indeed, Defendants provided a review of Fortrea's "go-forward approach to backlog recognition" and "modified [Fortrea's] backlog composition and recognition policies to facilitate period-to-period reporting going forward."  The result of this review and modification, according to defendant McConnell, was "restating the backlog to remove projects where [Fortrea] no longer [had] current revenue[.]"

64.    Further, Defendants, according to defendant McConnell, "realized that there were some places where we had projects that were giving us current revenue and have revenue to burn where there was no backlog in there. And then we had the opposite where some over six or so months, we hadn't seen any revenue. And so we felt like it was appropriate to pull that out."

65.    Thus, as defendant McConnell admitted, Defendants underwent an extensive review of their backlog, including the Pre-Spin Projects, and determined that there were "some projects" that were "appropriate to pull . . . out" of the backlog because Defendants "hadn't seen any revenue." Defendants, however, told investors and analysts that this review did not lead to "a material adjustment," and what remained in the backlog, including the Pre-Spin Projects, was still "valid backlog for the future."

66.    Defendants, however, did not restate the historical metrics for the Company's backlog, meaning investors had no way of knowing the effect of the restatement on Fortrea's Pre-Spin Projects.  Indeed, as an analyst from William Blair explained in a January 5, 2024 report on Fortrea, Defendants' decision not to restate historical backlog metrics left "little information for investors to use for the purpose of making informed comparisons that could help illustrate the company's operation progress."  Because Defendants did not restate the historical metrics for the Company's backlog, investors were left to rely solely on Defendants' commentary regarding Fortrea's backlog to understand the impact of the Pre-Spin Projects on future revenue.

67.    Nevertheless, even after Defendants underwent this review and modification of the Company's backlog, they told investors, during the 2Q23 Earnings Call, that the review was "an opportunity to ensure the robustness of everything that was in there."

68.    Based, in part, on the purported revenue that would be generated for 2024 from the Pre-Spin Projects, Defendants guided investors towards lofty revenue targets for FY24.

69.    On March 11, 2024, during the conference call to discuss Fortrea's fourth quarter ("4Q23") and FY23 financial results (the "FY23 Earnings Call"), defendant McConnell told investors that Fortrea was "targeting full year 2024 total revenue in the range of $3.14 billion to $3.21 billion."

70.    The following quarter, during the May 13, 2024 conference call to discuss Fortrea's first quarter ended March 31, 2024 ("1Q24") financial results (the "1Q24 Earnings Call"), Defendants lowered Fortrea's revenue guidance for FY24 to a range of $2.785 billion to $2.855 billion, citing "slower study start-up due to the therapeutic mix and certain biotech programs" and "lower-than-anticipated first quarter book-to-bill and lower recent pass-through trends."

71.    Indeed, Defendants reinforced throughout FY24 the notion that the backlog of Pre-Spin Projects remained strong and would be meaningful for 2024.  During the August 12, 2024 conference call to discuss the Company's financial results for 2Q24 (the "2Q24 Earnings Call"), defendant McConnell pointed to the Company's "backlog of more than $7 billion" as a key reason that Fortrea remained "a long-term value creation opportunity for [its] investors."  Similarly, during the November 8, 2024 conference call to discuss the Company's third quarter ended September 30, 2024 ("3Q24") financial results (the "3Q24 Earnings Call"), defendant McConnell touted the Company's "attractive backlog of nearly $7.6 billion."

72.    Former employee 1 ("FE1"), a former employee of Fortrea who, from the span of March 2004 to February 2025, worked as Director of Technology Engagement, then Senior Director of Technology Engagement, and finally Executive Director of Technology Engagement, recounted that Fortrea was not bringing in significant new business following the Spin-Off, but rather relied heavily on the Pre-Spin Projects to provide revenue for the Company.

73.    Yet, at the same time, FE1 recounted that it was well known throughout the Company that the trials and other projects associated with the Pre-Spin Projects had little work left on them. According to FE1, it was common knowledge throughout the organization since the time of the Spin-Off that the backlog of Pre-Spin Projects simply was not producing enough revenue to carry the Company.

74.    FE1 described an atmosphere of pervasive boredom and anticipation.  Employees in the drug-development department had too much time on their hands, leading everyone in the Company to anxiously await new bookings.  Indeed, FE1 specifically recalled asking the Individual Defendants to provide more color on the Company's pipeline of new contracts at a Fortrea town hall event (the Individual Defendants brushed off the question, according to FE1).

- 17 -

75.     Thus, throughout the Class Period, Defendants conditioned investors to expect that the Company's Pre-Spin Projects would serve as a strong foundation for future revenue, and specifically for FY24 revenue, without disclosing that the Pre-Spin Projects, many late in their lifecycle, already had "a lot of hours in them" and, under their terms, would provide less revenue and less profitability on an annual basis going forward.

**Analysts and Investors Were Highly Attuned to the Pre-Spin Projects**

76.     Throughout the Class Period, analysts consistently tracked Fortrea's backlog and the Company's reliance on the Pre-Spin Projects to provide meaningful revenue.

77.     For example, on August 7, 2023, an analyst from BofA Global Research published a report on Fortrea and highlighted that Fortrea's "ending backlog grew to $8,899 (+8.3% y/y, +3.2% q/q)" and noted that "[a]lthough these are healthy backlog and book-to-bill metrics, management has cautioned that some customers have delayed awarding Fortrea new work ahead of the company's spin-off[.]"  In other words, at the time of the Spin-Off, Defendants made clear that the Company's supposedly strong backlog consisted primarily of the Pre-Spin Projects.  Thus, analysts were led to believe that Fortrea's purportedly "healthy" backlog consisted primarily of the Pre-Spin Projects, as new bookings were slower following the Spin-Off.

78.     Indeed, this sentiment regarding Fortrea's backlog and the importance of the Pre-Spin Projects continued into 2024.  On May 13, 2024, an analyst from Jefferies Equity Research issued a report on the Company's 1Q24 results and stated that "[n]otably, backlog only increased by $33M to $7.425B."

79.     Similarly, an analyst report issued by Deutsche Bank Research on August 12, 2024 stated that "one of the key foci on the conference call this morning will be the 0.96x book-to-bill in the quarter; this follows a 1.11x in 1Q24 ***and backlog decreased by (1%) [quarter-over-quarter]***."

80.    Finally, on October 18, 2024, an analyst from Deutsche Bank Research issued a report on Fortrea and noted that the Company had "***muted backlog growth*** and bookings through 1H24."

81.    Thus, throughout the Class Period, analysts and investors closely monitored the Company's backlog, with the understanding – which had been provided by Defendants – that, regardless of new bookings, the Pre-Spin Projects would serve as a strong foundation for meaningful revenues, especially in 2024.

**Following the Spin-Off, Fortrea's SG&A Significantly Increased Throughout the Class Period**

82.    By the start of the Class Period, Fortrea had significantly higher SG&A than its competitors.  According to Fortrea's FY23 Form 10-K, SG&A expenses "consist primarily of administrative payroll and related benefit charges, advertising and promotional expenses, administrative travel and an allocation of facility charges and information technology costs."  These costs include many of the services and business systems provided by Labcorp to Fortrea pursuant to the TSAs.

83.    SG&A ballooned in 2024.  Indeed, SG&A as a percentage of revenue increased year over year in ***each fiscal quarter*** for FY24.  In 1Q24, Fortrea's SG&A as a percentage of revenue was 18.14%.  In 2Q24, Fortrea's SG&A as a percentage of revenue was 23.58%.  For 3Q24, Fortrea's SG&A as a percentage of revenue was 20.20%, compared to 14.96% in 3Q23 (Fortrea's first fiscal quarter as a standalone company).  In total, SG&A costs in FY24 were $560.7 million, or 20.79% of Fortrea's revenue.

84.    The following table shows Fortrea's revenues, SG&A expense, and payments made to Labcorp (per Labcorp's public SEC filings).  It also shows SG&A compared to revenue, and what portion of SG&A came from the TSAs.  Dollar figures are in millions:

| Quarter | Revenue | SG&A Expense | TSA Payments to Labcorp | SG&A as a Percentage of Revenue | TSA Costs as a Percentage of SG&A |
|---|---|---|---|---|---|
| **3Q23** | $ 713.8 | $ 106.8 | $ 22.7 | 14.96% | 21.25% |
| **4Q23** | $ 709.7 | $ 126.7 | $ 23.4 | 17.85% | 18.47% |
| **1Q24** | $ 662.1 | $ 120.1 | $ 22.4 | 18.14% | 18.65% |
| **2Q24** | $ 662.4 | $ 156.2 | $ 22.9 | 23.58% | 14.66% |
| **3Q24** | $ 674.9 | $ 136.3 | $ 18.4 | 20.20% | 13.50% |
| **4Q24** | $ 697.1 | $ 148.1 | $ 16.3 | 21.25% | 11.01% |
| **1Q25** | $ 651.3 | $ 121.8 | $ 3.3 | 18.70% | 2.71% |

85.     As the above table shows, Fortrea's SG&A costs compared to revenue generally trended *up* even as TSA payments to Labcorp trended *down*.  Yet investors – based on Defendants' repeated misrepresentations – were led to believe SG&A was increasing *because of* the TSAs.

86.     Prior to the Class Period, for the fiscal year ended December 31, 2022 ("FY22"), Fortrea's SG&A costs were $279.8 million, or just 9.03% of the Company's revenue.  These costs ballooned to $560.7 million, *over 20% of revenue*, by the end of the Class Period.

**Defendants Primarily Attributed the Increase in SG&A to the TSAs**

87.     Throughout the Class Period, Defendants regularly attributed Fortrea's ballooning SG&A expenses to the TSAs and incremental costs to exit the TSAs.

88.     For example, in the 3Q23 Form 10-Q, which disclosed an 11.6% increase in SG&A costs year over year, the Company represented that "the increase [in SG&A] was primarily due to an increase in . . . transition service agreement costs. . . ."  The Company parroted this exact same language to explain the increase in SG&A year over year in the FY23 Form 10-K.

89.     Indeed, on November 13, 2023, during the earnings call to discuss the Company's 3Q23 financial results (the "3Q23 Earnings Call"), defendant McConnell represented that "SG&A was higher year-on-year by 11.6% due to . . . the addition of transition services agreement costs. . . ."

90.     On January 10, 2024, during the JPMorgan Healthcare Conference (the "January 2024 Conference"), defendant McConnell represented that Fortrea "exited about 40% [of the TSAs] in our first 6 months as a stand-alone company, slightly ahead of schedule.  2024 is the more complex year.  There are – this is where all the system technology ones that we really have to exit and those are the ones that are really key to unlocking a lot of that margin optimization."  Defendant Pike also asserted that the TSAs "force us into a cost structure that's higher than we would like."

91.     On March 11, 2024, during the 4Q23 Earnings Call, defendant McConnell represented that "SG&A in the quarter was higher year-over-year by 56.2% due primarily to stand alone operational and TSA costs."

92.     Moreover, in the Company's Form 10-Q dated August 12, 2024 (the "2Q24 Form 10-Q"), where the Company disclosed a 59.7% increase year over year in quarterly SG&A, the Company represented that "[t]he increase was primarily due to incremental costs incurred to exit the Transition Services Agreement with Labcorp" during the quarter.

93.     Similarly, in the Company's Form 10-Q dated November 8, 2024 (the "3Q24 Form 10-Q"), which disclosed a 27.6% increase in quarterly SG&A year over year, the Company attributed the increase to "other costs to support the exit of the Transition Services Agreement with Labcorp[.]"  The Company parroted this exact language to explain the increase in SG&A year over year in the FY24 Form 10-K.  During the 3Q24 Earnings Call, defendant McConnell stated that "SG&A in the quarter was higher year-over-year by 27.6%, primarily due to an increase in professional fees and incremental onetime costs incurred for exiting the TSA."

**Defendants Falsely and Repeatedly Assured Investors
that the TSA Exit Strategy Would Decrease SG&A**

94.    Defendants insisted that their devised TSA Exit Strategy, which included "detailed

TSA exit plans" to "move [Fortrea's] SG&A spend closer in line with peer benchmarks" would

cause Fortrea's SG&A to decrease.

95.    According to Defendants, the TSA Exit Strategy would involve procuring and

implementing necessary business systems such that Fortrea would no longer need to rely on Labcorp

to provide such services.  Although the TSA Exit Strategy would involve incurring certain one-time

costs to procure and implement new business systems, the result – according to Defendants – would

be lower SG&A.

96.    By lowering SG&A, Fortrea's operating margins and EBITDA would increase, as

SG&A as a percentage of revenue would decrease (improving margins), leading to higher earnings

(improving EBITDA).   These improvements would purportedly allow Fortrea to be more

competitive with its peers.

97.    For example, during the Company's Investor Day on June 6, 2023, defendant

McConnell told investors that as Fortrea "exit[s] TSAs over the next 24 months, stand-up costs will

trend down[.]"   Further, defendant McConnell explained that the TSA Exit Strategy would

"prioritize . . . select infrastructure investment to enable timely exit of the TSAs with Labcorp" and

that the Company would attain "margin expansion" through "building fit-for-purpose infrastructure."

Thus, once Fortrea procured and implemented business systems and other infrastructure – which

would purportedly be cheaper to maintain than paying Labcorp to provide that service – Fortrea

could exit the related TSA and, according to Defendants, reduce SG&A.

98.    Similarly, during the 2Q23 Earnings Call, defendant McConnell stated that "[w]e are

identifying improvements through sourcing and procurement and are finalizing our TSA exit

strategies to replace them with more fit-for-purpose infrastructure. We are prioritizing margin improvement efforts and continue to expect to move towards peer margin levels over time." During the same 2Q23 Earnings Call, defendant Pike represented that "we see addressing SG&A as well as programmatically exiting the TSAs with the parent on time as key activities that will improve our cost structure and aim to make our margins on par with industry leaders over coming years."

99.    During the 3Q23 Earnings Call, defendant Pike explained that the TSA Exit Strategy would involve "exiting arduous TSAs," which would, in turn, "deliver[] a cost structure that is appropriate for a clinical services CRO."

100.    During that same conference call, defendant McConnell explained that Defendants "recognize the tremendous opportunity in front of us to reduce our SG&A costs and bring EBITDA margins closer to peer levels, having been launched as a lift and shift spin-off. In the third quarter, we embarked on our journey of margin improvement and business transformation and have identified multiple levers to enhance margins over time. *We now have readouts on how we compare to our peers for each SG&A function as well as more detailed plans for the changes we can make to improve our SG&A cost as a percent of revenue*. The improvements will come in phases over the next few years as some are *heavily dependent upon exit of the TSA agreement*."

101.    Defendant McConnell further explained during the same conference call that Fortrea "need[s] to exit the TSAs as soon as possible to avoid incremental unplanned costs and to improve margins. This is a complex and expensive effort as systems, infrastructure and processes in many areas remain heavily integrated. We are dependent on support from our former parent to complete many of the exits." According to defendant McConnell, the TSA Exit Strategy was a "top priority," and Fortrea "built detailed TSA exit plans with the goal of *exiting the majority of the TSAs by the end of 2024*."

102.    Thus, by exiting the majority of the TSAs by the end of 2024, the Company should have seen a decrease in SG&A costs, and subsequent increases in margins and EBITDA, shortly thereafter.  Indeed, during the 3Q23 Earnings Call, defendant McConnell explained that "2025 and beyond *will benefit from the reduced cost infrastructure*, post the TSA exit along with increased automation, more efficient resource utilization and moving our SG&A spend closer in line with peer benchmarks."  Defendant Pike similarly explained that same day that "*if we can exit the majority of TSAs in 2024* . . . we believe we'll be able to get back to the margins we had in 2022."

103.    During a January 10, 2024 JPMorgan Healthcare Conference (the "January 2024 Conference"), defendant McConnell explained that, pursuant to the TSA Exit Strategy, once the Company exits a TSA, "those owners have been tasked with coming back with a replacement system or technology or process that is more cost effective."  Thus, according to defendant McConnell, "*getting through all those TSAs is really critical to unlocking that next step in margin expansion* versus like individual TSAs in particular."

104.    Then, during the FY23 Earnings Call on March 11, 2024, defendant McConnell told investors that "[i]n 2025, we expect to realize margin improvement from revenue growth in line with market growth rates and with our post TSA exit, including a streamlined cost infrastructure, increased automation and optimized resource utilization.  We believe this transformation will enable us to reduce our SG&A expenses and empower us to deliver projects faster and more efficiently for our customers. Assuming our ability to continue to drive quarterly book-to-bill metrics of at least 1.2x and exiting our TSAs per our current plans, we would target 2025 adjusted EBITDA margins consistent with 2022 on a full year basis of approximately 13%."

105.    Also during the FY23 Earnings Call, Defendants continued to mislead investors to believe that, while margins would not improve immediately, improvement was not far off.  Indeed,

defendant McConnell misled investors with an unattainable promise that SG&A would improve in "early 2025" or even "at the end" of 2024:

> SG&A should improve based on what we're doing. But the challenge there, again, is the timing of the TSA exits. And because they're largely Q3 really Q4, you won't see a huge amount of the improvement there until right at the end or even into early 2025. So I think you'll see more improvement in the cost of sales margin in the back half of this year before SG&A and then SG&A will pick up and really start to accelerate in 2025.

106.    Based on the SG&A improvements from the TSA Exit Strategy, Defendants guided to an adjusted EBITDA target of $280 million to $320 million for FY24, with "2/3 [of the adjusted EBITDA] in the second half." Indeed, defendant McConnell noted that, for FY24, Fortrea was "targeting the ***second half margin to improve from*** the revenue returning to market growth rates on improved productivity from our employee base along with ***the benefit of the anticipated cost reduction initiatives and TSA exits late in the year***."

107.    Moreover, defendant McConnell told investors that they "expect to be on track with the previously shared margin improvement target of exiting 2024 and entering 2025 at a run rate around a 13% adjusted EBITDA margin."

108.    Thus, according to Defendants, the TSA Exit Strategy would decrease SG&A, thereby increasing EBITDA and EBITDA margins. Based on the purported benefits of the TSA Exit Strategy, Defendants guided to adjusted EBITDA of between $280 and $320 million in FY24, as well as an adjusted EBITDA margin of 13% for FY25.

109.    The next day, during a Barclays Global Healthcare Conference on March 12, 2024 (the "March 2024 Conference"), defendant Pike told investors that "one of the most important things this year is that we will be exiting the transition service agreements from our former parent company. And this is really what unlocks the opportunity to improve the margins in the SG&A here." Similarly, defendant McConnell stated "you're going to see that there's a lot of opportunity

in SG&A and exiting those TSAs at the tail end of this year will give us that opportunity for 2025." Defendants also reinforced the 13% EBITDA margin guidance for FY25.

110.    By the end of 1Q24, Fortrea had exited "roughly half" of the TSAs and had "robust plans in place to exit the majority of the remaining TSAs around the end of 2024." Yet despite having already exited half of the TSAs, SG&A had not begun to decrease. Indeed, SG&A, as a percentage of revenue, increased to 18.14% for 1Q24, compared to 17.85% from the previous quarter, and Fortrea reported just $29.5 million in adjusted EBITDA, down from $58.2 million in the previous quarter. Nevertheless, Defendants continued to mislead investors about the benefits of the TSA Exit Strategy in FY24.

111.    During the 1Q24 Earnings Call, defendant McConnell implored investors to "see the significant opportunity we have to improve margins, post full TSA exit, by reducing our SG&A costs as a percent of revenue over time" through the TSA Exit Strategy. Additionally, defendant McConnell told investors that the TSA Exit Strategy would "start to benefit [Fortrea] in 2025, where we expect to realize margin improvement arising from revenue growth and operational productivity as well as our post-TSA streamlined SG&A cost infrastructure."

112.    Also during the 1Q24 Earnings Call, Defendants reduced their lower end of EBITDA guidance by $40 million, from a range of $280 million to $320 million to a range of $240 million to $260 million. In lowering guidance, however, Defendants made clear the drop in EBITDA guidance was driven by decreased projected revenue. According to defendant McConnell, the decrease in revenue was caused by "slower study start-up due to the therapeutic mix and certain biotech programs, our lower-than-anticipated first quarter book-to-bill and lower recent pass-through trends," as well as "lower service fee revenues" in 1Q24.

113.    Indeed, defendant McConnell made clear that Fortrea planned to reduce its costs to offset the decline in revenue, telling investors that Defendants had "taken a number of actions to reduce the typical drop-through of revenue reductions." Among these actions were the "robust plans in place to exit the majority of the remaining TSAs around the end of 2024[,]" which would cause Fortrea "to see benefits emerge later this year[.]" Thus, even though Defendants guided to lower EBITDA, Defendants continued to maintain that the TSA Exit Strategy would still produce lower SG&A by the end of FY24.

114.    On the 2Q24 Earnings Call, defendant McConnell told investors that "[o]n SG&A . . . *we expect to begin to see benefits emerge towards the end of the year with other improvements planned for 2025 and beyond as we fully exit the TSA* and adopt these more efficient infrastructures." Indeed, defendant McConnell told investors that the TSA Exit Strategy was "critical for [Fortrea] to be competitive with [its] peers."

115.    Despite telling investors that SG&A would improve by the end of FY24, Defendants again lowered EBITDA guidance, from a range of $240 million to $260 million to a range of $220 million to $240 million. Just as Defendants had told investors in 1Q24, they again insisted that the decrease was due to lower projected "service fee revenue," as defendant McConnell stated: "To get to our revised midpoint of $230 million, we are targeting service fee revenue growth to contribute $40 million to $50 million, *along with continued operational and SG&A optimization to contribute $15 million to $25 million*."

116.    During a Morgan Stanley Global Healthcare Conference on September 4, 2024, Defendants again chose to speak about the benefits of the TSA Exit Strategy going forward. When asked by an analyst about the EBITDA margin for the next year, defendant McConnell told analysts

and investors that "roughly half" of the EBITDA margin improvement "will come from SG&A[,]" and specifically from "the TSA exits[.]"

117.    On the 3Q24 Earnings Call, Defendants continued to mislead investors about the nature of the TSA Exit Strategy cost benefits.  Defendant McConnell told investors during the earnings call that: "We know that given our current margins, **we need to deliver savings elsewhere** to fund these investments. **We expect to exit the vast majority of the TSA services by year-end**, with a limited number being exited early in 2025 to ensure business continuity through 2024 year-end. We are continuing with targeted programs to reduce costs, including programs intended to better align our resources with the needs of specific projects while reducing pockets of lower productivity."

118.    Also during the 3Q24 Earnings Call, defendant McConnell told investors that "**the timing of those TSA exits is really critical because they are essential**. **We believe we're on track for year-end**, but there's still a lot of work.  And obviously, as I mentioned, two big systems getting ready to go live, and those are **absolutely essential for us in terms of moving into the next generation of SG&A improvement**."  Moreover, defendant McConnell represented to investors on the 3Q24 Earnings Call that "we really do need to exit those TSAs in SG&A to start to be able to drive the really different model."  Defendants then reaffirmed FY24 EBITDA guidance of $220 to $240 million.

119.    Even as Defendants lowered guidance throughout FY24, they consistently reassured investors that the TSA Exit Strategy would begin to decrease SG&A by the end of FY24.  Lower SG&A was critical to Fortrea, as it needed to move its margins closer to its competitors in order to attain long-term financial success.

120.    Thus, as Defendants frequently represented throughout the Class Period, exiting the TSAs by the end of 2024 was critically important to Fortrea.  According to Defendants, exiting the

TSAs by the end of 2024 was the key to unlocking cost-savings, thus lowering SG&A and increasing EBITDA and EBITDA margins in FY24 and FY25.

**Analysts and Investors Were Highly Attuned to Defendants' TSA Exit Strategy**

121.    Throughout the Class Period, Defendants made clear that the TSA Exit Strategy would be the primary driver for reducing SG&A costs, thus improving EBITDA and EBITDA margins.

122.    Analysts took these representations at face value, incorporating them into their projections and models.  Investors and analysts closely monitored the status of the TSA Exit Strategy, believing that the TSA Exit Strategy would be the primary driver of improving SG&A, EBITDA, and EBITDA margins.  For example, on August 15, 2023, an analyst from Barclays Equity Research issued a report on Fortrea and stated that "[t]he key focus will be on '24 EBITDA, and we model $317m on $3,169m of revenue, ***implying 10% EBITDA margins and 112bps expansion for the year***. We base this off of . . . *~50bps from lower cost from exiting TSAs*[.]" Further, the report stated that "[o]n the TSAs, management explained that these will roll-off over time.  As such, we would expect partial benefit in '23 ***and most of this benefit to come in '24***."

123.    Similarly, on November 14, 2023, an analyst from Barclays Equity Research issued a report on Fortrea, stating that "[t]he last piece is on the TSAs unwinding, and we should start getting more clarity on how those will flow through to margins in the later part of next year" and "we see a pretty clear path to mid-teens EBITDA."

124.    The fixation on the TSA Exit Strategy continued for analysts and investors into 2024. On January 5, 2024, an analyst from William Blair Equity Research issued a report on Fortrea and noted "***[b]eyond 2024, Fortrea should also benefit from exiting its existing TSAs with Labcorp***, with management ***pointing to another couple hundred basis points of margin expansion from 2024 through 2026***."

125.    Likewise, on January 8, 2024, an analyst from Evercore ISI issued a report on Fortrea and stated "***we are pleased that the TSA exits are continuing***. The announcement of having ***exited ~ 40% of the TSAs is a step-up from the 28 on the company's 3Q earnings call and is a demonstration of the seriousness of management's focus[.]***"

126.    On March 11, 2024, numerous analysts issued reports relying on Defendants' representations:

(a)    Bank of America wrote: "Post TSA exits, in FY25, Mgmt. looks to grow in line with the market and reduce SG&A expenses to achieve adj. EBITDA margin of ~13% for the year.  FTRE expects to further expand margins into the 'upper mid-teens.'"

(b)    Jefferies noted that the "13% EBITDA [m]argin in 4Q24 and [b]eyond" was "an explicit target from mgt."  Jefferies also commented that, given that most TSAs were still "left to be terminated," "the areas for cost cuts are obvious."

(c)    Deutsche Bank added that the 13% guidance for 2025 was a "floor," or minimum, for Fortrea.

(d)    William Blair agreed, opining that "there should be ample room for [2025] margin expansion" even beyond the 13% stated by management, "as top-line growth accelerates and the company exits the remaining 60% of its TSAs, streamlines its cost infrastructure, optimizes its resource utilization, and continues to invest in cost-saving automation technologies."

127.    Also on March 11, 2024, analysts from Evercore ISI shared "Notes" from their "Follow Up with FTRE Management[.]"  In response to a question "on the Accenture and Cognizant spending[,]" Fortrea representatives responded as follows (paraphrased and reported by Evercore):

FTRE is keeping the run costs from the TSAs from LH in the normal number but there was a big step-up in the spin-related add-back in the adj.  EBITDA, which is where the costs are currently.  ***The price and the deal with Cognizant in the long term is going to help bring IT costs down which will result in TSA costs swap out***

- 30 -

*and come in at a better rate*.  SG&A costs should not be going up from here and they should be coming down.  FTRE will be restating their SG&A to be in line with peers and the costs will start to come down over time, *particularly towards the end of this year and into 2025*.

128.    Thus, Defendants led the market to believe that as a result of "the price and the deal with Cognizant," SG&A costs would start to come down "towards the end of [2024] and into 2025."

129.    On May 13, 2024, an analyst from Evercore issued a report on Fortrea and noted that Fortrea "*still expect[s] to exit at 13% at the end of this year*. [Management] said in terms of the makeup, *~1/4 of the margin improvement will come from the SG&A cost actions* but FTRE won't get the full benefit until the TSAs are exited."  Indeed, the analyst also noted that Fortrea "is on track to exit the majority of [the TSAs] by the end of this year. The more costly TSAs will be coming out in the back end of the year."

130.    On June 5, 2024, an analyst from Jefferies Research Services stated in a report that Fortrea "still believes that it can *exit '24 with ~13% EBITDA margin, supported by TSA exits and better 2H revenue. [Fortrea] is now out of 50% of TSAs, with the majority of them rolling off by the end of '24.*"

131.    On August 12, 2024, more than a year after the Spin-Off, an analyst from Barclays Equity Research issued a report on Fortrea and explained that "*[t]he lone bright spot [for 2Q24] was on margins*, in our view, which came in above management's commentary and [short term] expectations, highlighting better [operational expenses] *likely due to exiting TSAs a little faster than expected*."  Similarly, an analyst from BofA Global Research noted in an August 12, 2024 report that Fortrea, "having now exited 60% of TSAs (vs 50% in 1Q), [] continues to expect to leave much of the remaining TSAs by year-end and a limited number in early 2025."

132.    In December 2024, Fortrea cancelled two conference appearances as well as a planned non-deal-roadshow, and told analysts that Fortrea "made a decision not to communicate

until after the close of [FY24]." Following this announcement, Fortrea did not communicate with the public until March 2025, leaving investors and analysts in the dark as to whether the TSA Exit Strategy was successful, and whether Fortrea would realize the cost savings Defendants had consistently touted for the end of 2024.

**Defendants Could Not Replace TSA Costs
with Cheaper Internal or Third-Party Infrastructure**

133.    Pursuant to the TSAs, which were dated and filed with the SEC on June 28, 2023, Fortrea and Labcorp agreed that "[i]t is the intent of the Parties that, except as otherwise provided in this Agreement, the Services be provided at cost" and that the fees set forth in the TSAs "were calculated to reflect costs."

134.    According to the July 2023 Form 8-K, Labcorp provided the following services and assets to Fortrea pursuant to the TSAs: (i) hosting and support for IT, network, security, and appications; (ii) accounting and finance; (iii) operations, marketing, and procurement; (iv) human resources, payroll and benefits; (v) treasury; (vi) insurance accounting and claims processing; (vii) facilities, environmental health and safety; (viii) tax matters; and (ix) administrative services.

135.    Thus, by the start of the Class Period, Fortrea was paying Labcorp to provide a host of services pursuant to the TSAs ***at cost***.

136.    In order to exit a specific TSA, Fortrea needed to implement its own version of the service or asset provided by Labcorp (or obtain it from elsewhere), and provide 60 days written notice that Fortrea had implemented its own version of the service or asset, as well as other requirements.

137.    According to defendant McConnell during a June 6, 2023 Investor Day prior to the Spin-Off, exiting the TSAs would include "building fit-for-purpose infrastructure" as well as "leveraging of [Fortrea's] external service partners." Defendant McConnell also explained that

Fortrea would engage in "infrastructure investment to enable timely exit of the TSAs with Labcorp." In other words, in order to exit the TSAs, Fortrea needed either to build its own version of the system or service provided by Labcorp, or find a third-party service provider to supply the service to Fortrea.

138.    Critical to the success of the TSA Exit Strategy, however, was that Fortrea replace the TSA services with lower cost services, which would lead to a commensurate decrease in Fortrea's SG&A.  As defendant McConnell explained during the June 6, 2023 Investor Day, Fortrea was "focused . . . not just [on] exiting [the TSAs], but exiting them with an infrastructure that's more fit-for-purpose[,]" *i.e*, ***cheaper*** infrastructure.

139.    Indeed, during the January 2024 Conference Call, defendant McConnell explained that:

> [for]these [TSA] exits, ***it's really what we replace them with***.  And so every single one of those exits, ***those owners have been tasked with coming back with a replacement system or technology or process that is more cost effective*** and so really, as we go through, we've talked a little bit about where we think we would exit 2024, getting through all those TSAs is really critical to unlocking that next step in margin expansion versus like individual TSAs in particular.

140.    Thus, pursuant to the TSA Exit Strategy, Defendants needed to replace the TSA services with lower cost services by the end of FY24, in order to "unlock [the] next step in margin expansion."

141.    But Labcorp was already providing many, if not all, of these services at cost, meaning it was nearly impossible for Defendants to implement cheaper infrastructure.  To make matters worse, on January 4, 2024, Fortrea announced that the Company selected Cognizant, a global IT consulting and outsourcing company, to serve as "Fortrea's strategic technology transformation provider."  According to Fortrea, "Cognizant [would] play a fundamental role in the exit from Fortrea's Transition Service Agreements with its former parent company, facilitating a smooth

switch and the establishment of the global Fortrea infrastructure, application management, and end-user services."

142.    According to Alejandro Martinez-Galindo ("Martinez-Galindo"), the Company's Chief Information Officer, Cognizant and Fortrea would work to "build the infrastructure that's essential to supporting [Fortrea's] platforms." Moreover, during the FY23 Earnings Call, defendant Pike told investors that "Cognizant will consolidate our infrastructure, hybrid cloud and application support."

143.    Also during the FY23 Earnings Call, defendant Pike announced that Fortrea hired Accenture, a global IT services and management consulting firm, to serve as Fortrea's "managed security services partner" as well as to "help [Fortrea] transition to a new enterprise resource planning system."

144.    Thus, Fortrea relied on third-party service providers to procure, implement, and support its business. These third-party service providers typically implement software and other services from additional parties, and then manage and support integration efforts after implementation.

145.    FE1 was tasked with, among other things, executing the exit and transition of a number of the Company's systems from Labcorp to Cognizant, such as customer relationship management systems and pharmacy systems. Because FE1 was responsible for certain TSA exits, FE1 participated in weekly "TSA Steering Committee" meetings during which the participants discussed the status of the TSA Exit Strategy. The TSA Steering Committee included FE1's direct superior and CIO, Martinez-Galindo, as well as consultants from Ernst & Young. Martinez-Galindo was a direct report to defendant Pike and a colleague of defendant McConnell – making FE1 just one level removed from the Individual Defendants.

146.    According to FE1, the TSA Steering Committee routinely discussed the progress of the TSA Exit Strategy.  Indeed, the TSA Steering Committee had "road maps" that tracked the progress of each TSA exit and showed the projected costs and timelines for each individual TSA.

147.    Moreover, according to FE1, the TSA Steering Committee kept track of the budget for each TSA exit.  As FE1 explained, if Fortrea was over-budget by any amount for a TSA exit, FE1 or Martinez-Galindo was required to request approval from defendant McConnell for the overage, regardless of the amount.  Defendant McConnell personally signed off on any and all increases to the budget for the TSA Exit Strategy.  FE1 described defendant McConnell as attentive to costs at an extremely granular level.

148.    FE1 confirmed that Fortrea was routinely over-budget on the costs paid to Cognizant to assist in the TSA Exit Strategy.  Some of these overages were due to Cognizant habitually "nickel-and-diming" Fortrea over technicalities and fine-print, according to FE1.

149.    FE1 added that, due to these runaway Cognizant costs, the TSA Steering Committee requested approval from defendant McConnell to spend more than the allocated budget on numerous occasions, including in 2Q24, 3Q24, and 4Q24.

150.    According to FE1, because Fortrea engaged Cognizant to assist in exiting the TSAs pursuant to the TSA Exit Strategy, and because Fortrea was already paying Labcorp to outsource these same services, exiting the TSAs would produce virtually no savings in infrastructure or hardware costs by the end of 2024.

151.    Hence, given that FE1 confirmed that exiting the TSAs would not save Fortrea significant amounts of money on infrastructure or hardware, it follows that the TSA Exit Strategy would not lower SG&A as Defendants had represented to investors.

152.    Former employee 2 ("FE2") is a former employee of Fortrea who worked as Category Manager for IT, Procurement Director, or Director of Purchasing from July 2016 to June 2024. Among FE2's duties was to oversee IT management and the purchasing of certain hardware, software, and other applications, many of which were covered by the TSAs.

153.    FE2 confirmed that Labcorp provided a host of applications and other services to Fortrea *at cost* through at least the beginning of 2024 (and presumably later in 2024 as well, though FE2 could not speak to that from personal knowledge). For example, by the end of 2023, Fortrea no longer relied on Labcorp's purchasing and financial personnel, but continued to use Oracle, Labcorp's purchasing and financial platform. Fortrea personnel utilized Labcorp's Oracle platform for invoicing and bill payments. According to FE2, Labcorp provided these Oracle services *at cost* through at least April 2024, and it was FE2's understanding that these services would continue to be provided by Labcorp at cost through the end of 2024 – meaning Labcorp charged Fortrea no premium or markup to use the platform. The costs charged by Oracle to Labcorp for Fortrea's usage – whether by number of users, or number of subscriptions, or number of logins, or some other similar arrangement – were passed along by Labcorp to Fortrea for the Company to pay.

154.    FE2 further recounted that FE2 was notified of the Company's decision to engage Cognizant for managed IT services in July 2023, shortly before the Company signed the engagement agreement with Cognizant. As Procurement Director, FE2 was responsible for obtaining signatures on behalf of the Company for the engagement agreement. According to FE2, the engagement with Cognizant was a sole source contract, meaning there was no competitive bidding process for the engagement.

155.    FE2 recalled being "blindsided" by the decision, as FE2 typically oversaw the procurement process for IT or managed service provider engagements. FE2 sensed that the entire IT

team likewise felt blindsided.  Moreover, FE2 felt that the cost to be paid by Fortrea under the contract was excessive compared to the services to be provided by Cognizant, based on FE2's experience with managed service providers.

156.    FE2 voiced concerns to their direct superior and Fortrea's Chief Procurement Officer, Duncan Whalen, questioning whether the engagement with Cognizant would lead to any SG&A savings, as Labcorp was already providing many of these services to Fortrea at cost.  According to FE2, it would have been more cost-effective and efficient for Fortrea to transition the TSA services from Labcorp in-house or through another provider, as opposed to outsourcing these services to Cognizant, which had higher costs than FE2 believed necessary for the scope of the agreement.

157.    As confirmed by FE2, the TSA Exit Strategy would not cause the Company's SG&A to decrease because Fortrea was already receiving many of these services from Labcorp *at cost* pursuant to the TSAs.  Instead, Fortrea would merely be shifting one fixed cost for a similar, if not higher, fixed cost from Cognizant.

158.    Thus, FE2 confirmed the TSA Exit Strategy could not lead to a significant decrease in SG&A by the end of FY24, in FE2's assessment.  FE2 held this opinion from when FE2 first learned of the Cognizant arrangement.

159.    According to FE2, management promoted the Cognizant engagement internally as a cost-saving strategy – but even management admitted the savings would only be recognized long-term.  In or about July 2023, FE2 was shown cost models – created by the IT team and approved by both Martinez-Galindo and defendant McConnell – showing that the shift from Labcorp's services pursuant to the TSAs to Cognizant would take *three or more years* for the Company to realize SG&A savings.

160.    Therefore, the TSA Exit Strategy would not result in "replacement system[s] or technolog[ies] or process[es] that [were] more cost effective[,]" but instead led to similar, if not higher, costs for the same services provided by Labcorp pursuant to the TSA.  In other words, the TSA Exit Strategy would not cause Fortrea to incur lower SG&A, as Fortrea was merely replacing one infrastructure cost for another, as Fortrea shifted from paying Labcorp (at cost) to paying Cognizant and Accenture (not at cost).

161.    Indeed, throughout the Class Period, SG&A costs increased despite the fact that Fortrea's payments to Labcorp pursuant to the TSAs incrementally decreased, as depicted by the below chart:



162.    Accordingly, as Defendants knew, the TSA Exit Strategy was, from its inception, wholly ineffective in reducing SG&A and increasing both adjusted EBTIDA and adjusted EBITDA margins.

**Defendants Are Forced to Admit the TSA Exit Strategy was a Failure
and the Pre-Spin Projects Had Little Remaining Revenue**

163.    The fraud perpetrated by Defendants quickly unraveled throughout FY24.  First, on

August 12, 2024, during the 2Q24 Earnings Call, Defendants were forced to admit that the Company

could not achieve the previously targeted 13% adjusted EBITDA margin for 4Q24 and, instead,

Fortrea "would target to deliver an adjust EBITDA margin in the 11% to 12% range for the fourth

quarter of 2024" as well as 2025.  Additionally, Defendants lowered adjusted EBITDA guidance

from a range of $240 million to $260 million to a range of $220 million to $240 million.

164.    Based on this revelation, Fortrea's common stock price fell 20.35%, from a close of

$25.16 per share the previous trading day to $20.04 per share at market-close on August 12, 2024.

Defendants, however, continued to mislead investors about the true nature of SG&A, telling

investors that Fortrea still expects to "begin to see benefits emerge towards the end of the year with

other improvements planned for 2025 and beyond as we fully exit the TSA and adopt these more

efficient infrastructures. As you can see from our SG&A expense line item, this is critical for us to

be competitive with our peers."

165.    Also on August 12, 2024, Jefferies lowered its Fortrea price target from $32 per share

to $25 per share.  In the same analyst report (the "August 2024 Jefferies Report"), Jefferies

explained, *inter alia*, that the TSA exits would merely "swap one cost for another":

> TSA Translation to SG&A. 2Q EBITDA "Quality" was low, with significant IT costs
> flowing through one-time charges.  The magnitude of those one-timers reflect large
> investments in standing up new, independent systems, including their operating
> costs.  We have struggled with this factor, and we don't think it is fully understood.
> Rather than gaining immediate cost leverage when duplicative systems are exited
> (TSA exits), mgt is already excluding one side.  Thus, the exits swap one cost for
> another, and only when/as the size of the investment (servers, applications, support
> staff) is rationalized does FTRE see add'l leverage.

166.    Jefferies elaborated a month later, in the September 2024 Jefferies Report:

- 39 -

**TSA Cost Savings Not as Material as One Might Think.** FTRE's mgt has pointed to TSA exits as a way to unlock cost savings. The problem: IT infrastructure costs to exit the TSAs are already non-GAAPed out of adjusted EBITDA. Thus, once TSAs are exited, FTRE will just be replacing TSA costs with internal operating costs. Some savings will come from eliminating duplicate apps and driving resource efficiency, but those savings seem incremental and over time, not immediate. (emphasis in original).

167.    On this news, Fortrea's common stock price fell 12.29%, from a close of $22.21 per share the previous trading day to a close of $19.48 per share on September 25, 2024.

168.    These two reports express a single idea. Fortrea's adjusted EBITDA margin for 2024 was around 8%. Specifically, as of Fortrea's most recent guidance issued on August 12, 2024, Defendants projected 2024 revenue around $2.725 billion and adjusted EBITDA around $230 million – an 8.4% margin.

169.    As explained in the Company's earnings presentation accompanying the 2Q24 Earnings Call, "adjusted EBITDA" is not a GAAP figure, so the Company provided a reconciliation table to enable investors to reconcile adjusted EBITDA with net income (the latter being a GAAP figure). One of the expense items that is deducted from revenue to arrive at net income is so-called "one-time spin related costs," which "[r]epresent[] one-time or incremental costs required to implement capabilities to exit Transition Services Agreement with former parent." Such costs could include, for example, the initial costs of setting up IT infrastructure (*e.g.*, physical servers), as opposed to ongoing costs such as personnel and SaaS subscriptions.

170.    These one-time costs are *not* subtracted from revenue to arrive at adjusted EBITDA, however. One of the purported benefits of adjusted EBITDA over net income is that, by ignoring one-off items, it allows for more stable depictions of core, as opposed to irregular or anomalous, business operations.

171.    The following table shows how various line items, including one-time costs, are "added    back"    to    net    income    to    arrive    at    adjusted    EBITDA:

### Net Income to Adjusted EBITDA Reconciliation (Non-GAAP)
### Continuing Operations

| ($ in millions) | Trailing Twelve Months Ended June 30, 2024 | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | | 2024 | 2023 | 2024 | 2023 |
| **Adjusted EBITDA from continuing operations:** | | | | | |
| Net income (loss) from continuing operations | $(243.8) | $(99.3) | $25.0 | $(179.1) | $33.0 |
| Provision for income taxes | 2.9 | 10.7 | 11.6 | 14.8 | 13.1 |
| Interest expense, net | 148.6 | 45.2 | 0.7 | 79.5 | 0.6 |
| Depreciation and amortization ¹ | 88.3 | 21.4 | 23.4 | 43.3 | 44.3 |
| **EBITDA from continuing operations** | (4.0) | (22.0) | 60.7 | (41.5) | 91.0 |
| Foreign exchange (gain) loss | 6.5 | 1.5 | (5.2) | 6.8 | 0.0 |
| Restructuring and other charges ² | 34.0 | 11.0 | 3.6 | 14.4 | 4.2 |
| Stock based compensation | 54.2 | 15.4 | 8.8 | 28.9 | 15.1 |
| Disposition-related costs ³ | 1.4 | 1.4 | 0.0 | 1.4 | 0.0 |
| One-time spin related costs ⁴ | 102.2 | 53.9 | 0.0 | 70.9 | 0.0 |
| Customer matter ⁵ | 13.0 | 0.4 | 0.0 | 4.3 | 0.0 |
| Enabling Services Segment costs not included in discontinued operations ⁶ | 17.8 | 2.5 | 4.2 | 7.3 | 8.7 |
| Other ⁷ | (15.7) | (8.9) | (0.2) | (10.2) | (0.3) |
| **Adjusted EBITDA for continuing operations** | $209.4 | $55.2 | $71.9 | $82.3 | $118.7 |
| | | | | | |
| **Adjusted EBITDA Margin from continuing operations:** | | | | | |
| Revenue from continuing operations | $2,748.0 | $662.4 | $725.1 | $1,324.5 | $1,419.0 |
| Adjusted EBITDA Margin from continuing operations | 7.6% | 8.3% | 9.9% | 6.2% | 8.4% |

Note: The financial information included herein includes immaterial adjustments to the Company's previously reported financial information. Please see the Company's Quarterly Report on Q1 2024 Form 10-Q, when filed with the Securities and Exchange Commission, for more information regarding these revisions.
1 Includes amortization of intangible assets acquired as part of business acquisitions.
2 Restructuring and other charges represent amounts incurred in connection with the elimination of redundant positions to reduce overcapacity, align resources, and restructure certain operations.
3 Disposition-related costs are short-term incremental costs to support the Transition Services Segment associated with the sale of the Enabling Services Segment.
4 Represents one-time or incremental costs required to implement capabilities to exit Transition Services Agreement with former parent.
5 As part of working with a customer, the Company has agreed to make concessions and provide discounts and other consideration to the customer as part of a multi-party solution.
6 These adjustments remove the impact of the Enabling Services Segment, which the Company sold in the second quarter of 2024.
7 Includes the recognition of a contingent consideration payment on a sale of a facility recorded in the second quarter of 2024 and income related to services provided under Transition Services Agreements.

Learn more at fortrea.com. ©2024 Fortrea Inc. All rights reserved.
Fortrea Q2 2024 Earnings presentation

10

✦ Fortrea

172.    As the reconciliation table shows, the calculation starts with net income (negative $99 million for this quarter).  Taxes, interest, and depreciation and amortization are added back, to arrive at Earnings Before Interest, Taxes, and Depreciation and Amortization, or EBITDA (negative $22 million).  Then, certain additional items, including the one-time costs at issue here, are added to that, to arrive at "adjusted" EBITDA ($55 million).

173.    Hence, when Defendants announced an anticipated 2024 adjusted EBITDA margin around 8%, it was *without* the impact of "one-time" costs.  They were already excluding transition costs.

174.    Yet, at the same time, Defendants promised a significant margin boost upon exiting the TSAs, from 8% to 13% (reduced to 11–12% as of August 12, 2024).  Such a jump might be plausible if the Company would no longer be paying tens of millions of dollars for one-time

infrastructure setups – but Defendants had already accounted for those savings. Hence, once the payments to Labcorp stopped, Fortrea would merely "swap one cost for another." The services that Labcorp had been providing would now need to be provided either by contractors such as Cognizant and Accenture or by Fortrea's own personnel. And, as explained above, there was no reason to expect improvement on that front, because Labcorp was already only charging Fortrea at cost.

175. Defendants themselves admitted as much a few months later. On the 3Q24 Earnings Call in November 2024, David Windley of Jefferies – the same analyst who had written the critical August 2024 Jefferies Report and September 2024 Jefferies Report – asked McConnell to confirm that the "removal of the check that you're writing to LabCorp for the TSA support services they are providing, that in and of itself is ***not*** what drives your margin expansion, but rather your ability to manage the business on your own systems and identify areas to take SG&A cost out? Is that correct? Is my understanding correct?" That is, he asked defendant McConnell point-blank whether the "removal of the check" to Labcorp, "in and of itself," would drive margin expansion. Defendant McConnell confirmed that it would not:

> Yes. No, your understanding is correct, David. . . . So getting [out of those] TSA [exits] is really critical. Obviously, there's additional costs associated there and the onetime costs . . . the way those things are paid and billed, you're going to see onetime costs through the first quarter, just by the nature of how things go. But we still believe that we're on track to exit the vast majority of it all by the end of this year, right around the end of this year, certainly by the time we're coming out, talking about Q4 results with all of you. And that is then really important. We'll go live on the new systems, and then that allows us to bring in different processes, new structures and ways of working, be able to do more volume of transactions in a more efficient and effective way. So that is really critical. ***It's not an immediate switch that you exit a TSA and we get massively reduced SG&A***. There are some places, as we've talked about, particularly with our IT infrastructure, where because of the work that we're doing with Cognizant. We've talked about that before, there will be some improvements, but you'll see more of those come out over the course of next year, and we'll provide a lot more detail about that journey when we give our guidance for 2025.

176.    Despite this partial admission, however, Defendants still misled investors about the TSA Exit Strategy.  With the exception of Jefferies, analysts continued to accept Defendants' representations that SG&A would go down and EBITDA margins would go up once Fortrea exited the TSAs.

177.    On December 6, 2024, Baird cut its per share Fortrea price target from $35 to $28.  In explaining their decision, the analysts cited, *inter alia*, the "lack of clarity on the abrupt communications course change[.]"  The Baird price cut was publicized in media such as *Seeking Alpha*.  On this news, Fortrea's stock price declined 8%, from a closing price of $23.57 per share on December 5, 2024 to a closing price of $21.67 per share on December 6, 2024.

178.    Then, on December 11, 2024, Citigroup reduced its per share price target from $30 to $23, in part due to a lack of clarity on Fortrea's plan to increase margins.  On this news, Fortrea's stock fell 8%, from a closing price of $21.15 per share on December 10, 2024 to a closing price of $19.45 per share on December 11, 2024.

179.    Finally, after the extended quiet period, on March 3, 2025, Fortrea announced its 4Q24 and FY24 financial results, and Defendants revealed for the first time "that the pre-spin projects, many late in their life cycle, have less revenue and less profitability than expected for 2025."  Moreover, the Pre-Spin Projects represented "the vast majority of [Fortrea's] later stage full-service-clinical revenue."

180.    As a result of "lower new business awards in the pre-spin period, along with a mix of later in their life cycle and longer duration studies in [the Company's] backlog, including slower burning studies[,]" Fortrea reported just $2.67 billion in revenue, well below both the revised targets from 1Q24 and 2Q24, and nowhere near the originally targeted $3.14 billion to $3.21 billion range.

The headline of Bank of America's analyst report later that day was "FTRE uncovers a mess in pre-spin backlog, delaying a long-promised transformation[.]"

181.    Defendants also revealed they had "essentially exited from the TSA services" pursuant to the TSA Exit Strategy.  Nevertheless, Defendants were forced to concede the true extent of the Company's TSA Exit Strategy failure and the related significant negative impact on Fortrea's financial performance, *i.e*, that Fortrea would not come close to achieving 13% adjusted EBITDA margins by the end of FY24, and that SG&A did not decrease in 4Q24.

182.    Indeed, on March 3, 2025, Defendants reported FY24 of just $202.5 million, with a FY24 adjusted EBITDA margin of just 7.5%, which was 1.1 percentage points ***lower*** than in FY23.  Moreover, adjusted EBITDA margin for 4Q24 was just 8.0% – significantly below both the previously targeted 13%, as well as the revised 11-12% from earlier in the year.  Compared to the prior quarter, 3Q24, SG&A actually *increased* from $136.3 million to $148.1 million, and adjusted EBITDA margin *decreased* from 9.5% to 8.0%.

183.    Defendants were also forced to disclose that the Company's SG&A and margins would not significantly improve in 2025 or 2026, targeting "mid-7s [percent] on EBITDA margin" in 2025, and admitting that "[t]he lower margin targets are driven by the inefficiencies in the pre-[spin] portfolio and the inherited SG&A costs that we are actively working to reduce.  Many of the pre-[spin] projects are extended in duration and are well into their life cycle, . . . both of which create headwinds to growth and margin expansion in 2025."  Moreover, when asked by an analyst from Baird why investors and analysts "shouldn't just be thinking mid-8s [percent] EBITDA margin in [20]26," defendant McConnell responded, in pertinent part, that Defendants "would be better off waiting a couple more months and see how these forecasts are tracking compared to what we've provided and then we can probably provide a little more clarity on what that future looks like."

184.     In an earnings presentation issued the same day, Defendants stated that "TSA exits *lay the foundation* for SG&A cost reduction in 2025[.]"  This mealy-mouthed equivocation marked a stark departure from Defendants' repeated assurances throughout the Class Period that the TSA exits would *cause* SG&A cost reduction.  As the Jefferies' analysts wryly observed, "Presentation says that TSA exits lay the foundation for SG&A cost reductions, but those are not helping '25 margins."

185.     In other words, nearly two years after the Spin-Off, and despite continuously assuring investors that the TSA Exit Strategy would result in lower SG&A and subsequently improved margins by the end of FY24, in FY25, the Company was no closer to lowering SG&A or improving margins than at the beginning of the Class Period.

186.     Due to this revelation, Fortrea's stock price fell $3.47 per share, to close at $10.38 per share on March 3, 2025.

187.     Throughout the Class Period, despite the touted benefits of the TSA Exit Strategy, SG&A increased steadily, causing an overall decrease in quarterly EBITDA throughout the Class Period:



188.    Moreover, despite the fact that the TSA Exit Strategy would purportedly *improve* adjusted EBITDA margins throughout FY24, and, more specifically, the second half of FY24, Fortrea's quarterly adjusted EBITDA *decreased* between the end of 2Q24 and the end of 4Q24, as demonstrated by the chart below:

| Quarter | Adjusted EBITDA Margin |
|---------|------------------------|
| 1Q24 | 4.5% |
| 2Q24 | 8.3% |
| 3Q24 | 9.5% |
| 4Q24 | 8.0% |
| FY24 | 7.5% |

189.    Following the end of the Class Period, on May 12, 2025, Fortrea reported its financial results for the fiscal quarter ended March 31, 2025 ("1Q25"), the first two months of which were during the Class Period.  Revenue for the quarter was $651.3 million, and adjusted EBITDA was $30.3 million, for a margin of just 4.7%.  Despite having exited the TSAs, SG&A expense for the quarter was $121.8 million, or 18.7% of revenue.  That ratio of SG&A to revenue is comparable to what it had been earlier in the Class Period, when Fortrea was spending significantly more on TSAs (*see* table above, ¶84).

190.    Also on May 12, 2025, Fortrea announced that CEO Pike was stepping down – even though the initial term of his employment agreement would not be ending until December 31, 2025.  Analysts at J.P. Morgan described being "surprised" by the decision.  Analysts at Bank of America added that "[t]he sudden move is unexpected and could raise questions about [Fortrea's] internal discussions and longer-term transformation roadmap post-spin from Labcorp."

191.    On August 6, 2025, Fortrea reported its financial results for the fiscal quarter ended June 30, 2025 ("2Q25").  Revenue was $710.3 million, and adjusted EBITDA was $54.9 million, for a margin of 7.7%.  SG&A expense was $124.8 million, or 17.6% of revenue – again, comparable to the prior year and a half despite no longer paying Labcorp.

192.    On November 5, 2025, Fortrea reported its financial results for the fiscal quarter ended September 30, 2025 ("3Q25").  Fortrea's reported SG&A for 3Q25 further demonstrated the futility of the TSA Exit Strategy.  For 3Q25, Fortrea reported $106.8 million in SG&A, *the exact same SG&A as reported in 3Q23*, Fortrea's first full quarter as an independent company.  What's more, Fortrea's revenue in 3Q25 was lower than in 3Q23, so that same $106.8 million in SG&A represents a higher percentage of Fortrea's revenue now (15.23%) than in 3Q23 (14.96%).  Thus, despite the benefit of three full fiscal quarters following the completion of the TSA Exit Strategy, Fortrea was no closer to "*improv[ing] [its] SG&A cost as a percent of revenue*," despite claiming the TSA Exit Strategy would do so on the 3Q23 Earnings Call.

193.    In fact, on November 5, 2025, during the conference call to discuss the Company's 3Q25 financial results (the "3Q25 Earnings Call"), defendant McConnell told investors that they "expect [their] SG&A optimization programs to extend into 2026 as [they] continue efforts to bring this spend[ing] more in line with peers."

194.    Moreover, during the 3Q25 Earnings Call, defendant McConnell announced updated FY25 revenue guidance of $2.7 billion to $2.75 billion and adjusted EBITDA guidance of $175 million and $195 million.  Based on these targets, Fortrea's implied EBITDA margin for FY25 is just 6.7%, *about half of the previously targeted 13%*.

195.    In total, the Company lost ***nearly three quarters*** of its value during the Class Period compared to the start of the Class Period, July 5, 2023, when Fortrea's common stock price opened at $36.84 per share.

## DEFENDANTS' MATERIALLY FALSE
## AND MISLEADING STATEMENTS AND OMISSIONS

196.    Prior to the Class Period, during an Investor Day for Fortrea on June 6, 2023, defendant Pike told investors that when investors "look at [Fortreas] backlog, you're looking at a company that has revenue in years to come[.]"

197.    The statement by Defendant Pike referenced above in ¶196 was materially false and misleading when made because he knew, or recklessly disregarded, and failed to disclose that the Pre-Spin Projects, many late in their lifecycle, already "ha[d] a lot of hours in them" and, under their terms, would provide less revenue and less profitability on an annual basis going forward.

198.    The statement referenced above in ¶196 remained alive and uncorrected during the Class Period.

199.    During the Class Period, Defendants made other materially false and misleading statements, and otherwise violated an obligation to disclose material information, concerning:  (1) Fortrea's Pre-Spin Projects; and (2) the TSA Exit Strategy and related SG&A.

**Defendants' Materially False and Misleading Pre-Spin Projects' Misstatements and Omissions Are Actionable**

200.    The Class Period begins on July 5, 2023.  The prior trading day, on July 3, after the market closed, Defendants filed the July 2023 Form 8-K, which stated in pertinent part: "With a portfolio of projects that extend over multiple years, our longer-term contract durations give us confidence and visibility into our future revenues."

201.    The statement by Defendants in ¶200 that the Company's "portfolio of projects that extend over multiple years" and "longer-term contract durations" was materially misleading when

made because Defendants knew or recklessly disregarded and failed to disclose that the Pre-Spin Projects, many late in their lifecycle, already had "a lot of hours in them" and, under their terms, would provide less revenue and less profitability on an annual basis going forward.  By choosing to speak about the Company's backlog, Defendants created a duty to speak the whole truth about the Company's long term contracts.

202.    On August 14, 2023, during the 2Q23 Earnings Call, defendant McConnell told investors that "[a]s part of becoming a stand-alone company, the company reviewed and modified its backlog composition and recognition policies to facilitate period-to-period reporting going forward. As a result of this review, we have decided to make modifications in the following areas: *restating the backlog to remove projects where we no longer have current revenue* as well as incorporating all known changes in scope from customers or other uncertainties."

203.    The statement by defendant McConnell in ¶202 that Fortrea "restat[ed] the backlog to remove projects where [Fortrea] no longer [had] current revenue" was materially false and misleading when made because Defendants knew or recklessly disregarded and failed to disclose that the Pre-Spin Projects, many late in their lifecycle, already had "a lot of hours in them" and, under their terms, would provide less revenue and less profitability on an annual basis going forward.  Thus, by telling investors that they had reviewed Fortrea's backlog and removed projects that were not producing revenue, investors were led to believe that the remaining projects would be meaningfully contributing to revenue on a going forward basis.

204.    During the 2Q24 Earnings Call, in her prepared remarks, defendant McConnell told investors: "[b]ut make no mistake, *with a backlog of more than $7 billion*, a global talented team of more than 16,000 clinical development professionals and full independence to unlock future

optimization insight, *we remain* a great partner for our growing customer base, a rewarding place to work for our employees and *a long-term value creation opportunity for our investors*."

205.    The statement by defendant McConnell in ¶204 that the Company's "backlog of more than $7 billion" was a key reason that Fortrea remained "a long-term value creation opportunity for [its] investors" was materially false and misleading when made because she failed to disclose that the Pre-Spin Projects, many late in their lifecycle, already had "a lot of hours in them" and, under their terms, would provide less revenue and less profitability on an annual basis going forward, which was known to defendant McConnell at the time, or recklessly disregarded by her.

206.    During the 3Q24 Earnings Call, defendant McConnell stated: "[t]here is still work to be done, but we are putting building blocks in place to create long-term value for all of our stakeholders.  With the solid foundation we have laid in the past year, *attractive backlog of nearly $7.6 billion* and a talented global team of more than 15,500 professionals, *we are committed to longer-term growth and margin expansion*."

207.    The statements by defendant McConnell in ¶206 were materially false and misleading when made for the reasons set forth above in ¶205.

**Defendants' Materially False and Misleading TSA Exit Strategy and Related SG&A Misstatements and Omissions Are Actionable**

208.    During the 2Q23 Earnings Call, defendant McConnell stated: "[w]e . . . are finalizing our TSA exit strategies to replace them with more fit-for-purpose infrastructure.  We are prioritizing margin improvement efforts and continue to expect to move towards peer margin levels over time."

209.    The statement by defendant McConnell in ¶208 that the TSA Exit Strategy would "replace" TSA services provided by LabCorp with "more fit-for-purpose infrastructure" was materially false and misleading when made because she knew but failed to disclose that the TSA Exit Strategy would merely result in replacing TSA service costs with similar, if not higher,

infrastructure costs from Fortrea itself for third-party service providers. Moreover, because the TSA Exit Strategy would not cause Fortrea's SG&A to decrease, defendant McConnell's statement that the Company continues "to expect to move towards peer margin levels over time Fortrea" was lacking in a reasonable basis when made.

210. Then, during the 3Q23 Earnings Call, defendant Pike told investors that Fortrea needs to "invest in its future, while exiting arduous TSAs and delivering a cost structure that is appropriate for a clinical services CRO."

211. The statement by defendant Pike in ¶210 that "exiting arduous TSAs" would "deliver[] a cost structure that is appropriate for a clinical services CRO" was materially false and misleading when made for the reasons set forth in ¶209 above.

212. Additionally, during the 3Q23 Earnings Call, defendant McConnell explained that Fortrea had "detailed plans for the changes we can make to improve our SG&A cost as a percent of revenue. The improvements will come in phases over the next few years as some are heavily dependent upon exit of the TSA agreement."

213. The statement by defendant McConnell in ¶212 that Fortrea had "detailed plans for the changes [it] could make to improve [its] SG&A cost" was materially false and misleading when made because she knew or recklessly disregarded and failed to disclose that the "detailed plans . . . to improve [Fortrea's] SG&A" to exit the TSAs would merely replace certain SG&A costs for services provided by Labcorp for similar or higher costs from third-party service providers and would not materially decrease Fortrea's SG&A. Moreover, in or about July 2023, FE2 was shown cost models approved by defendant McConnell showing that the engagement with Cognizant would take three or more years for the Company to realize SG&A savings after exiting the TSAs.

214.    Also during the 3Q23 Earnings Call, when asked how Fortrea could lower SG&A and increase margins by the end of FY24, defendant McConnell replied: "we have been able to see some significant margin expansion opportunity with that SG&A benchmarking.  Some of that will, however, require a full exit from the TSAs for some of the groups, as you can imagine, particularly in IT and in finance.  So we will get benefit from some of the reductions and changes that we're making in SG&A."

215.    The statement by defendant McConnell in ¶214 was materially false and misleading when made because she knew but failed to disclose that Fortrea could not decrease SG&A costs by exiting the TSAs because many of the TSAs were provided to Fortrea by Labcorp at cost.  Even as Defendants exited the TSAs, those costs were replaced by similar, if not higher, infrastructure costs from third-party providers.  As such, the TSA Exit Strategy would not lead to improved margins by the end of FY24, as exiting the TSAs would simply lead to similar, if not higher, SG&A costs in FY24.  Moreover, in or about July 2023, FE2 was shown cost models approved by defendant McConnell showing that the engagement with Cognizant would take three or more years for the Company to realize SG&A savings after exiting the TSAs.

216.    Also during the 3Q23 Earnings Call, defendant Pike stated, in pertinent part, "the biggest area here is IT and IT infrastructure [costs,]" which are "interrelated with exiting the TSAs as we continue to be on the infrastructure of our former parent company through 2024. . . .  We're looking hard at our delivery center and trying to figure out how we can optimize that based on what we've seen.  So you'll see it emerging as through the year, but primarily late in the year as we exit the TSAs."

217.    The statement by defendant Pike in ¶216 was materially false and misleading when made because by speaking about costs associated with exiting the TSAs, he created a duty to

disclose that because Fortrea received a number of these IT and IT infrastructure services from Labcorp at cost pursuant to the TSAs, the TSA Exit Strategy would simply replace costs to Labcorp with similar, if not higher, infrastructure costs from third-party providers, and there would be no meaningful improvement in these costs by the end of 2024, which he knew or recklessly disregarded at the time he made this statement.

218.    During the January 2024 Conference, defendant McConnell stated: "we exited about 40% [of the TSAs] in our first 6 months as a stand-alone company, slightly ahead of schedule. 2024 is the more complex year. There are -- this is where all the system technology ones that we really have to exit and those are the ones that are really key to unlocking a lot of that margin optimization. . . . And '24 is really how do we make sure we exit those TSAs, start moving towards a more fit-for-purpose infrastructure."

219.    The statements by defendant McConnell in ¶218 that exiting certain TSAs would result in "unlocking a lot of margin optimization" to "start moving towards a more fit-for-purpose infrastructure" were materially false and misleading when made because she knew and failed to disclose that Fortrea could only exit the system technology TSAs after it had procured its own versions of these systems and that exiting these TSAs would result in Fortea replacing TSA costs to Labcorp with similar, if not higher, infrastructure costs to a third-party service provider. Accordingly, the TSA Exit Strategy would not result in "more fit-for-purpose infrastructure" or improved margins.

220.    Also during the January 2024 Conference, defendant McConnell told investors that "these [TSA] exits, it's really what we replace them with. And so every single one of those [TSA] exits, those owners have been tasked with coming back with a replacement system or technology or process that is more cost effective and so really, as we go through, we've talked a little bit about

where we think we would exit 2024, getting through all those TSAs is really critical to unlocking that next step in margin expansion versus like individual TSAs in particular."

221.    The statement by defendant McConnell in ¶220 that "getting through all those TSAs is really critical to unlocking the next step in margin expansion" was materially false and misleading when made because it created a duty to disclose that, as detailed herein, the TSA Exit Strategy would not cause Fortrea to lower SG&A in FY24, or improve FY24 margins, which she knew at the time of this statement.  Moreover, in or about July 2023, FE2 was shown cost models approved by defendant McConnell showing that the engagement with Cognizant would take three or more years for the Company to realize SG&A savings after exiting the TSAs.

222.    During the FY23 Earnings Call, defendant McConnell represented that "[t]he continued spin-year headwinds of lower full-service clinical sales, elevated infrastructure costs and the transition services agreement weighed on our fourth quarter results.  We are working to mitigate these headwinds and *we expect to be on track with the previously shared margin improvement target of exiting 2024 and entering 2025 at a run rate around a 13% adjusted EBITDA margin*."

223.    The statement by defendant McConnell in ¶222 that "*we expect to be on track with the previously shared margin improvement target of exiting 2024 and entering 2025 at a run rate around a 13% adjusted EBITDA margin*" was materially false and misleading when made because: (i) she knew that many of the TSA services were being provided to Fortrea at cost and that exiting the TSA Exit Strategy would lead to similar, if not higher, SG&A costs from third-party infrastructure providers; (ii) in or about July 2023, FE2 was shown cost models approved by defendant McConnell showing that the engagement with Cognizant would take *three or more years* for the Company to realize SG&A savings after exiting the TSAs; and (iii) accordingly, the targeted 13% EBITDA margins for the end of FY24 were unattainable.

224.    Also during the FY23 Earnings Call, defendant McConnell told investors:

*In 2025, we expect to realize margin improvement from revenue growth in line with market growth rates and with our post TSA exit, including a streamlined cost infrastructure*, increased automation and optimized resource utilization.  We believe *this transformation will enable us to reduce our SG&A expenses* and empower us to deliver projects faster and more efficiently for our customers. Assuming our ability to continue to drive quarterly book-to-bill metrics of at least 1.2x and exiting our TSAs per our current plans, *we would target 2025 adjusted EBITDA margins consistent with 2022 on a full year basis of approximately 13%*.

225.    The statements by defendant McConnell in ¶224 were materially false and misleading when made for the reasons stated above in ¶223.

226.    Moreover, during the FY23 Earnings Call, when asked about Fortrea's planned margin improvements in FY24, defendant McConnell responded: "when you think about the *back half [of FY24], you'll see it be weighted a little bit more to revenue growth because the TSA exits are happening later in the year. So there will be improvement in SG&A*, but you'll see more of it coming from revenue because as I had commented, we're holding on to some resource in anticipation of that growth. So we wouldn't expect to have to add a lot of additional resource to support that growth, at least in the near term. *And then you will see some improvement in SG&A, but it's going to be much more weighted to the end of the year*."

227.    The statements by defendant McConnell in ¶226 were materially false and misleading when made for the reasons stated above in ¶223.

228.    Also on the FY23 Earnings Call, in response to an analyst asking whether the 13% guidance for 2025 was "kind of like worst-case scenario," defendant McConnell responded:

Yes, we would expect it, obviously, to improve slightly as we go through the course of the year because the TSA exits allow us to start to make some of the more significant changes around SG&A, but those things will come at a little bit of a ramp. But I think just appreciating how much that is in terms of the total dollar value in that 300-plus basis points.  I think at this point, we're not going to commit to anything greater than that.  But we hope there will be upside.  But obviously, we'll be able to share more with you on that, I would say, later this year once we confirm that we're

fully on our TSA exit trajectory because that's really key to unlocking the SG&A improvement.

229.    The statements in ¶228 that 13% was "kind of like worst-case scenario," and she said, "we're not going to commit to anything greater than that," were materially false and misleading when made for the same reasons set forth in ¶223 above.

230.    Similarly, during the March 2024 Conference, defendant McConnell stated:

> ***So that growth in the second half largely doesn't need additional resources to support it***. So it will drop through pretty strongly. ***The – as are really more so coming very much at the end of the year, and they really unlock the SG&A margin expansion into 2025. So we've shared that in the first quarter, we're going to start to report our cost of sales and our SG&A more in line with our peers***. It was done a bit differently as part of LabCorp you're going to see that there's ***a lot of opportunity in SG&A and exiting those TSAs at the tail end of this year will give us that opportunity for 2025***. And as Tom mentioned, we said ***we expect to exit this year on that 13% trajectory and we would expect to continue that through 2025***.

231.    The statements by defendant McConnell in ¶230 were materially false and misleading when made for the reasons set forth above in ¶223.

232.    During the 1Q24 Earnings Call, defendant Pike told investors that "[o]ur team is working hard to minimize the impact of less planned revenue in our organization and financials. While the top priorities are winning business, customer delivery and ***getting out of these burdensome TSAs, given our situation, we're pushing even harder on expense controls and cost improvements in operations and SG&A***."

233.    The statements by defendant Pike in ¶232 that Fortrea's priority was "getting out of these burdensome TSAs" and they were pushing harder on "cost improvements in operations and SG&A" were materially false and misleading when made because he knew or recklessly disregarded and failed to disclose that the costs reduction associated with exiting the TSAs was offset by the same or higher costs for these services and systems from third-party providers. Accordingly, exiting the TSAs would not lead to "cost improvements in operations and SG&A." Moreover, by speaking

about the cost improvements in SG&A, this created a duty for defendant Pike to speak completely and truthfully, including disclosing that exiting the TSA Exit Strategy would lead to similar, if not higher, SG&A costs from third-party infrastructure providers.

234.    Also during the 1Q24 Earnings Call, defendant McConnell told investors, in pertinent part, that:

> *We have benchmarked our SG&A against our peers and are building more efficient supporting organizations. In some key areas, we expect to begin to see benefits emerge later this year with others planned for next year as we fully exit the TSA*. As you can see from our recasted SG&A expense line item, this is critical for us to be competitive with our peers.  In addition, this quarter, we identified and started setting targets in some key areas to drive operating margin improvement. . . . *Most of these changes will start to benefit us in 2025, where we expect to realize margin improvement arising from revenue growth and operational productivity as well as our post-TSA streamlined SG&A cost infrastructure*.  We believe this transformation *will enable us to reduce our expenses* and to deliver projects faster and more efficiently for our customers.

235.    The statement by defendant McConnell in ¶234 that "most of these changes [in SG&A] will start to benefit us in 2025 where we expect to realize margin improvement arising from revenue growth and operational productivity as well as our post-TSA streamlined SG&A cost infrastructure" was materially false and misleading when made for the same reasons set forth in ¶223.

236.    During the Q&A session of the 1Q24 Earnings Call, an analyst asked how Defendants planned to hit their target of 13% margins by the end of the year.  Specifically, he wanted to know whether the improvement would come from gross margin or from SG&A:

> So thinking about the difference between the gross margin, SG&A and EBITDA line as we go through the year.  Obviously, you've got that steep ramp to sort of hit exiting the year at roughly 13%.  So should we be thinking that gross profit gets you part of the way there, but the majority is really should be coming from the SG&A line?

237.    Defendant McConnell responded that the improvement would actually come mostly from gross margin rather than SG&A, *because* the Company would not yet have exited the TSAs:

So actually, we do think that – we think it will actually come more from gross margin improvements, which are kind of driven from the modest increase in revenue growth, so getting to about 3% in the back half compared to where we are in the first half with essentially the same size of operational footprint. Most of that increase then drops through and only about 1/4 of it will come from SG&A. Because you may remember from earlier calls, we are able to make some improvements and changes this year. But ***until we fully exit all of the TSAs***, which won't be really until right at the end of the year. Maybe even just into 2025, but the majority by the end of this year, ***you really can't change some of the cost base you have in SG&A until you fully exit*** because you're kind of stuck with that cost base and supporting the existing processes and systems. So it actually comes more from top line than it does from just cost cuts to get to there in the back half.

238.    The statement by defendant McConnell in ¶237 that SG&A would not materially decrease "until we fully exit all of the TSAs" was materially misleading because it led investors to believe that SG&A would decrease after Fortrea exited the TSAs, which defendant McConnell knew at the time she made this statement was untrue. By attributing the Company's excessive SG&A costs to the Company being "stuck" in the TSAs – "you really can't change some of the cost base you have in SG&A until you fully exit because you're kind of stuck with that cost base" – McConnell led investors to believe that the only remaining barrier to lowering SG&A was getting out of the TSAs, which she knew was untrue.

239.    During the 2Q24 Earnings Call, defendant McConnell stated, in relevant part, "[o]n a GAAP basis, direct costs in the quarter decreased 7.6% year over year, primarily due to lower pass-through costs. SG&A in the quarter was higher year over year by 59.7%, ***primarily due to incremental one-time costs incurred for exiting the TSA with our former parent***. . . . We see significant potential ***to expand margins by reducing SG&A expense as a percentage of revenue over time once we fully exit the TSA services and can transition to lower cost replacement infrastructure***."

240.    The statements by defendant McConnell in ¶239 were materially false and misleading when made for the reasons set forth above in ¶223.

- 58 -

241. Also during the 2Q24 Earnings Call, defendant McConnell told investors and analysts:

> On SG&A, while we have made initial progress in IT already, we are continuing to prepare for more efficient supporting organizations over time. In a few areas, we began -- *we expect to begin to see benefits emerge towards the end of the year* with other improvements planned for 2025 and beyond *as we fully exit the TSA and adopt these more efficient infrastructures*. As you can see from our SG&A expense line item, this is critical for us to be competitive with our peers.

242. The statements by defendant McConnell in ¶241 were materially false and misleading when made for the reasons set forth above in ¶223.

243. Additionally, during the 2Q24 Earnings Call, when asked about the planned margin improvement, defendant McConnell stated that "half" the margin increase in FY25 "will come from SG&A improvements. We've been talking about the fact that we need to get really through those TSAs and be fully exited to start to see some of that value and the dollars coming out in SG&A."

244. The statement by defendant McConnell in ¶243 that "half [of the FY25 margin increase] will come from SG&A improvements" was materially false and misleading when made because she knew but failed to disclose that the costs reduction associated with exiting the TSAs were offset by the same or higher costs for these services and systems from third-party providers and, accordingly, the TSAs would not lead to "value and the dollars coming out in SG&A" in FY24 or FY25.

245. During the 3Q24 Earnings Call, defendant McConnell stated "*the timing of those TSA exits is really critical because they are essential. We believe we're on track for year-end*, but there's still a lot of work. And obviously, as I mentioned, two big systems getting ready to go live, *and those are absolutely essential for us in terms of moving into the next generation of SG&A improvement*."

246.    The statement by defendant McConnell in ¶245 that the TSA Exit Strategy was "absolutely essential for [Fortrea] in terms of moving into the next generation of SG&A improvement" was materially false and misleading when made for the reasons set forth above in ¶223.

## ADDITIONAL SCIENTER ALLEGATIONS

247.    As alleged herein, Defendants acted with scienter in that defendants Fortrea, Pike and McConnell knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company or in their own name during the Class Period were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; did not honestly believe the truthfulness or completeness of their statements; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants Fortrea, Pike and McConnell, by virtue of their receipt of information reflecting the true facts regarding Fortrea, their control over, and/or receipt and/or modification of Fortrea's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Fortrea, were active and culpable participants in the fraudulent scheme alleged herein.

248.    Defendants Fortrea, Pike and McConnell knew or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

249.    The Individual Defendants, by virtue of their high-level positions with the Company – defendant Pike as CEO and defendant McConnell as CFO – directly participated in the

management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, subsidiaries, financial statements, and financial condition, as alleged herein.

250.    The Individual Defendants, because of their positions with Fortrea – Pike as CEO and McConnell as CFO – controlled the content of the Company's public statements during the Class Period.  Defendants Pike and McConnell were provided with or had access to the statements alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations that were being made were false and misleading.  As a result, each of the Individual Defendants is responsible for the accuracy of Fortrea's corporate statements and is therefore responsible and liable for the misrepresentations contained therein.

251.    At the very least, when making their public statements, the Individual Defendants were required to have a legitimate and valid basis for their representations.  To the extent they were lacking such a basis, especially when presenting themselves as informed and knowledgeable, they are likewise responsible and liable for the misrepresentations contained therein.

252.    The Individual Defendants understood – or recklessly refused to understand – the issues plaguing the Company due to their considerable business experience.  Before joining Fortrea, defendant Pike was CEO of another CRO.  He also "worked at Arthur Andersen/Accenture for 22 years in various positions of increasing responsibility, including serving as the Chief Risk Officer

and Managing Director of the North America Health and Products business," according to Fortrea's 2023 Form 14A proxy statement, filed with the SEC on March 28, 2024.

253.    Defendants' knowledge of facts contradicting their public statements can be inferred from the nature of the statements themselves.  Defendants spoke repeatedly, in painstaking detail, about the exact topics of the alleged fraud:

(a)    **TSAs**: Defendants had access to information about the TSAs, and the cost-savings that would supposedly develop from exiting them, and frequently discussed them with the public.  As but a few examples:

(i)    On January 10, 2024, defendant McConnell told investors that "these [TSA] exits, it's really what we replace them with. And so every single one of those [TSA] exits, those owners have been tasked with coming back with a replacement system or technology or process that is more cost effective and so really, as we go through, we've talked a little bit about where we think we would exit 2024, getting through all those TSAs is really critical to unlocking that next step in margin expansion[.]"

(ii)    On March 11, 2024, Pike predicted margin improvement in 2025 due to "our post TSA exit, including a streamlined cost infrastructure, increased automation and optimized resource utilization."  On that same call, analysts asked a number of questions on this subject, to which Pike and McConnell responded in detail.

(iii)    On August 12, 2024, the Company reduced its previously announced 2025 EBITDA margin guidance from 13% to 11–12%.  That would still be about three percentage points (or 300 "basis" points) over the 2024 guidance.  On the August 12, 2024 conference call, defendant McConnell discussed the breakdown of that anticipated improvement, explaining that about "half" would come from "SG&A improvements" due to exiting the TSAs.  By providing such

granular projections, McConnell held herself out as an expert on this subject, with access to detailed and reliable information.

(b)    **Backlog Burn Rate**: Likewise, at all relevant times, Defendants had access to accurate information about Fortrea's revenue backlog and made statements to investors about it.

(i)    From the very beginning of the Class Period, Defendants touted their "long-term contract durations" which purportedly provided "confidence and visibility into [Fortrea's] future revenues." They even announced their intent to review Fortrea's "go-forward approach to backlog recognition" and "modify" Fortrea's "backlog composition and recognition policies to facilitate period-to-period reporting going forward."

(ii)    More than that, one of the key performance indicators that Defendants discussed at almost every public conference was the Company's "book-to-bill" ratio. This refers to the ratio of new business deals signed (bookings) to jobs actually done and revenue earned (billings). Analysts from institutions such as J.P. Morgan, Barclays, Jefferies, Bank of America, William Blair, Deutsche Bank, and Evercore regularly included this metric in their reports and projections about the Company throughout the Class Period. The denominator of the book-to-bill ratio – billings – is simply how fast old jobs are converted to revenue. In other words, it is the backlog burn rate. Hence, by paying meticulous attention to the Company's book-to-bill ratio, Defendants paid attention to the Company's backlog burn rate.

254.    In sum, the frequency and specificity with which Defendants discussed these topics are a testament to the topics' outsized importance to the Company. Defendants' knowledge of material nonpublic information about these subjects – including that their projections pursuant to the TSA Exit Strategy were fatally flawed by excluding "one-time" costs from adjusted EBITDA and yet simultaneously insisting that EBITDA margins would improve once those very costs ceased; and

that much of the revenue from the Company's pre-spin backlog had already dried up – can therefore be inferred.

255.    Relatedly, under the core operations theory, Defendants' knowledge of facts undermining their statements about the TSA Exit Strategy can be inferred given the sheer importance of that strategy to the Company.  In Defendants' own words, exiting the TSAs would be "***really critical*** to unlocking that next step in margin expansion" (January 2024 Conference); "***one of the most important*** things this year" and "really what unlocks the opportunity to improve the margins in the SG&A" (March 2024 Conference); "***critical for us to be competitive*** with our peers" (1Q24 Earnings Call); and "***absolutely essential*** for us in terms of moving into the next generation of SG&A improvement" (3Q24 Earnings Call).  Analysts, too, were laser-focused on this subject, asking about it constantly.

256.    The facts undermining Defendants' statements were already in existence and knowable long before the statements were made.  The TSA Exit Strategy statements were contradicted by simple math: one-time costs were already excluded from adjusted EBITDA, and the TSA payments to Labcorp were already at cost.  Indeed, although most investors and even analysts accepted Defendants' lofty margin projections, some analysts were skeptical.  In May 2024, for instance, TD Cowen noted "limited visibility into the potential margin improvement from exiting TSAs, including whether FTRE's systems and processes will prove to be more cost-effective as a standalone company."  And in January 2024, William Blair modeled 2024 adjusted EBITDA margin of 10.2% – considering even that "slightly aggressive[.]"  At the same time, William Blair acknowledged that the market "consensus" was higher.  Time would show that even William Blair missed the boat, as 2024 margins turned out to be just 7.5%.  While analysts – whose knowledge is

necessarily limited to the information graced upon them by management – had no way of knowing better, management – who by definition have access to the full panoply of inside information – did.

257.    Likewise, the Pre-Spin Projects statements were belied by facts already in existence and to which Defendants had access – that the contracts were late in their life cycle and therefore burned more slowly.  Indeed, Defendants told investors that they had done a review of the Pre-Spin Projects; as such, Defendants either knew or were reckless in not knowing that the Pre-Spin Projects, many late in their lifecycle, already had "a lot of hours in them" and, under their terms, would provide less revenue and less profitability on an annual basis going forward.  As analysts from Truist would later comment, "Given it has been roughly 2 years since spin-off, we believe investors were caught by surprise from FTRE's messaging around 'pre-' versus 'post-' spin portfolio dynamics. . . ."

258.    Scienter is further bolstered by the former-employee allegations:

(a)    With respect to the Pre-Spin Projects, FE1 recounted that it was common knowledge throughout the organization since the time of the Spin-Off that the Pre-Spin Projects had little work left on them.

(b)    With respect to the TSA Exit Strategy, FE1 said Fortrea was routinely over-budget on the costs paid to Cognizant, and that defendant McConnell personally signed off on any and all payments in excess of budget, including in 2Q24, 3Q24, and 4Q24.  FE2, meanwhile, confirmed that Fortrea's TSA payments to Labcorp were at cost.  FE2 further recalled that there was no competitive bidding process for the Cognizant engagement.  Finally, FE2 stated that senior managers themselves – including defendant McConnell – internally projected that cost savings from the shift to Cognizant would take ***three or more years*** to materialize.

259. Defendants' recklessness in choosing to speak on topics they admittedly did not know about or understand further supports scienter. While the securities laws mandate certain periodic disclosures, they do not mandate disclosure of non-GAAP figures such as adjusted EBITDA. By volunteering such information – repeatedly and in great detail – Defendants assumed a responsibility to make sure their statements were accurate. If it is indeed true that Fortrea's internal bookkeeping was in disarray – which, after all, was Defendants' purported explanation for not disclosing the true amount and rate of burn left on the Pre-Spin Projects until *two years after* the spin – then Defendants should not have spoken about such revenues. Likewise, they should not have provided SG&A projections based on the TSA Exit Strategy without first calculating the numbers for one-time costs, fees paid to third-parties such as Cognizant and Accenture, and the fact that the TSA payments to Labcorp were already at cost.

260. With respect to the Cognizant arrangement in particular, it is noteworthy that defendant Pike "had a distinguished career at Accenture in executive roles," according to Fortrea's 2023 Form 14A proxy statement, filed with the SEC on March 28, 2024. Pike was with Accenture for many years, as early as 2001, according to that same filing. The current Chair of Cognizant's Board of Directors is Stephen (Steve) J. Rohleder, who spent 35 years at Accenture, culminating his career there as "Group Chief Executive, North America of Accenture plc from 2014 until his retirement in 2015[,]" per Cognizant's website. The Accenture connection between Pike and Rohleder could help explain why Fortrea rubberstamped the Cognizant deal without a competitive bidding process, per FE2's allegations.

261. Finally, the "surpris[ing]" and "unexpected" resignation of defendant Pike, announced on May 12, 2025 – even though the initial term of his employment agreement did not end until December 31, 2025 – further supports scienter.

**LOSS CAUSATION/ECONOMIC LOSS**

262.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Fortrea stock and operated as a fraud or deceit on purchasers of Fortrea stock during the Class Period by failing to disclose and misrepresenting the adverse facts detailed herein.    As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Fortrea stock declined significantly as the prior artificial inflation came out of the Company's stock.

263.    As a result of their purchases or acquisitions of Fortrea stock during the Class Period, Lead Plaintiffs and the other Proposed Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.    Defendants' false and misleading statements had the intended effect and caused shares of Fortrea stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $40 per share in March 2024.

264.    When the truth about the Company was revealed to the market, the price of Fortrea stock fell significantly to about $10 per share, where it has remained ever since.    These declines removed the inflation from the price of Fortrea stock, causing real economic loss to investors who had purchased or acquired Fortrea stock during the Class Period.

**The August 12, 2024 Stock Drop**

265.    The market first began to learn the truth about Fortrea on August 12, 2024.    As noted above, during the 2Q24 Earnings Call, Defendants were forced to admit that the Company could not achieve the previously targeted 13% adjusted EBITDA margin for 4Q24 and, instead, Fortrea "would target to deliver an adjusted EBITDA margin in the 11% to 12% range for the fourth quarter of 2024" as well as 2025.

266.    Revenue for 2Q24 was reported to be $662 million and adjusted EBITDA was $55 million, for a margin of 8.3%.   Regarding revenue, defendant McConnell explained that the Company's "second quarter service-fee revenue continues to be impacted by a combination of factors, primarily **lower new business awards in the pre-spin period**, along with the mix shift towards **later stage and longer duration studies**, particularly in oncology."  Regarding margins, she explained that "[a]djusted EBITDA margin in the quarter was negatively impacted by lower service fee revenues from the **lower awards during the pre-spin year**, the **mix of longer duration studies**, and **higher SG&A costs post spin to support operations as a public company**."

267.    Thus, the Company's underwhelming 2Q24 performance was the materialization of precisely the risks Defendants had tried so hard to cover up: (i) weak backlog from the pre-spin period, including "later stage and longer duration studies"; and (ii) "higher SG&A costs post spin to support operations as a public company," *i.e.*, ballooning costs as a result of the doomed TSA Exit Strategy.

268.    Following the disappointing 2Q24 Earnings Call, Fortrea's stock fell 20%, from a closing price of $25.16 per share on Friday, August 9, 2024 to a closing price of $20.04 per share on Monday, August 12, 2024.

269.    Additionally, multiple analysts lowered their Fortrea price targets.  On August 12, 2024, Barclays lowered its per share price target from $30 to $21; Bank of America lowered its per share price target from $26 to $21; and Jefferies lowered its per share price target from $32 to $25. In particular, Jefferies' price-target cut was based, in part, on the realization that the TSA "exits swap one cost for another," as explained in the August 2024 Jefferies Report discussed above.

270.    The next day, August 13, 2024, TD Cowen lowered its per share price target from $27 to $23.  Deutsche Bank followed suit a few days later, on August 19, 2024, lowering its per share price target from $28 to $23.

**The September 25, 2024 Stock Drop**

271.    Next, on September 25, 2024, Jefferies lowered its per share price target again, this time from $25 to $21.  This price-target reduction was publicized in media outlets such as *Bloomberg*.  On this news, Fortrea's stock fell 12%, from a closing price of $22.21 per share on September 24, 2024 to a closing price of $19.48 per share on September 25, 2024.  Jefferies' price-target cut was based, in part, on the fact that "IT infrastructure costs to exit the TSAs are already non-GAAPed out of adjusted EBITDA[, so] once TSAs are exited, FTRE will just be replacing TSA costs with internal operating costs[,]" as explained in the September 2024 Jefferies Report discussed above.

**The December 6, 2024 Stock Drop**

272.    On or about December 4, 2024, Fortrea shocked investors by withdrawing from several already-scheduled conferences, beginning a self-imposed "quiet period."  At first, Fortrea's stock price counterintuitively shot *up*; analysts commented that the market apparently mistook the cancellations for a signal of an imminent takeover.  After a few days, however, the market began to see Defendants' abrupt change of course for what it was: a sign of deep distress.  As analysts from Barclays would later explain, Fortrea's "11th-hour cancellations of sell-side conferences" led to "very negative" market sentiment.  Likewise, analysts from TD Cowen explained that the Company's "unexplained cancellations in December of multiple investor conference appearances" sparked "renewed investor concerns[.]"

273.    Two days later, on December 6, 2024, Baird cut its Fortrea per share price target from $35 to $28.  In explaining their decision, the analysts cited, *inter alia*, the "lack of clarity on the

abrupt communications course change[.]"  The Baird price cut was publicized in media such as *Seeking Alpha*.  On this news, Fortrea's stock price declined 8%, from a closing price of $23.57 per share on December 5, 2024 to a closing price of $21.67 per share on December 6, 2024.

**The December 11, 2024 Stock Drop**

274.    A few days later, on December 11, 2024, Citigroup reduced its per share price target from $30 to $23, in part due to a lack of clarity on Fortrea's expected margins.  The Citigroup price cut was publicized in media.  On this news, Fortrea's stock fell 8%, from a closing price of $21.15 per share on December 10, 2024 to a closing price of $19.45 per share on December 11, 2024.

275.    Fortrea's stock price continued to decline steadily over the following months.

**The March 3, 2025 Stock Drop**

276.    On March 3, 2025 (the first trading day after the end of the Class Period), Defendants ended their quiet period and announced Fortrea's financial results for the fourth quarter of 2024.  Revenue for the quarter was $697 million and adjusted EBITDA was $56 million, for a margin of 8%.  For the full year 2024, revenue was $2.69 billion and adjusted EBITDA was $202 million, for a margin of 7.5%.

277.    While Fortrea's fourth quarter revenue of $697 million was only slightly below what analysts had expected, adjusted EBITDA of $56 million and margin of 8% were significantly below.  Wall Street had expected adjusted EBITDA around $75 million and a margin of at least 10.5%, according to analyst reports by Jefferies, J.P. Morgan, and William Blair.  In sum, Jefferies explained: "A slight 4Q rev miss was exacerbated by higher Direct and SG&A costs to a 25% 4Q adj EBITDA miss."

278.    The disappointing 4Q24 adjusted EBITDA was due, at least in part, to runaway SG&A costs that Defendants had led investors to believe were under control.  As analysts from Deutsche Bank explained, "On the quarter itself, Q4 revenue by (1%), and EBITDA margin of 8% in

the quarter was meaningfully below our estimate of 10.5%. The company attributed the 4Q performance to lower billable hours and higher SG&A costs as driving the variance in EBITDA versus its guidance range."

279.    As for 2025 guidance, Defendants disclosed that the goal of a low-teens EBITDA margin would not materialize. The Company was now guiding 2025 revenue of around $2.5 billion and adjusted EBITDA around $185 million – a margin of just 7.4%.

280.    At the last earnings call before this one – the 3Q24 call on November 8, 2024 – Defendants had projected $2.7 billion revenue for 2025. They blamed the reduction to $2.5 billion to their sudden realization that the Pre-Spin Projects did not have as much burn left as previously believed. As Pike explained, during the quiet period, Defendants "did a deeper analysis of full-service projects and other inputs to longer term forecasts" and found "that the pre-spin projects, many late in their lifecycle, have less revenue and less profitability expected for 2025." In response to analyst questioning, defendant Pike elaborated as follows:

> It's not so much less backlog; it's actually slower burn and that's the difference in '25. So these projects, we did some interesting analysis that showed that a lot of these older projects extend out as much as 40% to 50% longer than the projects we're selling today. And so, as you can imagine, when they've extended out over time, they're burning more slowly. They have a lot of hours in them already, and every incremental hour is less as a percentage of the total, and that causes them to burn more slowly. So it's less -- it's not so much that it's a reduction in backlog, it's just a lesser amount of it is going to show up in 2025 than we expect.

281.    "[E]ven more disappointing" than the top-line reduction, however, was Defendants' reduction to EBITDA guidance, in William Blair analysts' words. 2025 revenue guidance as of the 3Q24 Earnings Call was $2,700 - $2,725 million, whereas now it was reduced to $2,450 - $2,550 million – a roughly 7% reduction at the midpoint. 2025 EBITDA, on the other hand, was guided on 3Q24 at $220 - $240 million and now was reduced to $170 - $200 million – a roughly **19%** reduction at the midpoint.

—

282.    Defendant McConnell explained that the "lower margin targets are driven by the inefficiencies in the pre-spin portfolio and the inherited SG&A costs that we are actively working to reduce."

283.    Thus, Defendants admitted that the TSA Exit Strategy was a failure.  Despite having already exited the TSAs three months ago at the end of 2024, Fortrea was still bogged down by insurmountable SG&A costs.  Analysts at Evercore summed it up: "Legacy spin issues continue to create significant obstacles for Fortrea, creating short-term revenue headwinds in 2025 vs prior investor (and mgmt[]) expectations[]."

284.    The market's reaction was swift and catastrophic.  Fortrea's stock price plummeted 25% in a single day, from a closing price of $13.85 per share on Friday, February 28, 2025, to a closing price of $10.38 per share on Monday, March 3, 2025.

285.    Despite the disappointing revenue and EBITDA guidance, the Company announced *better* than expected new billings.  The book-to-bill ratio for the fourth quarter of 2024 was 1.35, compared to 1.23 for the third quarter.  Analysts at William Blair commented, "Net new business awards of $940 million blew our $817 million estimate out of the water, leading to a net book-to-bill ratio of 1.35 times in the quarter (versus our estimate of 1.17 times)."

286.    Fortrea's better-than-expected new business deals underscore just how damaging the problems revealed were.  As analysts from Jefferies noted in a wry understatement, Fortrea's results and guidance together "don't quite compute" (emphasis in original):

> The strong 2H24 bookings (1.29x B2B) but weaker '25 revenue outlook don't quite compute.  CPS was strong, which should *help* burn rate.  Thus, the burn rate decline on old studies has to be more severe, and mgt points to pre-spin studies with worse revenue and margins having an outsized impact on '25 growth.  To get that magnitude so suddenly, mgt's deep dive analysis must have identified projects that were over-accrued or failed to get change orders that would shore up their profitability.

287.    Clearly, the issues plaguing the Company – underperforming backlog combined with stubborn SG&A costs – were so great they could not be offset by new sales alone.  As J.P. Morgan summarized the following day (March 4, 2025), "Results missed, guidance was weaker and management provided little conviction that results / leverage will improve materially from here. Book to bill and backlog were strong but the timing of the 'growth' is peculiar and warrants a deeper dive."

## CLASS ACTION ALLEGATIONS

288.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Fortrea during the Class Period, inclusive, and who were damaged thereby (the "Proposed Class"). Excluded from the Proposed Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

289.    The members of the Proposed Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Fortrea common stock was actively traded on the NASDAQ.  While the exact number of Proposed Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are hundreds, if not thousands, of members in the Proposed Class.  Record owners and other members of the Proposed Class may be identified from records maintained by Fortrea and/or its transfer agent and may be notified of the pendency of this action by mail or by electronic mail, using the form of notice similar to that customarily used in securities class actions.

290.    Lead Plaintiffs' claims are typical of the claims of the members of the Proposed Class as all members of the Proposed Class are similarly affected by the wrongful conduct of Defendants in violation of federal law that is complained of herein.

291.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Proposed Class and have retained counsel competent and experienced in class and securities litigation.

292.    Common questions of law and fact exist as to all members of the Proposed Class and predominate over any questions solely affecting individual members of the Proposed Class. Among the questions of law and fact common to the Proposed Class are:

(a)    whether statements made by Defendants misrepresented material facts about the business, operations, and management of Fortrea;

(b)    whether Defendants failed to disclose material facts in discussing the business, operations, and management of Fortrea, making those statements materially false and misleading;

(c)    whether the federal securities laws were violated by the acts or omissions of Defendants as alleged herein;

(d)    whether the price of Fortrea stock was artificially inflated during the Class Period; and

(e)    to what extent the members of the Proposed Class have sustained damages and the proper measure of damages.

293.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Proposed Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Proposed Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**NO SAFE HARBOR**

294.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements challenged herein.  Many of the statements challenged herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer and/or director of the Company who knew that those statements were false when made.

**APPLICATION OF PRESUMPTION OF RELIANCE:**
**THE *BASIC* AND *AFFILIATED UTE* PRESUMPTIONS**

295.    Lead Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine as outlined in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as outlined in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

296.    With respect to the *Basic* presumption, a presumption of reliance under the fraud on the market doctrine is appropriate because, among other things:

(a)    Defendants made public misrepresentations and failed to disclose material facts during the Class Period;

(b)    the misrepresentations and omissions were material;

(c)    Fortrea's common stock traded in an efficient market;

(d)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Lead Plaintiffs and other members of the Proposed Class purchased Fortrea common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

297.    At all relevant times, the market for Fortrea common stock was efficient for the following reasons, among others:

(a)    Fortrea common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)    as a regulated issuer, Fortrea filed periodic public reports with the SEC;

(c)    Fortrea regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Fortrea was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

298.    As a result of the foregoing, the market for Fortrea common stock promptly digested current information regarding Fortrea from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of Fortrea common stock during the Class Period suffered similar injury through their purchase of Fortrea common stock at artificially inflated prices and a presumption of reliance applies.

299.    In addition to the *Basic* presumption, a class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute* because the claims of the Proposed Class include material omissions by Defendants.  Because this action involves the failure by Defendants to disclose material adverse information regarding Fortrea's core business operations – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

300.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

301.    During the Class Period, Defendants disseminated or approved the statements specified above, which they knew, or deliberately disregarded, were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

302.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Fortrea common stock during the Class Period.

303.    Lead Plaintiffs and the Proposed Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Fortrea common stock.  Lead Plaintiffs and the Proposed Class would not have purchased Fortrea common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

304.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

305.    The Individual Defendants, and/or persons under their control, violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions described above, causing economic injury to Lead Plaintiffs and the other members of the Proposed Class.  By virtue of their positions as controlling persons, each of these defendants is liable pursuant to §20(a) of the Exchange Act for the acts and omissions of their co-defendants in violation of the Exchange Act.

306.    Each of these defendants acted as a controlling person of some or all of their co-defendants, because they each had the capacity to control, or did actually exert control, over the actions of their co-defendants in violation of the securities laws.  Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to, and did, control or influence the business practices or conditions giving rise to the securities violations alleged herein, and the contents of the statements

which misled investors about those conditions and practices, as alleged above. By virtue of their high-level positions, ownership of, and contractual rights with, Fortrea, participation in or awareness of the Company's operations, and intimate knowledge of the matters discussed in the public statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the contents and dissemination of the false and misleading statements alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs demand judgment against Defendants as follows:

A.    Determining that this action is a proper class action, certifying Lead Plaintiffs as Proposed Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiffs' counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Lead Plaintiffs hereby demand a trial by jury.

DATED:  November 10, 2025

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID A. ROSENFELD
JOSHUA D. FORGY
JONATHAN A. OHLMANN

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
drosenfeld@rgrdlaw.com
jforgy@rgrdlaw.com
johlmann@rgrdlaw.com

*Counsel for Lead Plaintiffs*

ASHERKELLY
CYNTHIA J. BILLINGS-DUNN
25800 Northwestern Highway, Suite 1100
Southfield, MI  48075
Telephone:  248/746-2710
cbdunn@asherkellylaw.com

*Additional Counsel*