UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LUCAS DESLANDE, Individually and on :
Behalf of All Others Similarly Situated,     :

                             :   Civil Action No. 1:25-cv-04630-KPF

           Plaintiff,      :

                             :

     vs.            :

                             :

FORTREA HOLDINGS INC., THOMAS PIKE,:
and JILL MCCONNELL,       :

                             :

          Defendants.    :

                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

## **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
## <u>**MOTION TO DISMISS THE AMENDED COMPLAINT**</u>

 

                                 Susan L. Saltzstein
                                 Robert A. Fumerton
                                 Jeffrey S. Geier
                                 Eryn M. Hughes
                                 SKADDEN, ARPS, SLATE,
                                    MEAGHER & FLOM LLP
                                 One Manhattan West
                                 New York, New York 10001
                                 (212) 735-3000

                                 *Attorneys for Defendants Fortrea Holdings Inc.,*
                                 *Thomas Pike, and Jill McConnell*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES.................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS......................................................................................................3

    A.    Fortrea's Business and Spin-off from Labcorp...........................................3

    B.    Fortrea Publicly Disclosed the Transition Plan, the TSA Framework, and
        Execution Risk ............................................................................................4

    C.    Fortrea Explained that TSA Exit  Would Be a Step Towards Expected
        SG&A Cost Improvements..........................................................................5

    D.    Fortrea's Backlog and PSPs .......................................................................6

    E.    Fortrea Discloses Financial Results and Updates Projections.............................7

ARGUMENT .........................................................................................................................7

I.    PLAINTIFFS FAILS TO PLEAD THE EXISTENCE OF AN ACTIONABLE
    MISSTATEMENT OR OMISSION..........................................................................8

    A.    The Vast Majority of the Challenged Statements  Are Inactionable
        Forward-Looking Statements ......................................................................9

        1.    These Forward-Looking Statements Were Accompanied By
                Meaningful Cautionary Language............................................................10

        2.    Plaintiffs Have Not Pled Defendants Had Actual Knowledge That
                The Statements Were False.......................................................................11

    B.    Plaintiffs' TSA Allegations Do Not Identify  Any Actionable
        Misstatement or Omission...........................................................................12

    C.    Plaintiffs' PSP Allegations Do Not  Identify Any Actionable Misstatement
        or Omission ................................................................................................17

    D.    Fortrea's Statements of Corporate Optimism or Opinion Are Not
        Actionable..................................................................................................20

II.    PLAINTIFFS FAIL TO ALLEGE A STRONG INFERENCE OF SCIENTER ...................21

    A.    Plaintiffs' Miscellaneous Allegations Do Not Give Rise to a Strong
        Inference of Scienter ..................................................................................21

B.      The Former Employee Allegations Do Not Establish Scienter ................................23

C.      Non Culpable Inferences Are More Compelling...................................................25

III.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ....................................................25

IV.    PLAINTIFFS' SECTION 20(A) CLAIM SHOULD BE DISMISSED..........................26

CONCLUSION..................................................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ..................................................................................................21

*Ark. Public Employees Retirement System v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ...................................................................................................10

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ............................................................................................ 3, 7, 25

*In re Barrick Gold Corp. Securities Litigation*,
341 F. Supp. 3d 358 (S.D.N.Y. 2018)....................................................................................22

*Bay Harbour Management LLC v. Carothers*,
282 F. App'x 71 (2d Cir. 2008) .............................................................................................16

*Bratusov v. Comscore, Inc.*,
2020 WL 3447989 (S.D.N.Y. June 24, 2020) .................................................................. 16, 23

*Campo v. Sears Holdings Corp.*,
635 F. Supp. 2d 323 (S.D.N.Y. 2009), *aff'd,* 371 F. App'x 212 (2d Cir. 2010) ..........................22

*Chapman v. Mueller Water Products, Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)....................................................................................24

*In re Chicago Bridge & Iron Co. N.V. Securities Litigation*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) ..........................................................................9

*In re Citigroup Inc. Securities Litigation*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010).....................................................................................22

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013)...........................................................................9

*City of Warren Police & Fire Retirement System v. Foot Locker, Inc.*,
412 F. Supp. 3d 206 (E.D.N.Y. 2019).....................................................................................20

*Damri v. LivePerson, Inc.*,
772 F. Supp. 3d 430 (S.D.N.Y. 2025).....................................................................................23

*In re Danimer Sci., Inc. Sec. Litig.*, 2023 WL 6385642 (E.D.N.Y. Sept. 30, 2023), *aff'd
sub nom. Swanson v. Danimer Sci., Inc*., 2024 WL 4315109 (2d Cir. Sept. 27, 2024)................11

*Docdeer Foundation v. BioNTech SE*,
2025 WL 2781381 (S.D.N.Y. Sept. 30, 2025) ...................................................10, 17, 20, 22, 26

*In re DraftKings Inc. Securities Litigation*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023)..............................................................................19

*In re DRDGOLD Ltd. Securities Litigation*,
472 F. Supp. 2d 562 (S.D.N.Y. 2007)................................................................................7

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005)...................................................................................................... 1, 25

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JPMorgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) .................................................................................... 20, 21, 22

*In re Estée Lauder Co., Inc. Securities Litigation*,
2025 WL 965686 (S.D.N.Y. Mar. 31, 2025)......................................................................9

*In re Express Scripts Holdings Co.*,
773 F. App'x 9 (2d Cir. 2019) ..........................................................................................12

*In re Farfetch Ltd. Securities Litigation*,
802 F. Supp. 3d. 652 (S.D.N.Y. 2025)..............................................................................22

*Fila v. Pingtan Marine Enterprise Ltd.*,
195 F. Supp. 3d 489 (S.D.N.Y. 2016)................................................................................25

*Fresno County Employees' Retirement Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017)................................................................................21

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)..........................................................................21, 23

*Haw. Structural Ironworkers Pension Trust Fund v. AMC Entertainment Holdings, Inc.*,
422 F. Supp.3d 821 (S.D.N.Y. 2019)................................................................................11

*In re IAC/InterActiveCorp Securities Litigation*,
478 F. Supp. 2d 574 (S.D.N.Y. 2007)................................................................................12

*In re ITT Educational Services, Inc. Securities& Shareholder Derivatives Litigation*,
859 F. Supp. 2d 572 (S.D.N.Y. 2012)................................................................................19

*Jackson v. Halyard Health, Inc.*,
2018 WL 1621539 (S.D.N.Y. Mar. 30, 2018)....................................................................23

*In re Keyspan Corp. Securities Litigation*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003)................................................................................16

iv

*Lattanzio v. Deloitte & Touche LLP*,
476 F.3d 147 (2d Cir. 2007) ...............................................................................17

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161, 173 (2d Cir. 2005)............................................................. 15, 18, 25

*In re Lions Gate Entertainment Corp. Securities Litigation*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016).......................................................................17

*Lipow v. Net1 UEPS Technologies, Inc.*,
131 F. Supp. 3d 144 (S.D.N.Y. 2011)....................................................................22

*Local No. 38 International Bhd. of Electrical Workers Pension Fund v. American Express Co.*,
724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011) ......................22, 23

*In re Lululemon Securities Litigation*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) .............................18

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024)............................................................................................16

*Martin v. Quartermain*,
732 F. App'x 37 (2d Cir. 2018) ...........................................................................12

*In re Merrill Lynch & Co. Research Reports Securities Litigation*,
568 F. Supp. 2d 349 (S.D.N.Y. 2008)....................................................................15

*In re Merrill Lynch & Co. Research Reports Securities Litigation*,
273 F. Supp. 2d 351 (S.D.N.Y. 2003), *aff'd*, 396 F.3d 161 (2d Cir. 2005) ...................................3

*Meyer v. Organogenesis Holdings Inc.*,
727 F. Supp. 3d 368 (E.D.N.Y. 2024)....................................................................23

*In re Nokia Corp. Securities Litigation*,
2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021)...................................................... 8, 20

*In re Nokia Oyj (Nokia Corp.) Securities Litigation*,
423 F. Supp. 2d 364 (S.D.N.Y. 2006)....................................................................25

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ......................................................................... 18, 23

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015).................................................................................. 8, 16, 20

*In re Omnicom Group, Inc. Securities Litigation*,
597 F.3d 501 (2d Cir. 2010) ................................................................................25

*In re Openwave Systems Securities Litigation*,
528 F. Supp. 2d 236 (S.D.N.Y. 2007).................................................................17

*In re Petrobras Securities Litigation*,
116 F. Supp.3d 368 (S.D.N.Y. 2015)..................................................................20

*In re Philip Morris International Inc. Securities Litigation*,
89 F.4th 408 (2d Cir. 2023) ..................................................................................7

*In re Pretium Resources Inc. Securities Litigation*,
256 F. Supp. 3d 459 (S.D.N.Y. 2017), *aff'd*, 732 F. App'x 37 (2d Cir. 2018) ............................24

*Prime Mover Capital Partners L.P. v. Elixir Gaming Technologies, Inc.*,
548 F. App'x 16 (2d Cir. 2013) ...........................................................................26

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ................................................................ 10, 16, 19, 25

*SEC v. Farnsworth*,
692 F. Supp. 3d 157 (S.D.N.Y. 2023)..................................................................20

*SEC v. Rio Tinto plc*,
41 F.4th 47 (2d Cir. 2022) ....................................................................................8

*Steamship Trade Ass'n of Baltimore-International Longshoreman's Ass'n Pension Fund
v. Olo Inc.*,
704 F. Supp. 3d 429 (S.D.N.Y. 2023)..................................................................11

*Schiro v. Cemex, S.A.B. de C.V.*,
396 F. Supp. 3d 283 (S.D.N.Y. 2019)..................................................................24

*Setzer v. Omega Healthcare Investors, Inc.*,
968 F.3d 204 (2d Cir. 2020) ................................................................................16

*Shemian v. Research In Motion Ltd.*,
2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014) ................19

*Sherman v. Abengoa, S.A.*,
156 F.4th 152 (2d Cir. 2025) ...............................................................................24

*Singh v. Cigna Corp.*,
918 F.3d 57 (2d Cir. 2019) .............................................................................. 7, 12

*In re Skechers USA, Inc. Securities Litigation*,
444 F. Supp. 3d 498 (S.D.N.Y. 2020)..................................................................15

*Slayton v. American Express Co.*,
604 F.3d 758 (2d Cir. 2010) .......................................................................... 8, 9, 11

*Smith v. PureCycle Technologies, Inc.*,
No. 23-CV-8605 (JGK), 2024 WL 5186586 (S.D.N.Y. Dec. 20, 2024) .....................................18

*In re STMicroelectronics N.V. Securities Litigation*,
2025 WL 2644241 (S.D.N.Y. Sept. 15, 2025) ........................................................................12

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016) ...................................................................................................20

*In re Virtu Financial, Inc. Securities Litigation*,
770 F. Supp.3d 482 (E.D.N.Y. 2025)......................................................................................20

*In re Weight Watchers International Inc. Securities Litigation*,
504 F. Supp. 3d 224 (S.D.N.Y. 2020)......................................................................................10

*Wilbush v. Ambac Financial Group, Inc.*,
271 F. Supp. 3d 473 (S.D.N.Y. 2017)......................................................................................23

## STATUTES

15 U.S.C. § 78u-4(b)(1).............................................................................................................8

15 U.S.C. § 78u-5(c)(1)..........................................................................................................9, 11

Defendants Fortrea Holdings Inc. ("Fortrea" or the "Company"), Thomas Pike, and Jill McConnell (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint (the "Complaint") (ECF No. 53).[1]

## PRELIMINARY STATEMENT

This action represents an attempt by Plaintiffs to manufacture a securities fraud action out of Fortrea's fully disclosed post-spin-off transition process. As part of Fortrea's July 2023 separation from Labcorp Holdings, Inc. ("Labcorp"), the Company inherited legacy contracts and systems and entered into publicly disclosed, time-limited Transition Services Agreements ("TSAs") under which Labcorp would continue providing certain services while Fortrea built infrastructure designed for its standalone business. When Fortrea later encountered execution challenges and revised its outlook, Plaintiffs filed this action in an attempt to transform the federal securities laws into a system of "broad insurance against market losses," an approach the Supreme Court has expressly rejected. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). Unfortunately for Plaintiffs, the Complaint does not come close to satisfying the heightened pleading standards applicable to securities claims and should be dismissed in its entirety.

In support of their legally insufficient Complaint, Plaintiffs advance two theories of falsity. First, the bulk of the Complaint is directed at Fortrea's forward-looking statements concerning the fully-disclosed TSAs, pursuant to which Labcorp (which is not a global technology or administrative service provider) would continue to provide certain services to Fortrea during the transition. Plaintiffs point to forward looking statements regarding selling,

---

[1]    Citations to the Complaint are in the form of "¶ __." Exhibits attached to the Declaration of Robert A. Fumerton are cited herein as "Ex. __." Pincites for all exhibits reference the original pagination at the bottom of the page. All internal quotation marks and citations are omitted, and all emphases in quotations are added, unless otherwise indicated.

general, & administrative expenses ("SG&A") and margin improvements that Fortrea foresaw for coming years as it became a standalone company, and attempt to recast those statements into guarantees that exiting the TSAs would provide instant cost savings and margin improvements. In reality, Fortrea properly distinguished between one-time costs and ongoing targets and explained that it anticipated future SG&A and margin improvements would follow exiting the TSA and deployment of its new built-for-purpose systems. The Company also disclosed that its anticipated margin improvements would flow from several different drivers, including improved revenue. The Complaint confuses one-time and ongoing costs within SG&A and Plaintiffs have not adequately alleged the falsity of any of Fortrea's actual statements.

Plaintiffs' alternate theory is that Fortrea supposedly misled investors about revenue expected from its backlog of pre-spin projects ("PSPs"). But Plaintiffs do not dispute the accuracy of Fortrea's disclosed backlog figures, nor do they allege that Fortrea guaranteed revenue realization on any particular timeline. Instead, Plaintiffs rely on Fortrea's later explanation that certain PSPs were burning more slowly in 2025 than had been expected. Fortrea, however, consistently disclosed that its backlog consisted of multi-year contracts, that conversion timing could vary, and that backlog is "not" a "consistent indicator of future revenue." (Ex. A at 16, 75; Ex. B at 50; Ex. C at 39; Ex. D at 36; Ex. E at 56.) A later update about timing does not transform accurate statements into misrepresentations of fact. Once again, Plaintiffs have not adequately alleged the falsity of any of Fortrea's actual statements.

Although the Court need not reach the issue given the absence of an actionable false or misleading statement, Plaintiffs' claims also fail because they have not pleaded a strong inference of scienter, much less with the requisite particularity. They allege no motive or stock sales, or contemporaneous facts showing that Defendants knew any statement was false when

2

made. Instead, Plaintiffs rely on vague confidential-witness allegations disconnected from the allegations of falsity, generalized claims that issues were "well known," and bald assertions that Defendants "knew or recklessly disregarded" certain statements were false because of their positions. (¶¶ 73, 250.) Far from supporting a cogent inference of fraud, the Complaint depicts management doing exactly what the securities laws contemplate: warning of risks, updating investors as circumstances evolved, and revising expectations when execution proved more difficult than anticipated.

Finally, Plaintiffs fail to plead loss causation. None of the events they identify revealed the falsity of any prior statement, but instead reflect Fortrea's ongoing disclosures about execution challenges and evolving, forward-looking expectations during a fully disclosed transition process.

Given that Plaintiffs fail to plead an actionable misstatement or omission, scienter, or loss causation, the Complaint should be dismissed in its entirety with prejudice.

## STATEMENT OF FACTS[2]

### A.    Fortrea's Business and Spin-off from Labcorp

Fortrea is a global contract research organization ("CRO") providing clinical development services to pharmaceutical, biotechnology, and medical device companies. (¶ 2.) Before July 2023, Fortrea operated as part of Labcorp as its Clinical Development and Commercialization Services business. (¶ 3.) In June 2023, Fortrea spun off from Labcorp, becoming a standalone public company. (*Id.*)

---

[2]    The facts set forth herein are drawn from the allegations in the Complaint, documents incorporated by reference, matters of which judicial notice may be taken, and documents integral to the Complaint. *See In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003), *aff'd*, 396 F.3d 161 (2d Cir. 2005). The Court may also consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

**B.        Fortrea Publicly Disclosed the Transition Plan, the TSA Framework, and Execution Risk**

Labcorp's initial spin announcement explained that "there [would] be ongoing transition and commercial arrangements to provide for a seamless delivery of services to the customers and other stakeholders of the Labcorp and the Clinical Development business[.]" (¶ 48.) Among the multitude of tasks confronting Fortrea, the spin-off required Fortrea to establish independent systems, infrastructure, and corporate functions that had historically been provided by Labcorp. (¶¶ 11, 54.) To facilitate the separation, Fortrea entered into a series of TSAs under which Labcorp would continue to provide certain services–such as information technology, finance, and human resources–at cost for a limited period while Fortrea built standalone capabilities. (¶¶ 52-55.) Fortrea agreed to pay "fees based on the direct and indirect costs associated with rendering those services, at no less than cost," and that the TSAs "would not extend later than June 30, 2025, two years after the effective date of the Spin-Off." (¶¶ 53, 133.) Thus, from the very beginning of Fortrea, the market was fully informed of the TSAs, their limited duration and that services provided thereunder would be billed at *Labcorp's* cost. Labcorp, however, is not alleged to have been a technology service provider, and the systems provided pursuant to the TSAs had been developed for Labcorp's business needs, not for Fortrea as a standalone company.

Fortrea also disclosed that replacing the TSAs would require significant operational investment: "TSA inefficiencies reflect the impact of the incremental costs of obtaining services under the transition services agreement compared to the estimated cost of performing those functions internally." (Ex. A at 73.) Fortrea also explained that it "anticipated that the TSA arrangements [would] be phased out over a 24-month period as [Fortrea] develop[ed] the necessary infrastructure and capabilities to perform these functions internally." (*Id.*) Consistent

with that messaging, Fortrea stated that its near-term capital allocation "prioriti[es]" included "infrastructure investments to enable timely exit of the TSAs with Labcorp." (¶ 97.)

**C.      Fortrea Explained that TSA Exit
Would Be a Step Towards Expected SG&A Cost Improvements**

Fortrea repeatedly explained that exiting the TSAs and deploying its newly developed systems was an important step towards expected future SG&A cost improvements. For example, during the 3Q23 Earnings Call, Defendant McConnell stated that Fortrea had "detailed plans for the changes we can make to improve our SG&A cost as a percent of revenue[,]" but that "[t]he improvements will come in phases over the next few years as some are heavily dependent upon exit of the TSA agreement." (¶ 100.) Fortrea cautioned that exiting individual TSAs would not immediately drive margins: "the ones that we've come out [of] aren't going to—in and of themselves do a lot in terms of the margin," because "it's really what we replace them with." (Ex. F at 9.)

Fortrea also explained the larger context of future potential cost savings: "We do need to invest more in supporting technology and the spin and the exit from the parent will allow us to completely revise our software suite. There is also an opportunity for greater productivity while reducing technology costs. We also see procurement facility savings and will align operations cost with revenues more effectively." (Ex. G at 8.) The next quarter Fortrea stated, "As we have mentioned, much of this is focused on reducing high costs in IT, but also improving how we use technology throughout the business. We will benefit from the more modern tools being deployed in our industry now, along with AI and automation." (Ex. H at 7.)

Fortrea also cautioned that forward-looking statements regarding its performance were subject to "known and unknown risks and uncertainties," including risks arising from "the impacts of becoming an independent public company" and its "reliance on Labcorp . . . and third

5

parties" for "IT, accounting, finance, legal, human resources, and other services critical to our businesses" during and following the transition period. (Ex. B at 4; *see also* Ex. E at 4.) Fortrea warned that establishing standalone accounting, enterprise resource planning, and other management systems "could cost more or take longer than anticipated," and that the operational and systems separation from Labcorp was "complex and involves numerous systems and jurisdictions." (*Id.*)

**D.    Fortrea's Backlog and PSPs**

Fortrea also fully disclosed the backlog of PSPs that it inherited following the spin, which it defined as "anticipated future revenue from business awards that either have not started, or that are in process and have not been completed." (¶ 57.) In its FY23 Form 10-K, Fortrea cautioned that it did "not believe that, as a sole measure, our backlog is a consistent indicator of future revenue," because backlog is affected by "the variable size and duration of the projects." ( Ex. B at 50.) Similar disclosures were made throughout the putative class period. (*See, e.g.*, Ex. E at 56.) Fortrea also explained that backlog conversion depended on assumptions regarding trial progress, customer decisions, and contract modifications, that projects "may be canceled or delayed," and Fortrea generally has "no contractual right to the full amount of the future revenue reflected in our backlog" in the event of termination or changes in scope. (Ex. B at 25, 50; Ex. E at 27.) Fortrea further warned that "[t]he rate at which our backlog converts to revenue may vary over time," and that revenue recognition on "larger, more global projects could be slower," including due to extended coordination between award and contract execution and delays in regulatory approvals. (Ex. B at 25; Ex. E at 27.) Fortrea was transparent about revenue pressure being attributable to the "quantity and burn rate of new business wins pre-Spin" and "challenges of mix." (Ex. C at 39; *see also* Ex. D at 36 (revenues pressured due to "the mix of later stage and longer duration studies in our portfolio.").)

### E.    Fortrea Discloses Financial Results and Updates Projections

Throughout the putative Class Period, Fortrea reported quarterly results reflecting the costs and operational challenges of operating as a newly independent company. (¶¶ 167-196.) In May 2024, Fortrea reduced revenue guidance, citing "slower study start-up due to the therapeutic mix and certain biotech programs" and "lower-than-anticipated first quarter book-to-bill . . . ." (¶ 70.) In August 2024, Fortrea revised expectations again, explaining that "the challenges of the separation and the time it is taking to optimize our commercial approach and operational execution has led to a slower return to growth and margin expansion than we originally anticipated." (Ex. I at 8.) Fortrea confirmed that as it exited the TSAs and implemented its stand-alone systems, management conducted a "deeper analysis of full-service projects and other inputs to longer-term forecasts[,]" which took time to confirm and resulted in updated expectations for 2025. (¶ 280.) With respect to the PSPs, Fortrea disclosed that inherited pre-spin projects were "extended in duration" and "well into their life cycle," creating margin headwinds due to "inefficiencies in the pre-[spin] portfolio and the inherited SG&A costs . . . ." (¶ 183.) Fortrea later explained that those projects had "a lot of hours in them already," resulting in a "slower burn"—"[i]t's not so much less backlog; it's slower burn." (¶¶ 24, 280.)

### ARGUMENT

To state a claim under Section 10(b), Plaintiffs must allege, among other things: (1) a material misstatement or omission; (2) scienter; and (3) loss causation. *See Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019); *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023). Plaintiffs must also satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA, which require that the Complaint plead the circumstances constituting the alleged fraud with particularity. *See ATSI Commc'ns, Inc.*, 493 F.3d at 99; *Philip Morris*, 89 F.4th at 416-17; *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 567 (S.D.N.Y. 2007).

## I.    PLAINTIFFS FAIL TO PLEAD THE EXISTENCE OF AN ACTIONABLE MISSTATEMENT OR OMISSION

Plaintiffs identify allegedly false or misleading statements falling into two categories: (i) statements concerning Fortrea's TSA exit strategy and anticipated SG&A efficiencies from moving to "fit-for-purpose" infrastructure (¶¶ 208-46), and (ii) statements concerning Fortrea's PSP backlog and future revenue visibility. (¶¶ 196-207.) Plaintiffs have not adequately pleaded that any statement is actionable.[3]

To meet the heightened pleading standard of the PSLRA, a plaintiff must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Whether a statement is misleading must be assessed "in light of all its surrounding text," "in its full context," and from the perspective of a "reasonable investor." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015). A plaintiff must plead particularized facts showing that challenged statements were false or misleading when made, not merely that later developments disappointed expectations. *See In re Nokia Corp. Sec. Litig.*, 2021 WL 1199030, at \*14 (S.D.N.Y. Mar. 29, 2021). Allegations of "fraud by hindsight" are insufficient as a matter of law. *Slayton v. Am. Express Co.*, 604 F.3d 758, 776 (2d Cir. 2010).

---

[3]    To the extent Plaintiffs assert scheme liability under Rule 10b-5(a) or (c), that claim fails because Plaintiffs allege no deceptive conduct apart from the alleged misstatements and omissions, which must be analyzed under Rule 10b-5(b). *SEC v. Rio Tinto plc*, 41 F.4th 47, 54-55 (2d Cir. 2022).

**A.    The Vast Majority of the Challenged Statements
Are Inactionable Forward-Looking Statements**

As a threshold issue, the vast majority of the statements challenged by Plaintiffs are

forward-looking statements protected by the PSLRA safe harbor,[4] which makes such statements

inactionable if (1) the statement is identified as forward-looking and accompanied by meaningful

cautionary language, or (2) the plaintiff fails to plead facts showing that the speaker made the

statement with actual knowledge that it was false or misleading. 15 U.S.C. § 78u-5(c)(1). The

safe harbor is "written in the disjunctive." *Slayton*, 604 F.3d at 766

Here, both the TSA and PSP challenged statements are forward-looking on their face,

including those concerning expected future revenue visibility, anticipated margin improvement,

targeted EBITDA levels, the expected timing and impact of exiting TSAs, and anticipated

benefits from moving to "fit-for-purpose" infrastructure. (¶¶ 196, 200, 206, 208, 212, 214, 216,

218, 220, 222, 224, 226, 228, 230, 232, 234, 237, 239, 241, 243, 245.)[5] Likewise, Plaintiffs cite

to statements concerning targets or goals about future performance, including references to

"revenue in years to come" (¶ 196), "confidence and visibility into our future revenues" (¶ 200),

"expect[ations] to be on track with . . . exiting 2024 . . . at a run rate around a 13% EBITDA

margin" (¶ 222), improvements expected to emerge "over time," "in phases" and "through the

year" (¶¶ 208, 212, 216, 236, 239, 241), and SG&A efficiencies tied to replacing TSAs with

---

[4]    Each source of the challenged statements expressly identified them as "forward-looking statements" subject to significant risks and uncertainties that could cause actual results to differ materially from our current expectations" and incorporated Fortrea's risk disclosures filed with the SEC. (*See, e.g.*, Exs. G, H, I, J at 2; Ex. K at 2, 7; Ex. F at 1, 5.)

[5]    Plaintiffs identify one statement they contend encompassed a representation of present fact in their pre-motion letter (ECF No. 55 ("PML") at 2, citing ¶ 204.), That statement is inactionable puffery and not alleged to be false. Plaintiffs' reliance on *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600 (S.D.N.Y. May 24, 2018) therefore is unavailing. *See id.* at *8 (statements included present facts). And, as explained below, Plaintiffs have not identified any omissions, rendering the remainder of their citations inapposite. *See City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013); *In re Estée Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686, at *7 (S.D.N.Y. Mar. 31, 2025).

"more fit-for-purpose infrastructure" (¶ 208, 218). Because these statements are quintessential forward-looking statements, they cannot form the basis of securities fraud under the PSLRA safe harbor. *See Docdeer Found. v. BioNTech SE*, 2025 WL 2781381, at *12-13 (S.D.N.Y. Sept. 30, 2025) ("[P]rojections of revenue or income and future economic performance" are forward-looking statements.)

### 1. These Forward-Looking Statements Were Accompanied By Meaningful Cautionary Language

With respect to the TSA exits and forecasted future cost improvements, Fortrea cautioned its "dependence on third parties" and "ability to establish and develop" systems could "cost more or take longer than anticipated." (Ex. B at 4.) With respect to the PSPs and backlog, Fortrea cautioned that its "backlog . . . may not be indicative of [its] future revenues and [it] might not realize all of the anticipated future revenue reflected in [its] backlog." (*Id.*) Fortrea included specific disclosures concerning the very risks about which Plaintiffs complain.[6] The cited statements therefore are inactionable pursuant to the safe harbor. *See, e.g.*, *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355, 357 (2d Cir. 2022) (affirming dismissal where "the relevant risk . . . was fully disclosed."); *In re Weight Watchers Int'l Inc. Sec. Litig.*,

---

[6] Plaintiffs argue that the safe harbor is inapplicable because the risks supposedly already had transpired, asserting that the supposed fact that "the PSPs had 'a lot of hours in them'" and one vendor "was chronically over budget" already existed. (PML at 3.) Plaintiffs' allegations of falsity, however, concern statements about future SG&A savings, margin improvement and revenue generation from backlog, not the specific number of hours on projects or the budget for a vendor. This distinction is illustrated by the case Plaintiffs cite. *See Rombach v. Chang*, 355 F.3d 164, 173-74 ("A company that operates 119 separate facilities nationwide is bound to have problems assimilating this or that property, to have disputes over payments with vendors and landlords, and to have some bills unpaid by reason of contested amounts or spot episodes of illiquidity; the allegations in the complaint are consistent with unremarkable circumstances short of financial peril or instability.").

504 F. Supp. 3d 224, 255 (S.D.N.Y. 2020) (warnings "disclose[d] the <u>exact</u> risk of which Plaintiffs complain").[7]

### 2.    Plaintiffs Have Not Pled Defendants Had Actual Knowledge That The Statements Were False

To plead actual knowledge under the PSLRA's safe harbor, Plaintiffs must allege particularized facts showing that Defendants *knew* their statements were false or misleading when made. 15 U.S.C. § 78u-5(c)(1)(B)(i). "[T]he scienter requirement for forward-looking statements is stricter than for statements of current fact." *Slayton*, 604 F.3d at 773. To meet this high standard, Plaintiffs must allege "specific, contemporaneous reports or statements" demonstrating that Defendants did not believe their stated expectations or knew that the projections were unattainable when made. *In re Danimer Sci., Inc. Sec. Litig.*, 2023 WL 6385642, at *7 (E.D.N.Y. Sept. 30, 2023), *) aff'd sub nom. Swanson v. Danimer Sci., Inc.*, 2024 WL 4315109 (2d Cir. Sept. 27, 2024; *see also S.S. Trade Ass'n of Balt.-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*, 704 F. Supp. 3d 429, 443-44 (S.D.N.Y. 2023). Allegations that Defendants may have known of some issues affecting future performance are insufficient. *See Slayton*, 604 F.3d at 776.

Here, Plaintiffs claim that Defendants approved budget overages for a vendor and had seen an unidentified model in 2023 that projected cost savings from a particular project would take three years to realize. (PML at 3, citing ¶ 159.) But, as explained in more detail below (*see infra* § II.C), Plaintiffs' former employee ("FE") allegations do not establish the falsity of any statement, let alone that anyone knew the statements were false when made. Rather, the FE

---

[7]    Fortrea's risk disclosures are far more specific that the "general warnings in AMC's SEC forms, about 'execution risks' relating to AMC's acquisitions [and] unspecified 'known . . . risks [and] uncertainties'" at issue in the case cited by Plaintiffs. *See Haw. Structural Ironworkers Pension Trust Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp.3d 821, 847 (S.D.N.Y. 2019) (alterations in original).

11

allegations either are consistent with Fortrea's public statements, or fail to speak to the issues alleged by Plaintiffs. Plaintiffs have not shown with specificity that Defendants had acted with actual knowledge that the statements were false or misleading.[8]

### B.    Plaintiffs' TSA Allegations Do Not Identify Any Actionable Misstatement or Omission

Plaintiffs allege Fortrea purportedly failed to disclose that TSA services would be replaced with similar, if not higher costs, and that internal cost models allegedly showed that certain replacement arrangements would take years to yield savings. (¶¶ 209, 223-46.) Plaintiffs further contend that several statements misleadingly suggested that exiting the TSAs was the primary constraint on reducing SG&A and achieving margin improvement. (¶ 238.)

In evaluating the statements at issue, a court should consider the actual statements and surrounding context, not plaintiff's characterization of the statements. S*ee In re Express Scripts Holdings Co.*, 773 F. App'x 9, 12 (2d Cir. 2019); *Martin v. Quartermain*, 732 F. App'x 37, 41-42 (2d Cir. 2018); *Singh*, 918 F.3d at 63; *see also In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007) ("Nor should a court accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court."). Here, Plaintiffs have failed to allege that a single TSA statement was false when made.

*First*, Plaintiffs attempt to assert falsity by claiming that because Labcorp provided services at cost (which was disclosed), exiting the TSAs "would not cause the Company's SG&A to decrease." (¶ 157.) From this faulty premise, Plaintiffs allege the falsity of numerous

---

[8]    Again, the facts alleged here can be contrasted with the case relied upon by Plaintiffs (PML at 3), where the former employee was alleged to have reported the items at issue directly to the Chief Executive Officer. *See In re STMicroelectronics N.V. Sec. Litig.*, 2025 WL 2644241, at *2 (S.D.N.Y. Sept. 15, 2025).

statements, claiming that exiting the TSAs "would merely result in replacing TSA service costs with similar, if not higher, infrastructure costs from Fortrea itself for third-party service providers." (*See* ¶¶ 209, 211, 213, 215, 217, 219, 223, 225, 227, 229, 231, 233, 235, 240, 242, 244, 246.) But Plaintiffs' claims rewrite Fortrea's disclosures, which do *not* promise an instantaneous reduction of SG&A expense upon exiting a TSA,[9] but instead explain that Fortrea expected future SG&A improvements as it replaced TSAs "with more fit-for-purpose infrastructure" and that margin improvements would occur "over time." (¶ 208.) Indeed, as Plaintiffs concede, Fortrea explained that "[t]he improvements will come in phases over the next few years" (¶ 212) and that "owners have been tasked with coming back with a replacement system or technology or process that is more cost effective." (¶ 220; *see also* ¶¶ 210, 214, 216, 218, 226, 228, 230, 234, 237, 239, 241, 243, 245.) Read in context, Fortrea clearly explained that exiting the TSAs would open the door to a more cost optimized structure as Fortrea implemented newly designed fit-for-purpose systems allowing it to operate more efficiently.[10] Thus, Plaintiffs' bald allegations that the statements were false because replacing the TSA would result in "similar, if not higher, infrastructure costs" from a "third-party service provider" (¶¶ 215, 217, 219)–or suggestion that Labcorp's systems could not be improved upon because they were provided at cost (¶¶ 223, 242, 246)–are misaligned with Fortrea's actual disclosures, which speak to an ongoing process that would allow improved efficiencies from the newly developed systems (*Compare* ¶ 12 (incorrectly asserting that Defendants' statements could only be true if

---

[9]    There would be some improvement in expenses as exiting the TSAs would mean that Fortrea no longer would need to pay *both* for the TSA and the design and implementation of its new systems.

[10]    Fortrea's characterization of exiting the TSAs as being "key," "critical," or "essential" to future margin improvement (¶¶ 218, 220, 228, 230, 245) are consistent. These statements do not assert that TSA exit was the sole driver of margin improvement, nor do they represent that TSA exit alone would guarantee cost reductions.

they could "implement services cheaper than at the cost provided by Labcorp."); *see also* ¶¶ 97, 138, 139.)

*Second*, Plaintiffs recast their mistaken claim that the TSAs could not be improved upon into allegations that any forecast about SG&A or margin improvements also must have been false when made. Many of the statements identified by Plaintiffs, however, speak about *future* SG&A or margin improvement, *following* exit from the TSAs and implementation of the new fit-for-purpose systems. (*See, e.g.*, ¶ 212 ("improvements will come in phases over the next few years"); ¶ 218 (2024 "is really how do we make sure we exit those TSAs, start moving towards a more fit-for-purpose infrastructure"); ¶ 228 ("TSA exits allow us to start to make some of the more significant changes around SG&A"); ¶ 239 (potential to improve SG&A "over time once we fully exit the TSA services and can transition to lower cost replacement infrastructure"); *see also* ¶¶ 208, 210, 214, 220, 224, 230, 234, 237, 241, 245.) Contrary to Plaintiffs' allegations, Fortrea's disclosures speak to the development of a fit-for-purpose structure that would lead to potential future efficiencies.[11]

*Third*, Plaintiffs' attempt to bootstrap their TSA arguments into an assertion that SG&A or margin forecasts must have been false when made ignores Fortrea's actual disclosures and the components of the ratios they cite. Margin includes both revenue and adjusted EBITDA, both of which involve many metrics beyond TSA exits. (*See* ¶ 171 (net income to adjusted EBITDA

---

[11] Plaintiffs term this argument "puzzling" in their pre-motion letter (PML at 1 n.2), asserting that "Defendants also repeatedly assured investors that the TSA Exit Strategy would reduce expenses, leading to 13% EBITDA margins 'exiting 2024' and that the 'TSA exit trajectory' was 'really key to unlocking the SG&A improvement." (*Id.* at 1-2 (citations omitted).) The disclosures they cite, however, contain no such assurances. (*See* ¶ 222 (discussing "headwinds of lower full-service clinical sales, elevated infrastructure costs and the transition services agreement" and continues to state that the Company was "working to mitigate these headwinds and we expect to be on track with the previously shared margin improvement target of exiting 2024 and entering 2025 at a run rate around 13% adjusted EBITDA margin."); ¶ 230 ("there's a lot of opportunity in SG&A and exiting those TSAs at the tail end of this year will give us that opportunity for 2025"); ¶ 239 (potential margin improvement "over time once we fully exit the TSA services and can transition to lower cost replacement infrastructure.").)

reconciliation).)[12] Likewise, the ratio of SG&A expense to revenue axiomatically is driven in significant part by revenue.[13] And the forward-looking margin forecasts about which Plaintiffs complain reflect that Fortrea expected near term margin improvements to come from areas other than TSA exits. (*See* ¶ 222 (efforts to mitigate "headwinds of lower full-service clinical sales, elevated infrastructure costs and the transition services agreement"); ¶ 224 (margin forecast assumes "quarterly book-to-bill metrics of at least 1.2x and exiting our TSAs per our current plans."); ¶ 226 (margin growth in back half of 2024 "weighted a little bit more to revenue growth"); ¶ 237 (most margin improvement would come from gross margin "because the Company would not yet have exited the TSAs.").)[14] That Fortrea later revised its margin forecast does not make any of these statements false.

*Fourth*, Fortrea explained that exiting individual TSAs would not, standing alone, drive margin improvement because "it's really what we replace them with." (¶ 220.) Where a company discloses execution risk and that risk later materializes, the securities laws do not impose liability. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005); *Merrill Lynch & Co.*, 568 F. Supp. 2d 349, 360 (S.D.N.Y. 2008).[15]

---

[12] Plaintiffs' observation that adjusted EBITDA was reported "without the impact of 'one-time' costs" (¶ 173) is consistent. Adjusted EBITDA margin improvements can be driven by many factors unrelated to TSA exits.

[13] SG&A cost improvements also were not limited to TSA exits. (*See* ¶ 232 ("we're pushing even harder on expense controls and cost improvements in operations and SG&A.")).

[14] Although Plaintiffs attempt to disguise it by focusing on ratios, Plaintiffs' chart reflects that SG&A expense did decrease in the first quarter of 2025, as did its TSA expense. (*See* ¶ 84.)

[15] Although largely beside the point, *see In re Skechers USA, Inc. Sec. Litig.*, 444 F. Supp. 3d 498, 521 (S.D.N.Y. 2020) (analyst reports cannot make non-actionable statements actionable), Plaintiffs also misportray analyst commentary. William Blair cautioned that Fortrea's margin outlook carried significant "execution risk." (Ex. L at 1.) Jefferies similarly emphasized that margin improvement depended on revenue productivity rather than cost cutting alone. (Ex. M at 1.) Deutsche Bank likewise noted that "[n]ear term margins" would remain pressured, with "the majority of SG&A improvement" expected in 2025. (Ex. N at 2.).

*Fifth*, Plaintiffs' alternate attempt to cast their claim as one of omission fails. Plaintiffs claim that Fortrea failed to disclose that TSA services would be replaced with similar, if not higher costs. (¶¶ 209, 211, 213, 215, 217, 219, 221, 223.) Setting aside that the fact that Labcorp's service under the TSA was provided at cost was fully disclosed (*see supra*),[16] additional disclosure is required "only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Macquarie Infrastructure Corp. v. Moab Partners*, *L.P.*, 601 U.S. 257, 264 (2024). "Whether a statement is misleading must be assessed "in light of all its surrounding text," "in its full context," and from the perspective of a "reasonable investor." *Omnicare, Inc.*, 575 U.S. at 190. Plaintiffs' omission theory fails for the very same reason as its misstatement theory: Fortrea's disclosures were not false when made, and no further disclosure was necessary to make them not misleading. *See Bratusov v. Comscore, Inc.*, 2020 WL 3447989, at *10-12 (S.D.N.Y. June 24, 2020) (Failla, J.).[17]

In the end, to plead a claim for securities fraud Plaintiffs must plead particularized facts showing challenged statements "were false or misleading when made." *Rombach*, 355 F.3d at 175. They have not done so. And pleading fraud by hindsight, which is all Plaintiffs have done, is insufficient as a matter of law. *Bay Harbour Mgmt. LLC v. Carothers*, 282 F. App'x 71, 75 (2d Cir. 2008).

---

[16]    "Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed." *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003).

[17]    As explained in the case cited by Plaintiffs, "[w]e do not understand these references to the 'whole truth' and to speaking 'completely' to describe a duty to disclose all the facts that pertain to a subject (many of which would be immaterial), but instead to describe a duty not to omit material facts whose omission, in light of what was stated, would be misleading." *Setzer v. Omega Healthcare Inv., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020).

**C.      Plaintiffs' PSP Allegations Do Not
Identify Any Actionable Misstatement or Omission**

Plaintiffs' allegations concerning PSP backlog fare no better. Two of those predate the

putative class period and cannot be the source of a securities fraud claim. (*See* ¶¶ 196, 200). *See*

*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007); *In re Lions Gate Ent.*

*Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 16-17 (S.D.N.Y. 2016); *In re Openwave Sys. Sec. Litig.*, 528

F. Supp. 2d 236, 253-54 (S.D.N.Y. 2007). In any event, those statements, as well as the

remaining three, distill to statements that Fortrea had a backlog of a specified amount (¶¶ 204,

206), had contracts that extended over multiple years (¶¶ 196, 200) and had restated its backlog

to remove projects with no current revenue and to incorporate known scope changes. (¶ 202.)

None of these statements is alleged to be false.

Plaintiffs do not dispute the accuracy of Fortrea's disclosed backlog metrics, nor that

Fortrea had contracts that extended for multiple years. Indeed, Plaintiffs *admit* that Fortrea

converted significant backlog into revenue during the putative class period. (¶ 59.) *See Docdeer*

*Found.*, 2025 WL 2781381, at *12 (accurate historical information does not create implicit

promise as to future success). Plaintiffs also do not dispute that Fortrea restated its backlog in

2023 as part of the spinoff to remove contracts that no longer had current revenue.[18]

Instead, Plaintiffs purport to show falsity by pointing to a later disclosure "that the pre-

spin projects, many late in their lifecycle, have less revenue and less profitability expected for

2025," which Fortrea further explained: "[i]t's not so much less backlog; it's slower burn and

that's the difference in '25" and that certain contracts "have a lot of hours in them already, and

every incremental hour is less as a percentage of the total, and that causes them to burn more

---

[18]    Removing contracts that have no current revenue from the backlog is far different than forecasting which
contracts might experience slower that expected burn years in the future.

17

slowly." (¶ 280; *see also* ¶¶ 201, 203, 205, 207.) That the backlog conversion in 2025 turned out differently than expected does not demonstrate the falsity of any of these statements. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), ("A statement believed to be true when made, but later shown to be false, is insufficient."), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

Moreover, Fortrea expressly warned that backlog is "not" a "consistent indicator of future revenue" and is affected by "the variable size and duration of projects." (Ex. B, FY23 Form 10-K at 50.) Fortrea also cautioned investors throughout the class period about the "need to expend significant efforts and costs" to replace TSAs. (*Id.*; *see also* Ex. A at 26 ("including potentially materially in excess of those estimated in the transition services agreement".) Indeed, Fortrea further explained in its 2024 quarterly filings that revenue pressure reflected the mix and burn rate of PSPs. (Ex. C at 39; Ex. D at 36.) Materialization of a disclosed risk does not constitute securities fraud. *Lentell*, 396 F.3d at 177; *Smith v. PureCycle Techs., Inc.*, No. 23-CV-8605 (JGK), 2024 WL 5186586, at *9-10 (S.D.N.Y. Dec. 20, 2024).

Plaintiffs' reliance on an unidentified FE who purportedly worked in "Technology Engagement" for less than a year who allegedly stated that it was "well known . . . that the trials and other projects associated with the Pre-Spin Projects had little work left on them" and "was not producing enough revenue to carry the Company" does not alter the analysis. (¶¶ 72-73.) FE1 is not alleged to have opined that Fortrea included anything inappropriate in its disclosed backlog figures. Rather, FE1 complains that the PSPs were "not producing enough revenue to carry the Company"(¶ 73) and that FE1 wanted but did not receive "more color on the Company's pipeline of new contracts." (¶ 74.) Fortrea, however, is not alleged to have stated that the PSP

18

contracts were sufficient to "carry" the Company, and Plaintiffs complain about the backlog, not pipeline.

Nor have Plaintiffs identified an actionable omission relating to the PSPs. In sweeping fashion, Plaintiffs conclude that each of the PSP statements was false because Fortrea purportedly failed to disclose "that the Pre-Spin Projects, many late in their lifecycle, already had 'a lot of hours in them' and, under their terms, would provide less revenue and less profitability on an annual basis going forward." (¶ 205; *see also* ¶¶ 197, 201, 203, 207.) But a plaintiff must plead particularized facts showing that challenged statements were false or misleading *when made*, not merely that later developments disappointed expectations. *Rombach*, 355 F.3d at 175; *Shemian v. Rsch. In Motion Ltd.*, 2013 WL 1285779, at *21 (S.D.N.Y. Mar. 29, 2013), (plaintiffs must plead "sufficient facts regarding the existence and timing of Defendants' knowledge of defects to give rise to a duty to disclose.") *aff'd*, 570 F. App'x 32 (2d Cir. 2014). Absent from the Complaint is any particularized allegation that Fortrea knew that it would later come to pass that certain projects were burning more slowly than had been anticipated based on then-available information. Plaintiffs also have failed to allege that any of the truthful statements made by Fortrea about its backlog were rendered false by an alleged omission. A plaintiff must plead a "direct connection between Defendants' statements" and the allegedly omitted facts. *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012); *see also In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 169 n.20 (S.D.N.Y. 2023). Here, the alleged omissions are disconnected from Fortrea's statements about the size of the backlog (which Plaintiffs do not dispute) or the fact that many of Fortrea's contracts were multiple year contracts (which Plaintiffs also do not contest).

19

### D.    Fortrea's Statements of Corporate Optimism or Opinion Are Not Actionable

Many of the challenged statements also fail to state a claim for additional reasons. Statements describing Fortrea as "a great partner" and "a long-term value creation opportunity" (¶ 204), having "confidence and visibility into [its] future revenues" (¶ 200), having an "attractive" backlog or is "commit[ed] to longer-term growth." (¶ 206) are classic examples of "vague pronouncements of corporate optimism" *In re Nokia Corp. Sec. Litig.*, 2021 WL 1199030, at *17 n.16, that "cannot have misled a reasonable investor." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JPMorgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *see also Docdeer Found.*, 2025 WL 2781381, at *14 (statements describing an "expanded broad pipeline" were puffery); *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 221 (E.D.N.Y. 2019).[19]

Likewise, Plaintiffs' attempt to challenge statements of opinion also fails. (*See* ¶¶ 118, 175, 224, 234, 245.) To plead a claim based on an opinion, a plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (quoting *Omnicare, Inc.*, 575 U.S. at 194). An opinion "is not necessarily misleading when an issuer knows, but fails to disclose,

---

[19]    The cases cited by Plaintiffs are not to the contrary. *See SEC v. Farnsworth*, 692 F. Supp. 3d 157, 181 (S.D.N.Y. 2023) (Failla, J.) (statements were "attempts to address concerns about specific elements of the Companies' financial situation and business model, rather than general boasting of general characteristics about the business"); *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 501 (E.D.N.Y. 2025) ("To ascertain whether the challenged statements are 'determinate, verifiable statements,' as opposed to puffery, courts look for an 'objective, black-and-white standard.'"); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (statements "were made repeatedly in an effort to reassure the investing public about the Company's integrity"). Indeed, there are no allegations that the Company was not on track for exiting the TSAs by the end of 2024 (¶¶ 118, 175, 245) or that a streamlined cost structure would not enable the Company to reduce SG&A expenses. (¶¶ 224, 234.)

20

some fact cutting the other way." *Id.* at 210.[20] For the reasons explained above, Plaintiffs have failed to plead with particularity that any of the opinion statements were known to be false at the time they were made.

## II.    PLAINTIFFS FAIL TO ALLEGE A STRONG INFERENCE OF SCIENTER

Although the Court need not reach the issue, Plaintiffs' claims fail for the independent reason that they have not pled "with particularity facts giving rise to a strong inference" that each Defendant acted with scienter, *i.e.*, "an intent 'to deceive, manipulate, or defraud.'" *ECA*, 553 F. 3d at 206 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)). To meet the onerous pleading standard, the inference of scienter "must be 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Id.* Plaintiffs must allege particularized facts showing either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA,* 553 F.3d at 198. Plaintiffs make no effort to show motive—there are no allegations of specific stock sales or other personal gains— and Plaintiffs' attempt to show conscious misbehavior or recklessness falls flat.

### A.    Plaintiffs' Miscellaneous Allegations
### Do Not Give Rise to a Strong Inference of Scienter

Unable to show motive, Plaintiffs resort to a hodgepodge of allegations distilling to a legally insufficient claim that the Defendants should have known of the falsity of their statements. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011). To plead scienter, however, "Plaintiffs would have to show, at the least, conduct which is highly unreasonable and

---

[20]    Unlike the cases cited by Plaintiffs, there are no facts pled establishing that the Defendants did not believe the statements were true. *See Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 547 (S.D.N.Y. 2017).

21

which represents an extreme departure from the standards of ordinary care." *ECA*, 553 F.3d at 202-03. They have not done so.

First, Plaintiffs' "core operations" argument fails, (*see* ¶ 255), as "[c]ourts have required that the operation in question constitute nearly all of a company's business . . . .'" *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 374 (S.D.N.Y. 2018) (finding company's largest mine, accounting for 70% of gold production, insufficient). Clinical development contracts constitute Fortrea's business—not transitional service agreements. (*See* ¶¶ 43-44.) Regardless, the core operations doctrine "does not independently establish scienter." *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015); *see also Docdeer Found.*, 2025 WL 2781381, at *16.

Nor can Plaintiffs allege scienter based on Defendants' high-level positions. (*See* ¶¶ 38, 249.) *See also In re Farfetch Ltd. Sec. Litig.*, 802 F. Supp. 3d. 652 (S.D.N.Y. 2025); *Lipow*, 131 F. Supp. 3d at 163. Even taken together, allegations based on core operations and high-level positions are too "general" and therefore "undisputedly insufficient to satisfy the heightened pleading standard." *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010); *see also Barrick Gold Corp.*, 341 F. Supp. 3d at 373. Nor can Plaintiffs cure these defects by alleging, in general terms, that certain information was available through internal systems or models. *See Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010).

Plaintiffs' last-ditch effort to cast Defendant Pike's resignation in May 2025—months after any purported materialization of disclosed risk—as evidence of scienter also is legally

insufficient. (¶ 261); *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 499 (S.D.N.Y. 2017) (resignations were not "'highly unusual [or] suspicious' when defendants 'resigned . . . several months after the Class Period ended'"); *see also Bratusov*, 2020 WL 3447989, at *15.

## B.    The Former Employee Allegations Do Not Establish Scienter

Plaintiffs additionally attempt to use confidential witness allegations as the basis to establish scienter. (¶¶ 145-59, 258.) As a threshold issue, Plaintiffs do not describe these purported sources "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314; *Damri v. LivePerson, Inc.*, 772 F. Supp. 3d 430, 450-51 (S.D.N.Y. 2025). None of the FEs is alleged to have held a position that would plausibly provide insight into Fortrea's senior-level decision-making,[21] nor do Plaintiffs allege that any FE had direct discussions with or attended any meeting with the Individual Defendants. *See Meyer v. Organogenesis Holdings Inc.*, 727 F. Supp. 3d 368, 396 (E.D.N.Y. 2024); *Loc. No. 38*, 724 F. Supp. 2d at 460 (rejecting "anecdotes and conclusory statements" from "rank-and-file" employees); *Jackson v. Halyard Health, Inc.*, 2018 WL 1621539, at *9 (S.D.N.Y. Mar. 30, 2018) ("Plaintiffs' vague references to 'senior leadership' and 'senior management' do not suffice to tie the Individual Defendants to any information that was conveyed."); *Glaser*, 772 F. Supp. 2d at 591 ("[C]onclusory statements that defendants 'were aware' of certain information . . . or 'should have' had such knowledge is insufficient").

---

[21]    Plaintiffs claim that FE1 participated in weekly "TSA Steering Committee" meetings, which included the Chief Information Officer who in turn, "was a direct report of defendant Pike and a colleague of defendant McConnell[.]" (¶ 145.) Plaintiffs claim this made "FE1 just one level removed from the Individual Defendants." (*Id.*) FE2, allegedly a procurement employee, appears even further removed. (*See* ¶ 156 (FE2 "voiced concerns to their direct superior and Fortrea's Chief Procurement Officer[.]").)

Even if the FE allegations could be credited, they do not establish scienter. At most, FE1 is alleged to have stated that the Company was overbudget on costs paid to one vendor because the vendor was "nickel-and-diming" the Company and that the Company signed off on certain budget overages. (¶ 148.) Even taken at face value, these allegations say nothing about Fortrea's strategy of attempting to reduce SG&A expense over time as the TSA exits occurred or how the supposed "nickel-and-diming" impacted any forecast or disclosed metric. Likewise, FE2 is alleged to have disagreed with the retention of a vendor and to have seen an unspecified cost model showing that the shift to a vendor would take three years to realize cost savings. (¶ 159.) But the purported model[22] would have been consistent with the Company's statements that efficiencies would materialize "over the next few years" and "in phases." (¶ 212; *see also* ¶¶ 208 239, 241.) As to the backlog, FE1's assertion that PSP pressures were "common knowledge" (¶¶ 73, 258(a)) provides no specific facts explaining who supposedly knew, when they knew, or how such knowledge could be imputed to Defendants. Courts routinely reject "'vague and conclusory'" confidential witness allegations that information was "'common knowledge within the company.'" *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 399-400 (S.D.N.Y. 2020) (citations omitted) ("pretty much everyone" was aware); *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019) ("everyone . . . knew"). By contrast, where confidential witness allegations are credited, they identify concrete internal practices, specific projects or data, contemporaneous timing, and direct contradictions of public statements—none of which is alleged here. *See Sherman v. Abengoa, S.A.*, 156 F.4th 152, 160 (2d Cir. 2025).

---

[22] Where Plaintiffs contend Defendants had access to contrary information, they must "specifically identify the reports or statements containing this information." *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 473 (S.D.N.Y. 2017), *aff'd*, 732 F. App'x 37 (2d Cir. 2018).

C.    **Non Culpable Inferences Are More Compelling**

Where, as here, Plaintiffs fail to plead motive, fail to identify contemporaneous contradictory facts, and rely instead on later-disclosed challenges and revised expectations, the more compelling inference is non-fraudulent: Defendants set targets, encountered operational challenges, and disclosed results. (*See, e.g.*, ¶¶ 175, 222, 280.) Defendants' pattern of contemporaneous risk disclosures, ongoing updates, and eventual revisions is fundamentally inconsistent with an inference that they acted with intent to deceive. *Rombach*, 355 F.3d at 176; *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 407 (S.D.N.Y. 2006).

III.    **PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION**

Dismissal is also independently warranted because no causal link connects any alleged misstatements to any purported loss. *See Dura Pharms.*, *Inc,* 544 U.S. at 345-46. Plaintiffs cannot simply point to a price decline following negative news; they must plead facts demonstrating that the negative news revealed "the truth" about a prior misstatement or omission. *Lentell*, 396 F.3d at 177. The loss must be "foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *ATSI Commc'ns, Inc.*, 493 F.3d at 107.

First, the 2Q24 Earnings call did not disclose that any prior statement was false. Rather, it disclosed only that Fortrea's transition plans and execution efforts were progressing more slowly than anticipated—precisely the type of risk Fortrea had repeatedly warned could materialize as a newly independent company. (*See* ¶¶ 266-268.) Second, the September 25, 2024 Jeffries Report Plaintiffs identify as a corrective disclosure is nothing more than "[a] negative . . . characterization of previously disclosed facts," which "does not constitute a corrective disclosure of anything but the [author's] opinions." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010); *Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 498 (S.D.N.Y. 2016).

25

Third, Plaintiffs also concede that on November 8, 2024—consistent with Fortrea's prior disclosures—Fortrea reiterated that exiting the TSAs would not result in "an immediate switch" to "massively reduced SG&A." (¶ 175.) There is no alleged stock-price decline that day. And Plaintiffs' allegations of price drops on December 6 and 11, 2024 are also untethered to any corrective disclosure revealing the falsity of the challenged statements. (¶ 272-75.)

Finally, Plaintiffs point to a stock price drop on March 3, 2025, following Fortrea's revision of guidance. Fortrea's revised projections are not corrective disclosures. *See Prime Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc.*, 548 F. App'x 16, 18 (2d Cir. 2013) (revised projections not corrective because it did not reveal a prior misstatement but only "suggested that defendants had not had reliable information" at the time.) Indeed, Plaintiffs admit that the relevant information regarding the TSAs already was public by this date. And, rather than "admit[] that the TSA Exit Strategy was a failure" (¶ 283), Fortrea actually explained, just as it had stated in the past, that it was moving toward programs designed to reduce expenses and optimize spend with its own post-TSA enterprise systems. (*See* Ex. J at 6.) As to the backlog, Fortrea explained that the alleged "slower burn" of certain pre-spin projects was identified during Fortrea's implementation of its new operating environment, not as the revelation of any previously concealed fact. (¶ 280.) A disclosure describing management's discovery of execution dynamics during implementation is not corrective because it does not "reveal to the market the falsity of the prior [statements]." *Prime Mover Cap. Partners L.P.*, 548 F. App'x at 17.

## IV.    <u>PLAINTIFF'S SECTION 20(A) CLAIM SHOULD BE DISMISSED</u>

For the reasons described above, Plaintiffs have not sufficiently alleged a primary violation of Section 10(b) or culpable participation by the Individual Defendants. Accordingly, the Section 20(a) claim fails. *See Docdeer Found.*, 2025 WL 2781381, at *11.

26

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: New York, New York
      January 28, 2026

Respectfully submitted,

/s/ *Robert A. Fumerton*
Susan L. Saltzstein
Robert A. Fumerton
Jeffrey Geier
Eryn M. Hughes

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000
Susan.Saltzstein@skadden.com
Robert.Fumerton@skadden.com
Jeffrey.Geier@skadden.com
Eryn.Hughes@skadden.com

*Attorneys for Defendants Fortrea Holdings Inc.,
Thomas Pike, and Jill McConnell*

## LOCAL RULE 7.1(C) CERTIFICATION

I, Robert A. Fumerton, hereby certify that the foregoing memorandum of law complies with the word count limitations set forth in Rule 7.1(c) of the Local Rules of the United States District Court for the Southern District of New York, and contains 8,750 words, exclusive of the caption, table of contents, table of authorities, table of exhibits, signature blocks, and this certificate.

Dated: New York, New York
January 28, 2026

/s/ Robert A. Fumerton
Robert A. Fumerton

28