UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

LUCAS DESLANDE, Individually and on
Behalf of All Others Similarly Situated,

                 Plaintiff,

    vs.

FORTREA HOLDINGS INC., THOMAS
PIKE, and JILL MCCONNELL,

              Defendants.

——————————————————————— x

:  Civil Action No. 1:25-cv-04630-KPF

:  <u>CLASS ACTION</u>

<u>ORAL ARGUMENT REQUESTED</u>

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ....................................................................................................1

II.   STATEMENT OF FACTS ......................................................................................2

      A.    The Spin-Off and the TSA Exit Strategy Fraud..........................................2

      B.    The PSP/Backlog Fraud................................................................................5

      C.    Investors Learn the Truth..............................................................................6

III.  ARGUMENT ..........................................................................................................7

      A.    Legal Standard ..............................................................................................7

      B.    The AC Alleges False and Misleading Statements and Omissions .............8

            1.    Defendants Misled Investors About Fortrea's TSA Exit Strategy..............8

            2.    Defendants Misled Investors About the PSPs and Fortrea's
                  Backlog .............................................................................................12

            3.    The PSLRA Safe Harbor Is Inapplicable.....................................................15

            4.    None of the Challenged Statements Are Corporate Optimism or
                  Opinions.............................................................................................17

      C.    The AC Alleges a Strong Inference of Scienter...........................................18

            1.    Defendants Knew or Recklessly Disregarded the Truth.............................19

            2.    The AC's FE Allegations Demonstrate Actual Knowledge ......................20

            3.    The Core-Operations Doctrine Supports an Inference of Scienter ...........23

            4.    The AC Alleges Fortrea's Scienter.............................................................23

            5.    Viewed Holistically, the AC's Allegations Support Scienter....................24

      D.    The AC Alleges Loss Causation....................................................................24

      E.    The AC Pleads Section 20(a) Control Person Liability ................................26

IV.   CONCLUSION.......................................................................................................26

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*380544 Can., Inc. v. Aspen Tech., Inc.*,
  544 F. Supp. 2d 199 (S.D.N.Y. 2008).................................................................................26

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
  19 F.4th 145 (2d Cir. 2021) ...........................................................................................8

*Barron v. Helbiz, Inc.*,
  2021 WL 4519887
  (2d Cir. Oct. 4, 2021) .....................................................................................................26

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).........................................................................................................7

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) .....................................................................................17, 18

*Bishins v. CleanSpark, Inc.*,
  2023 WL 112558
  (S.D.N.Y. Jan. 5, 2023)....................................................................................................25

*Bratusov v. Comscore, Inc.*,
  2020 WL 3447989
  (S.D.N.Y. June 24, 2020).................................................................................................12

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014)....................................................................................8, 24, 25

*City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*,
  552 F. Supp. 3d 406 (E.D.N.Y. 2021) ............................................................................17

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012)..............................................................................19

*City of Providence v. Aeropostale, Inc.*,
  2013 WL 1197755
  (S.D.N.Y. Mar. 25, 2013) ................................................................................................17

*Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
  22 F.4th 1 (1st Cir. 2021)..................................................................................................20

*Cornwell v. Credit Suisse Grp.*,
  689 F. Supp. 2d 629 (S.D.N.Y. 2010)..............................................................................15

**Page**

*Docdeer Foundation v. BioNTech SE*,
2025 WL 2781381
(S.D.N.Y. Sep. 30, 2025) ........................................................................................17

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................................................24

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................14

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)..............................................................................17, 24

*Gauquie v. Albany Molecular Rsch., Inc.*,
2016 WL 4007591
(E.D.N.Y. July 26, 2016) .......................................................................................19

*Geisler v. Petrocelli*,
616 F.2d 636 (2d Cir. 1980)......................................................................................7

*Genesee Cnty. Emps.' Ret. Sys. v. DocGo Inc.*,
773 F. Supp. 3d 62 (S.D.N.Y. 2025)....................................................8, 12, 23, 26

*In re Allergan PLC Sec. Litig.*,
2019 WL 4686445
(S.D.N.Y. Sep. 20, 2019) .......................................................................................15

*In re AppHarvest Sec. Litig.*,
684 F. Supp. 3d 201 (S.D.N.Y. 2023)..............................................................20, 23

*In re Avon Sec. Litig.*,
2019 WL 6115349
(S.D.N.Y. Nov. 18, 2019) .................................................................................17, 18

*In re Danimer Sci., Inc. Sec. Litig.*,
2023 WL 6385642
(E.D.N.Y. Sep. 30, 2023)..................................................................................21, 22

*In re Dentsply Sirona, Inc. Sec. Litig.*,
2026 WL 124581
(S.D.N.Y. Jan. 16, 2026).........................................................................................22

*In re DraftKings Inc. Sec. Litig.*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023)....................................................................15

**Page**

*In re Gilat Satellite Networks, Ltd.*,
2007 WL 2743675
(E.D.N.Y. Sep. 18, 2007) ........................................................................................13

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
20 F.4th 131 (2d Cir. 2021) .....................................................................................24

*In re Hi-Crush Partners L.P. Sec. Litig.*,
2013 WL 6233561
(S.D.N.Y. Dec. 2, 2013).........................................................................................23

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
859 F. Supp. 2d 572 (S.D.N.Y. 2012)......................................................................15

*In re ITT Educ. Servs., Inc. Sec. Litig.*,
34 F. Supp. 3d 298 (S.D.N.Y. 2014)........................................................................16

*In re Lottery.com, Inc. Sec. Litig.*,
765 F. Supp. 3d 303 (S.D.N.Y. 2025).......................................................................21

*In re Nortel Networks Corp. Sec. Litig.*,
238 F. Supp. 2d 613 (S.D.N.Y. 2003).......................................................................13

*In re NovaGold Res. Inc. Sec. Litig.*,
629 F. Supp. 2d 272 (S.D.N.Y. 2009)....................................................................9, 16

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010).....................................................................................25

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015).......................................................................17

*In re Pretium Res. Inc. Sec. Litig.*,
256 F. Supp. 3d 459 (S.D.N.Y. 2017),
*aff'd*, 732 F. App'x 37 (2d Cir. 2018)......................................................................22

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)....................................................................................8, 13

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889
(S.D.N.Y. Nov. 26, 2018) .......................................................................................19

**Page**

*In re Signet Jewelers Ltd. Sec. Litig.*,
　2019 WL 3001084
　(S.D.N.Y. July 10, 2019) .....................................................................................................25

*In re Signet Jewelers Ltd. Sec. Litig.*,
　389 F. Supp. 3d 221 (S.D.N.Y. 2019).................................................................................10

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
　625 F. Supp. 3d 164 (S.D.N.Y. 2022)..................................................................................17

*Lentell v. Merrill Lynch & Co.*,
　396 F.3d 161 (2d Cir. 2005)..................................................................................................10

*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
　724 F. Supp. 2d 447 (S.D.N.Y. 2010)..................................................................................21

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
　513 F.3d 702 (7th Cir. 2008) ................................................................................................24

*Martinek v. AmTrust Fin. Servs., Inc.*,
　2020 WL 4735189
　(S.D.N.Y. Aug. 14, 2020) ..............................................................................................16, 17

*Meyer v. Jinkosolar Holdings Co.*,
　761 F.3d 245 (2d Cir. 2014)..................................................................................................13

*Meyer v. Organogenesis Holdings Inc.*,
　727 F. Supp. 3d 368 (E.D.N.Y. 2024) .................................................................................21

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
　455 F. App'x 10 (2d Cir. 2011) .................................................................................19, 22, 23

*Nguyen v. New Link Genetics Corp.*,
　297 F. Supp. 3d 472 (S.D.N.Y. 2018)..................................................................................18

*Noto v. 22nd Century Grp., Inc.*,
　35 F.4th 95 (2d Cir. 2022) ......................................................................................................8

*Novak v. Kasaks*,
　216 F.3d 300 (2d Cir. 2000)..................................................................................................19

*Nutriband, Inc. v. Kalmar*,
　2020 WL 4059657
　(E.D.N.Y. July 20, 2020) .......................................................................................................20

**Page**

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)..................................................................................................10, 18

*Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*,
751 F. Supp. 3d 330 (S.D.N.Y. 2024).............................................................................12

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
732 F. Supp. 3d 300 (S.D.N.Y. 2024).......................................................................23, 25

*Sec. & Exch. Comm'n v. Farnsworth*,
692 F. Supp. 3d 157 (S.D.N.Y. 2023).............................................................................19

*Set Cap. LLC v. Credit Suisse Grp. AG*,
996 F.3d 64 (2d Cir. 2021)..............................................................................................11

*Setzer v. Omega Healthcare Invs., Inc.*,
968 F.3d 204 (2d Cir. 2020)............................................................................................12

*Sherman v. Abengoa, S.A.*,
156 F.4th 152 (2d Cir. 2025) .....................................................................................14, 23

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)............................................................................................16

*Solomon v. Sprint Corp.*,
2022 WL 889897
(S.D.N.Y. Mar. 25, 2022) ...............................................................................................12

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)...................................................................................................18, 24

*Wang v. Cloopen Grp. Holding Ltd.*,
661 F. Supp. 3d 208 (S.D.N.Y. 2023).............................................................................16

*zCap Equity Fund LLC v. LuxUrban Hotels Inc.*,
792 F. Supp. 3d 407 (S.D.N.Y. 2025).............................................................................24

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C.
§78j(b)..........................................................................................................7, 8, 26
§78t(a)......................................................................................................................26

17 C.F.R.
§240.10b-5..................................................................................................................8

**Page**

Federal Rules of Civil Procedure
    Rule 8(a)............................................................................................................24
    Rule 9(b) .......................................................................................................8, 20
    Rule 12(b)(6)........................................................................................................7

Private Securities Litigation Reform Act of 1995
    Pub. L. No. 104-67, 109 Stat. 737 (1995).................................................8, 15, 16, 20

Lead Plaintiffs Construction Industry Laborers Pension Fund and City of Pontiac Reestablished General Employees' Retirement System ("Plaintiffs") respectfully submit this opposition to the motion to dismiss the Amended Complaint (the "AC," cited as "¶__," ECF 53) (the "Motion," cited as "MTD," ECF 64) filed by defendants Fortrea Holdings Inc. ("Fortrea" or the "Company"), Thomas Pike ("Pike"), and Jill McConnell ("McConnell" and, with Pike, the "Individual Defendants," and altogether, "Defendants").[1]

## I.    INTRODUCTION

Plaintiffs assert Exchange Act claims on behalf of a proposed class of investors who purchased or otherwise acquired Fortrea shares from July 5, 2023 through February 28, 2025 (the "Class Period").  After Fortrea's June 2023 spin-off (the "Spin-Off") from Labcorp Holdings Inc. ("Labcorp"), its former parent company, Defendants needed to create a value proposition for investors of the new company.  Their efforts to do so resulted in two separate but related frauds.

*First*, Defendants misrepresented that they had developed a plan to decrease Fortrea's selling, general and administrative expenses ("SG&A"), which they admitted were excessive (*see, e.g.*, ¶90), by the end of 2024, through exiting "burdensome" transition service agreements ("TSAs") with Labcorp (the "TSA Exit Strategy").  ¶232.  Instead of reducing SG&A, however, the third-party service provider they retained, Cognizant Technology Solutions Corporation ("Cognizant"), charged *more* than Labcorp, as Defendants were well aware: Defendants approved numerous budget overages for payments to Cognizant throughout the Class Period, and approved cost models showing that the TSA Exit Strategy would not achieve any cost savings *for at least three years*, much less year-end 2024.

---

[1]    Capitalized terms not defined herein have the meanings assigned in the AC.  Unless otherwise indicated, all internal quotations marks and citations are omitted and all emphasis is added.

*Second*, Defendants deceived investors into believing that pre-spin projects ("PSPs") – *i.e.*, projects Fortrea acquired before the Spin-Off – would provide meaningful revenue for the Company following the Spin-Off.  Defendants failed to disclose, however, that these PSPs were aging, resulting in significantly diminishing profitability going forward.  Indeed, Defendants knew this from the beginning of the Class Period, as they underwent a review of Fortrea's backlog that purportedly "ensure[d] the robustness of everything that was in there."  ¶67.  And it was "common knowledge" throughout the Company that, after the Spin-Off, the PSPs would not "produc[e] enough revenue to carry the Company."  ¶73.

Based on these misrepresentations, Defendants guided investors to lofty targets for adjusted EBITDA margin.  The truth slowly emerged over the course of 20 months, however, culminating in the FY24 earnings call on March 3, 2025, during which Defendants admitted the TSA Exit Strategy was an abject failure, and that SG&A as a percentage of revenue would not decrease to the level of Fortrea's peers.  Defendants also admitted that the PSPs were "late in their life cycle" and had "less revenue and less profitability than expected for 2025."  ¶179.  Accordingly, Fortrea badly underperformed in FY24, and there would be no improvement in FY25.  In response, Fortrea's common stock value plummeted.

Unable to meaningfully address the allegations in the AC, including credible allegations from two former employees ("FEs"), Defendants resort to straw-man arguments, mischaracterizations of the AC's well-pleaded allegations, and counterfactual narratives.  As discussed herein, these arguments should be rejected.

## II.    STATEMENT OF FACTS

### A.    The Spin-Off and the TSA Exit Strategy Fraud

Fortrea is a global contract research organization ("CRO") that provides clinical trial management solutions to its customers.  ¶2.  In June 2023, Labcorp's Clinical Development and

Commercialization Services business was spun off and became Fortrea.  ¶¶3, 51.  As part of the Spin-Off, Fortrea and Labcorp entered into the TSAs, pursuant to which Labcorp provided Fortrea with necessary business services.  ¶¶52-54.  Labcorp provided these services at cost, charging no premium.  ¶¶133, 153.

Nevertheless, Fortrea's SG&A were significantly higher than those of its peers, a fact Defendants effectively conceded throughout the Class Period.  ¶¶100, 114.  Fortrea's SG&A – which analysts and investors closely monitored (¶¶121-132) – ballooned throughout FY23 and FY24 as a percentage of revenue (¶¶82-86), and Defendants routinely identified the TSAs as the main driver of its SG&A, representing that the TSAs "force us into a cost structure that's higher than we would like."  ¶90; *see generally* ¶¶86-93.  Defendants parroted this excuse to investors at nearly every opportunity (¶¶94-120), explaining, for example, that increases in SG&A were due to "increase[s] in [TSA] costs[.]"  ¶88; *see also* ¶¶89, 92-93.

To allay concerns from analysts and investors about Fortrea's viability as a standalone company, Defendants insisted that they had devised "detailed TSA exit plans" to "move [Fortrea's] SG&A spend closer in line with peer benchmarks."  ¶94.  The TSA Exit Strategy would involve implementing necessary business systems, such that Fortrea would no longer need to rely on Labcorp, thereby decreasing SG&A and, in turn, increasing EBITDA margins.  ¶100.

Even before the Spin-Off, Defendants represented that, as Fortrea "exit[s] TSAs over the next 24 months [after the Spin-Off], stand-up costs will trend down[.]"  ¶97.  This cost reduction, according to Defendants, would be possible because each TSA exit would be paired with "a replacement system or technology or process that is *more cost effective*."  ¶103.  Defendants reiterated the importance of the TSA Exit Strategy, referring to it as, *inter alia*, "one of the most important things this year."  ¶109.

- 3 -

Specifically, according to Defendants, the TSA Exit Strategy would cause SG&A to decrease, leading to improved adjusted EBITDA margins, similar to those Fortrea enjoyed in 2022, when it was part of Labcorp.  Defendants targeted 13% adjusted EBITDA margins "*exiting 2024*" (¶222), as Fortrea purportedly replaced each TSA with a "system or technology or process that is more cost effective."  ¶220.

But in or about July 2023, Defendants privately decided that, instead of establishing their own in-house infrastructure, they would replace the TSAs with services outsourced to Cognizant.  ¶154.  The Cognizant engagement was a sole-source contract, meaning there was no competitive bidding process.  *Id.*  Fortrea announced the Cognizant engagement months later, on January 4, 2024.  ¶141.

When Defendants signed the deal with Cognizant, they knew it would merely shift their TSA costs from Labcorp to Cognizant, resulting in similar, or higher, costs.  ¶157.  Nevertheless, Defendants touted the Cognizant deal to analysts and investors as a key part of the TSA Exit Strategy, which would "*help bring IT costs down [and] result in TSA costs swap out and come in at a better rate*."  ¶127.  Based on Defendants' representations regarding Cognizant, the market understood that "SG&A costs should not be going up from here and they should be coming down . . . , *particularly towards the end of this year and into 2025*."  *Id.* (quoting Evercore analysts).

By the start of 2024, Fortrea had put into place a "TSA Steering Committee" that, *inter alia*, created "road maps" to track the status of each individual TSA exit.  ¶¶145-146.  As part of that effort, the committee became aware, and made CFO McConnell aware, that Fortrea was routinely over-budget on costs paid to Cognizant.  McConnell personally signed off on all budget increases for

the TSA Exit Strategy, regardless of amount, and approved budget overages on payments to Cognizant on numerous occasions, including in 2Q24, 3Q24, and 4Q24.  ¶¶147-149.

### B.    The PSP/Backlog Fraud

Before the start of the Class Period and the Spin-Off, Defendants represented to investors and analysts that Fortrea had "a large backlog" of PSPs that would provide a strong foundation for future revenues "in years to come."  ¶¶56, 58.  Because Defendants highlighted Fortrea's backlog to investors *before* the Spin-Off, they were necessarily referring to the PSPs. ¶59.  By representing this backlog as a source of "revenue in years to come," Defendants conditioned investors to believe the PSPs would meaningfully contribute to the Company's future revenues.  ¶60.  After the Spin-Off, Defendants emphasized that the Company's "longer-term contract durations" gave them "confidence and visibility into [its] future revenues."  ¶200.

Indeed, Defendants led investors and analysts to believe they had weeded out any nonperforming projects.  On August 14, 2023, during the 2Q23 Earnings Call (and just a month into the Class Period), Defendants explained that they had undertaken an extensive review of Fortrea's backlog and identified "some projects" that were "appropriate" to remove from the backlog because Defendants "hadn't seen any revenue."  ¶65.  Defendants assured the market that this review did not require "a material adjustment," and that what remained, including the PSPs, was still "valid backlog for the future."  *Id.*  According to Defendants, the review "ensure[d] the robustness of everything that was in" the backlog.  ¶67.  Importantly, because Defendants did not restate historical metrics for backlog, there was "little information for investors to use for the purpose of making informed comparisons that could help illustrate the company's operation progress."  ¶66.  In other words, investors had to rely on Defendants' commentary about Fortrea's backlog to understand the impact of the PSPs on future revenue.  *Id.*

After this review, Defendants continued to represent the purported strength of the backlog (¶¶68-71), targeting revenue of over $3 billion for 2024, and citing the "attractive backlog" as a key reason that Fortrea remained "a long-term value creation opportunity for [its] investors." ¶71.

### C.    Investors Learn the Truth

The market began to learn the truth of Fortrea's financial condition on August 12, 2024, during the 2Q24 Earnings Call. Defendants admitted that the Company could not achieve its previously targeted 13% adjusted EBITDA margin for 4Q24, and represented that Fortrea would instead "target to deliver an adjusted EBITDA margin in the 11% to 12% range" for 4Q24 and FY25. ¶265. Defendants also reported an underwhelming $662 million in revenue and $55 million in adjusted EBITDA for the quarter, a margin of just 8.3%. ¶266. They blamed the Company's lackluster performance on: (i) weak backlog from the pre-spin period, including "later stage and longer duration studies"; and (ii) "higher SG&A costs post spin to support operations as a public company," *i.e.*, ballooning costs resulting from the doomed TSA Exit Strategy. ¶267.

Consequently, on September 25, 2024, Jefferies lowered its price target for Fortrea from $25 per share to $21, noting that "TSA [c]ost [s]avings [are not] as [m]aterial as [o]ne [m]ight [t]hink." ¶271; ¶166. As an analyst from Jefferies explained, "IT infrastructure costs to exit the TSAs are already non-GAAPed out of adjusted EBITDA[, so] once TSAs are exited, [Fortrea] will just be replacing TSA costs with internal operating costs[.]" ¶271.

Then, on December 4, 2024, Defendants shocked investors by announcing a self-imposed "quiet period," withdrawing from several already-scheduled conferences. ¶272. Two days later, on December 6, 2024, Baird cut its per-share price target for Fortrea from $35 to $28. ¶273. In explaining its decision, Baird cited, *inter alia*, the "lack of clarity on the abrupt communications course change[.]" *Id.* A few days later, on December 11, 2024, Citigroup reduced its per-share price target from $30 to $23, in part due to a lack of clarity on Fortrea's expected margins. ¶274.

Finally, on March 3, 2025, Defendants announced Fortrea's financial results for 4Q24 and FY24, revealing an adjusted EBITDA margin of just 8% for the quarter – nowhere close to the previously guided 13%, nor even the revised 11-12%.  ¶¶276-277.  For FY24, revenue was $2.69 billion and adjusted EBITDA was $202 million, for a margin of just 7.5%.  ¶276.  "[E]ven more disappointing," Fortrea revised its FY25 revenue guidance, implying adjusted EBITDA margin of just 6.7%, *about half of the previously targeted 13%*.  ¶281 (quoting William Blair analysts).

Defendants were forced to disclose the real cause of Fortrea's anemic financial performance: "inefficiencies in the pre-spin portfolio and the inherited SG&A costs" that Defendants were *still* "actively working to reduce."  ¶282.  Defendants admitted that "[m]any of the pre-[spin] projects" (¶183) "ha[d] a lot of hours in them already, and every incremental hour is less as a percentage of the total[.]"  ¶280.  Defendants also admitted that the TSA Exit Strategy was wholly ineffectual. Despite having "essentially exited from the TSA services," SG&A *increased* in 4Q24 quarter-over-quarter as both a standalone figure and as a percentage of revenue.  ¶181.

As result of Defendants' fraudulent conduct, the Company's common stock lost *nearly three quarters* of its value during the Class Period.  ¶195.

## III.    ARGUMENT

### A.    Legal Standard

To avoid dismissal pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), the AC must allege "enough facts to state a claim" that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This Court only "assess[es] the legal feasibility of the complaint"; it does not "assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).

To state a claim under Section 10(b) of the Exchange Act, Plaintiffs must plead: (1) a material misrepresentation or omission; (2) in connection with a purchase or sale of a security;

(3) made with scienter; (4) reliance; (5) economic loss; and (6) loss causation. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). While Plaintiffs must also satisfy the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), the Second Circuit has cautioned that courts "must be careful not to mistake heightened pleading standards for impossible ones." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021). Plaintiffs do not need to plead "detailed evidentiary matter." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). The AC adequately alleges material misstatements and omissions, a strong inference of scienter, and loss causation.

### B.        The AC Alleges False and Misleading Statements and Omissions

A misstatement is actionable under Section 10(b) and SEC Rule 10b-5 thereunder if it includes any "untrue statement of a material fact" or omits "a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 102 (2d Cir. 2022). "At the pleading stage, a plaintiff need not establish that each of the alleged misstatements or omissions is [materially] misleading in and of itself; rather, a plaintiff must only allege that the defendant's representations, *taken together and in context*, would have misled a reasonable investor." *Genesee Cnty. Emps.' Ret. Sys. v. DocGo Inc.*, 773 F. Supp. 3d 62, 80 (S.D.N.Y. 2025) (Failla, J.) (emphasis in original).

#### 1.        Defendants Misled Investors About Fortrea's TSA Exit Strategy

During the Class Period, Defendants assured investors that they had devised "detailed TSA exit plans" to "improve [Fortrea's] SG&A cost as a percent of revenue." ¶¶100-101. Defendants also repeatedly represented that the TSA Exit Strategy would lead to 13% adjusted EBITDA margins "exiting 2024." ¶222; *see also* ¶¶230, 239. At nearly every opportunity, Defendants linked

Fortrea's ballooning SG&A to the TSAs.  ¶¶87-93.  As CEO Pike explained, SG&A was "interrelated with exiting the TSAs," and investors would see the benefits "emerging [] through [2024], but primarily late in the year as we exit the TSAs."  ¶216.  These statements are actionable because they led investors to believe the TSA Exit Strategy would cause SG&A to improve, when Defendants knew, but failed to disclose, that they had engaged Cognizant to provide these same services at similar, if not higher, costs, and that Fortrea's payments to Cognizant were over budget. *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 299 (S.D.N.Y. 2009) (statements false when defendants knew costs on a project were "running over budget," but "continued to tout" the project "throughout that year").  None of Defendants' arguments regarding the falsity of the TSA statements is availing.

Defendants do not (because they cannot) meaningfully contest that Fortrea engaged Cognizant to provide the TSA services for more than Labcorp was charging, or that Fortrea was routinely over-budget on costs to Cognizant.  Instead, Defendants conjure a narrative in which they never expected the TSA Exit Strategy to directly reduce costs, but merely to "open the door" for *future* infrastructure cost savings.  MTD at 13.  This narrative is not only contrary to Defendants' own Class Period representations (linking lower SG&A to exiting TSAs), but would still be false because Cognizant *was* the new infrastructure.

Defendants made it clear throughout the Class Period that exiting the TSAs would – *by the end of 2024* – decrease SG&A and improve margins.  *See* ¶¶216, 218, 220, 226, 230.  They did not characterize these benefits as "potential future efficiencies" (MTD at 14), but instead led investors to believe that the "benefits [would] emerge towards the end of [2024] . . . as [Fortrea] fully exit[ed] the TSA and adopt[ed] these more efficient infrastructures."  ¶241.  And although Defendants acknowledged the Cognizant contract on January 4, 2024 (¶141), they did not disclose that it would

result in increased, not decreased, costs. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another.").

To the contrary, just six days later (on January 10, 2024), McConnell represented that Fortrea personnel had been "tasked with coming back with a replacement system or technology or process [for the TSAs] that [would be] more cost effective." ¶¶90, 220. But Defendants already knew that, because of the Cognizant contract, the replacement systems would *not* be "more cost effective" or "fit-for-purpose" (¶208), but instead would be *less* so. ¶160. Far from "exiting arduous TSAs" to "deliver[] a cost structure that [was] appropriate for a clinical services CRO" (¶210), through an "ongoing process" for achieving "improved efficiencies" (MTD at 13), with corresponding reductions in SG&A, Fortrea had entered into a more costly agreement with Cognizant.[2]

Defendants respond that they *did* disclose that Labcorp had been providing TSA services to Fortrea "at cost." *See* MTD at 12, 16. But that did not stop them from representing – *after* they had already entered the higher-cost contract with Cognizant – they could secure even "more cost effective" TSA services elsewhere. ¶220.[3]

Defendants also contend that, because "[m]argin includes both revenue and adjusted EBITDA," which involve inputs other than SG&A and TSA exits, their TSA-related statements cannot be shown to be false. MTD at 14-15. But Defendants themselves told investors that reduced

---

2    Although Defendants accuse Plaintiffs of ignoring the "surrounding context" of their statements (MTD at 12), these and similar misrepresentations, stated by Defendants and quoted in the AC, **as well as Fortrea's contract with Cognizant**, are themselves the surrounding context. Yet Defendants fail to mention Cognizant by name even once, despite over 40 references to it in the AC, instead making only passing references to a "vendor." *See, e.g.*, MTD at 10 n.6 (regarding "vendor"). Thus, it is Defendants, not Plaintiffs, who are ignoring the critical surrounding context. *See In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 230 (S.D.N.Y. 2019) (rejecting defendants' position that the court "ignore all context; just look at the statements in a vacuum; do not consider whether they comport (or contradict) the company's other disclosures and conduct").

3    This stands in stark contrast to *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), where the plaintiff did not explain "to what extent those misrepresentations and omissions *concealed* the risk." *Id.* at 177; *see also* MTD at 15.

SG&A from the TSA Exit Strategy would improve adjusted EBITDA margin, expressly linking SG&A to adjusted EBITDA margin. During the 3Q23 Earnings Call, for example, when asked how Fortrea could lower SG&A and increase margins by the end of FY24, McConnell replied: "we have been able to see some *significant margin expansion opportunity with that SG&A benchmarking*," which will "*require a full exit from the TSAs . . . . So we will get benefit from some of the reductions and changes that we're making in SG&A*."[4] ¶214. Defendants could not, however, come close to achieving the promised 13% adjusted EBITDA margin, or even the revised 11-12% adjusted EBITDA margin, because Cognizant was more costly.[5]

Defendants also argue that they "disclose[d an] execution risk . . . that risk later materialize[d]" (MTD at 15) when McConnell told investors that, for "these [TSA] exits, it's really what we replace them with." *Id*. (citing ¶220). By January 10, 2024 (¶90), however, when McConnell made that purportedly exculpatory disclosure about a *future* risk, Defendants had already signed the more costly deal with Cognizant. Thus, the purportedly future risk she disclosed – of an unsuccessful replacement for the TSAs – had already occurred. *See Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021). And not only did McConnell fail to disclose that already-existing additional cost; she *concealed* it by representing that Fortrea personnel had "been tasked with coming back with a replacement system or technology or process that is more cost effective." ¶220. At that point, however, the Cognizant contract was a *fait accompli*.

---

[4]    Despite noting "the ratio of SG&A expense to revenue axiomatically is driven in significant part by revenue" (MTD at 15), Defendants attempt to bolster their argument by noting that SG&A decreased in 1Q25 (after the Class Period). MTD at 15 n.14. But SG&A decreased *because* revenue decreased – and it was still significantly higher during 1Q25 than the beginning of the Class Period. ¶84. Furthermore, the relevant metric, as Defendants conceded during the Class Period, is SG&A as a percentage of revenue. *See* ¶239 ("We see significant potential to expand margins by reducing *SG&A expense as a percentage of revenue*."). Thus, Defendants' claim that Fortrea's TSA expense decreased cuts against its own argument. MTD at 15 n.14. Even as TSA costs trended down, SG&A as a percentage of revenue remained elevated. ¶84.

[5]    The statements regarding the TSA Exit Strategy's impact on adjusted EBITDA are also false because many of the TSA costs were "non-GAAPed out of adjusted EBITDA." ¶¶166-176.

Finally, Defendants had an affirmative obligation to disclose that the TSAs would be replaced by similar, if not higher, costs.[6]  "Second Circuit law is clear that once a corporation chooses to speak on an issue, there is a duty to tell the whole truth." *Solomon v. Sprint Corp.*, 2022 WL 889897, at *6 (S.D.N.Y. Mar. 25, 2022).  "The ultimate question . . . remains whether a reasonable investor could have been [misled] to believe something in contradiction to the omitted facts." *Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*, 751 F. Supp. 3d 330, 347 (S.D.N.Y. 2024).  By discussing the TSA Exit Strategy and its purported benefits, Defendants put the issue "in play," and had a duty to disclose that Cognizant would cost the Company more, not less, than the TSAs.  *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n.15 (2d Cir. 2020).[7]

### 2.    Defendants Misled Investors About the PSPs and Fortrea's Backlog

Preliminarily, Defendants mischaracterize one of their Class Period misstatements as pre-Class Period and purportedly inactionable.  After the market closed on July 3, 2023, the first trading day before the July 5 start of the Class Period, Defendants falsely represented that their "longer-term contract durations give us confidence and visibility into our future revenues." ¶200.  This statement was misleading because it failed to disclose that older PSPs had diminished profitability.  More to the point, when "materially false and misleading" statements are made "after the close of the markets[,] . . . the relevant Class Period begins on . . . the first trading day after the allegedly false

---

[6]    Defendants' reliance (MTD at 16) on *Bratusov v. Comscore, Inc.*, 2020 WL 3447989, at *11 (S.D.N.Y. June 24, 2020) (Failla, J.), is misplaced.  There, the complaint did "not commit [defendants] to a particular strategy for achieving its goal" or allege knowledge "that the goal was not feasible." *Id.*

[7]    Defendants argue that the cost of Cognizant's services was immaterial to investors.  MTD at 16 n.17.  But Defendants conceded materiality by describing the TSA Exit Strategy as "absolutely essential" and "really critical." ¶¶220, 245.  In any event, "[b]ecause materiality is a mixed question of law and fact, a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *DocGo*, 773 F. Supp. 3d at 81.

statements" – that is, July 5. *In re Gilat Satellite Networks, Ltd.*, 2007 WL 2743675, at *6 (E.D.N.Y. Sep. 18, 2007). This is not, therefore, a pre-Class Period statement.[8]

None of Defendants' other arguments are meritorious:

*First*, Defendants misconstrue Plaintiffs' allegations. Plaintiffs do not allege that Defendants' statements are false because they miscalculated backlog. MTD at 17. Rather, they are false because Defendants repeatedly cited backlog as a valuable asset for the Company, but already knew, yet failed to disclose, that many of the PSPs were "late in their lifecycle" (¶197), with diminishing profitability. ¶¶196-207. "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014).

*Second*, Defendants told investors they "ensure[d] the robustness of everything" in the backlog, including the PSPs, and that what remained was "valid backlog for the future." ¶¶65, 67. From this review, which occurred early in the Class Period (if not before) (*id.*), Defendants knew or should have known, but failed to disclose, that the PSPs already had "a lot of hours in them," resulting in diminishing profitability. ¶205. Thus, when Defendants repeatedly touted the PSPs and the backlog as "attractive" (¶206), representing that they had "confidence and visibility into [Fortrea's] future revenues" (¶200), they misled investors into believing the PSPs would meaningfully contribute to future revenues. *See In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 628 (S.D.N.Y. 2003) (finding representation of "strong order backlog" to be actionable). Defendants' review of Fortrea's backlog demonstrates that their upbeat statements were not "believed to be true when made," but instead are actionably false. MTD at 18.

---

[8]    A June 6, 2023 statement Plaintiffs quote, that when investors "look at [Fortreas's] backlog, [they]'re looking at a company that has revenue in years to come," is pre-Class Period. ¶196. Nevertheless, it previews Defendants' use of the PSP backlog to give investors a misleadingly favorable view of Fortrea's prospects. *See, e.g.*, *Scholastic*, 252 F.3d at 72 (pre-class period statements may be relevant for other purposes, such as bolstering scienter).

*Third*, Defendants point to snippets of boilerplate warnings, such as that backlog is not "a consistent indicator of future revenue," as exculpatory. Defs' Ex. B (ECF 65-2) at 50; *see also* MTD at 18. But Defendants' argument misses the point. Their representations about the strength of Fortrea's backlog (¶¶200, 202, 204, 206) are not misleading for failing to predict future revenue, but for failing to disclose the present fact – known to Defendants through their review of Fortrea's backlog in August 2023 (or earlier) (¶63) – that certain PSPs were already aging and subject to diminishing returns. To the extent Defendants' risk disclosures even pertain to this particular risk, which is dubious, it was a risk that had already materialized. Put another way, these misstatements are actionable because Defendants touted Fortrea's backlog, while omitting material facts regarding the present status of certain PSPs in the backlog. *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 191 (S.D.N.Y. 2010) ("this is not a case of 'failure to predict' riskiness or future" performance).

*Fourth*, the information from FE1 supports falsity, and Defendants' serious mischaracterization of Plaintiffs' allegations about FE1 do not change that fact. FE1 worked in Technology Engagement for Labcorp and then Fortrea (as a Director, then Senior Director, then Executive Director) *for over 20 years*, and all but a few days of the entire Class Period – not "less than a year," as Defendants contend. MTD at 18; *contra* ¶72. According to FE1, Fortrea was not bringing in significant new business following the Spin-Off, but rather relied heavily on revenue from the PSPs. ¶72. Indeed, this was "common knowledge" throughout the Company. ¶73. Although Defendants, citing no authority, attempt to brush these well-pleaded allegations aside, the Second Circuit recently credited similar allegations of a fact being "commonplace and widely known within the company." *Sherman v. Abengoa, S.A.*, 156 F.4th 152, 160 (2d Cir. 2025); *see also*

- 14 -

*Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637-38 (S.D.N.Y. 2010) (crediting FE allegations that "everyone knew" of problems).

*Fifth*, the AC alleges actionable omissions relating to the PSPs. Defendants' review of Fortrea's backlog at the start of the Class Period apprised them of the PSPs' status; thus, each of the PSP statements regarding the strength of the backlog was "false or misleading *when made*" for failing to disclose that information. MTD at 19 (emphasis in original). Having chosen to speak about the amount of the backlog (more than $7 billion (¶¶204, 206)) and the "attractive[ness]" of the backlog (¶206), as evidence of "a long-term value creation opportunity" (¶204) and "longer-term growth and margin expansion" (¶206), Defendants had a duty to reveal the full truth – that a material component of that backlog was nearing the end of its lifecycle, and would not contribute to future "value creation" or "growth and margin expansion." That omission was misleading and actionable.[9] *See In re Allergan PLC Sec. Litig.*, 2019 WL 4686445, at *23 (S.D.N.Y. Sep. 20, 2019) ("[E]ven a statement that is literally true when viewed in isolation can be misleading in context if it leaves investors with a false impression.").

### 3.    The PSLRA Safe Harbor Is Inapplicable

Defendants challenge 21 statements as inactionable forward-looking statements protected by the PSLRA's safe harbor. MTD at 9. But the AC does not allege that any arguably forward-looking aspect of these statements is false. The AC makes clear that the relevant allegations relate solely to the then-existing facts.

For the challenged TSA statements, Defendants virtually ignore Plaintiffs' allegations regarding Cognizant. Defendants already knew, but failed to disclose, that the Cognizant deal would

---

[9]    Defendants' citations (MTD at 19) are unavailing because Defendants linked the PSPs to the backlog by touting Fortrea's backlog prior to the Spin-Off. ¶59; *see also In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012) ("[T]hese statements are not misleading because they do not suggest that the undisclosed improper activity alleged by [p]laintiff was not occurring."); *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 169 (S.D.N.Y. 2023) ("Simply put, [the omissions and misleading statements] are different concepts.").

- 15 -

not cause SG&A to decrease, even after fully exiting the TSAs. *In re ITT Educ. Servs., Inc. Sec. Litig.*, 34 F. Supp. 3d 298, 306 (S.D.N.Y. 2014) (safe harbor not triggered when plaintiffs alleged "at the time the statement was made, it was already untrue"); *see, e.g.*, ¶¶212, 214, 216, 232, 237. Similarly, based on Defendants' review of Fortrea's backlog, they already knew the PSPs would not be a source of meaningful revenue. ¶¶196, 200, 206.

Furthermore, the PSP and TSA statements regarding "targets or goals about future performance" (MTD at 9) are similarly unprotected because they failed to disclose the facts regarding the present status of the TSAs and PSPs, and thus are false and misleading "regardless of whether or not they were 'forecasts.'" *NovaGold Res.*, 629 F. Supp. 2d at 301; *see also, e.g.*, ¶¶196, 200, 208, 212, 216, 222, 236, 239, 241.

Moreover, none of the statements in question was accompanied by meaningful cautionary language. Defendants "must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton v. Am. Express Co.*, 604 F.3d 758, 772 (2d Cir. 2010); MTD at 10. Defendants point to language warning of its "dependence on third parties," and that building systems could "cost more or take longer than anticipated." MTD at 10. Similarly, Fortrea merely cautioned that its "backlog . . . may not be indicative" of future revenue. *Id.* This language warned against risks that had already transpired. *See Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 228 (S.D.N.Y. 2023) (warnings of materialized risks not meaningful).

In any event, as explained below, the AC alleges Defendants' actual knowledge of falsity, rendering the PSLRA safe harbor inapposite. *Martinek v. AmTrust Fin. Servs., Inc.*, 2020 WL 4735189, at *14 (S.D.N.Y. Aug. 14, 2020) (Failla, J.) (finding statements regarding defendants'

"expectations" actionable where "at the time they held their expectations[,]" defendants made their statements "with actual knowledge that they were false or misleading"); *see infra* §§II.C.1.-2.[10]

### 4. None of the Challenged Statements Are Corporate Optimism or Opinions

Defendants identify three snippets of challenged statements as statements of corporate optimism: (i) ¶200; (ii) ¶204; and (iii) ¶206. MTD 20. But "[w]hether a representation is 'mere puffery' depends, in part, on the context in which it is made." *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (materiality "necessarily depends on all relevant circumstances of the particular case").

Viewing these statements in full context, they were materially false and/or misleading when made. ¶200 is misleading because Defendants said the projects "extend over multiple years" and had "longer-term contract durations," when they knew the PSPs already had "a lot of hours in them." ¶201. ¶204 is false and misleading because Defendants identified the backlog as a key reason that Fortrea "remain[ed] . . . a long-term value creation opportunity," when they knew the PSPs already had "a lot of hours in them." ¶205. And ¶206 is false and misleading because Defendants identified the backlog as a reason for growth, when Defendants knew the PSPs already had "a lot of hours in them." ¶207. *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 223 (S.D.N.Y. 2022) (no puffery when, "viewed in context," the statement "was addressed to the particular concern of investors").[11] Moreover, Defendants *repeated* these statements to investors, and "when a

---

[10]    Even if any of the challenged statements were forward-looking, which they are not, the majority are misleading for omitting material existing facts, which exempts them from the safe harbor. *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013); *see, e.g.*, ¶¶196-209, 212-219, 232.

[11]    While Defendants cite to *Docdeer Foundation v. BioNTech SE*, 2025 WL 2781381, at *14 (S.D.N.Y. Sep. 30, 2025) (Failla, J.), the puffery statement there concerned a "pipeline," *id*., which provides less certainty than a backlog. *Compare City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*, 552 F. Supp. 3d 406, 417 n.7 (E.D.N.Y. 2021) (describing pipeline as "a vague measure of sales opportunities not subject to uniform definition") *with Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 990 (9th Cir. 2008) (noting that backlog represents a "contractual entitlement

company makes repeated representations on the same topic, even where those representation[s] would otherwise be puffery, the repetition itself communicates to investors what matters [are] particularly important, and those statements may become material to investors." *See In re Avon Sec. Litig.*, 2019 WL 6115349, at *16 (S.D.N.Y. Nov. 18, 2019).

Nor are any of the challenged statements insulated as opinion.  MTD at 20.  ¶¶224 and 234 quote misrepresentations that exiting the TSAs will improve SG&A, which will in turn lead to 13% EBITDA margins.  Similarly, ¶245 communicated: "the timing of those TSA exits is really critical because they are essential."  Although these statements were couched as opinion, they all "contradict facts known to [D]efendant[s]" – that the Cognizant contract would result in higher costs – and are therefore actionable.  *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 488 (S.D.N.Y. 2018).

In any event, as the Second Circuit has held, whether the statements are fact or opinion is of little significance; what matters is if the statements misled investors.  *Omnicare*, 575 U.S. at 175 (statements are actionable if a plaintiff identifies undisclosed "particular (and material) facts" that would mislead a reasonable investor).  That is what occurred here.

## C.    The AC Alleges a Strong Inference of Scienter

In assessing whether the AC adequately pleads scienter, the Court must determine "whether all of the facts alleged, *taken collectively*, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007).  The Court must conduct a "comparative assessment of plausible inferences, while *constantly assuming the plaintiff's allegations to be true[.]*"  *Id.* at 326-

to perform certain work").  As Defendants acknowledge, "Plaintiffs complain about the backlog, not pipeline."  MTD at 18-19.

- 18 -

27. Where, as here, "the complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, recklessness is adequately pled for defendants who knew or should have known they were misrepresenting material facts with respect to the corporate business." *Sec. & Exch. Comm'n v. Farnsworth*, 692 F. Supp. 3d 157, 187 (S.D.N.Y. 2023) (Failla, J.).

### 1.    Defendants Knew or Recklessly Disregarded the Truth

The AC alleges Defendants' knowledge of, access to, and reckless disregard of information contradicting their public statements regarding the TSAs and the PSPs. *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). As for the TSAs, Defendants repeatedly stressed the importance of the TSA Exit Strategy, calling it "critical" (¶¶220, 234, 241, 245), "essential" (¶245), and "one of the most important things this year" (¶109). Defendants referenced the TSAs on nearly every call with analysts and investors, providing specific updates on the percentage of TSAs exited and the timing of purported benefits. ¶¶94-120; *see also City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("specificity" of statements suggests defendants received "specific" information); *Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at *2-*3 (E.D.N.Y. July 26, 2016) (same). Moreover, analysts asked about the status of the TSA Exit Strategy and SG&A throughout the Class Period, and Defendants consistently provided misleading answers to reassure the market. *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (defendants "would have been alert to information concerning" key subject "about which investors and analysts often inquired"); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018) (statements to "placate the market" support scienter); *see also, e.g.*, ¶¶116, 127, 175, 214, 226, 228, 236-237.

As for the PSPs, Defendants admit to undertaking a review of Fortrea's backlog before August 2023. ¶¶63-67. Defendants conceded that the review "ensure[d] the robustness of

- 19 -

everything that was in there." ¶67. Following this review, Defendants continued to tout the purported strength of Fortrea's backlog. ¶71; *see also Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 9 (1st Cir. 2021) ("[T]he company thought it important enough to warrant two specific plugs from top management, thereby creating a very strong inference that the senior executives who gave those apparently prepared remarks . . . would have paid at least some attention to the [matter].").

The Individual Defendants' positions within the Company also support scienter. *Nutriband, Inc. v. Kalmar*, 2020 WL 4059657, at *11 (E.D.N.Y. July 20, 2020) ("[G]iven that the Individual Defendants were the highest-ranking executives of the Corporate Defendants, it would strain[] credulity to believe they were not involved (and aware of) these misrepresentations.").

### 2.    The AC's FE Allegations Demonstrate Actual Knowledge

Plaintiffs buttress the AC's scienter allegations with highly credible allegations from two FEs. Unable to contest the AC's FE allegations, Defendants mischaracterize these allegations in an attempt to downplay them. But "courts consider and take as true the statements of [confidential] witnesses at this stage, even when applying the heightened standards of Rule 9(b) and the PSLRA." *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 261 (S.D.N.Y. 2023).

*First*, contrary to Defendants' assertions (MTD at 23), the AC pleads the FE allegations with the requisite particularity. FE1 worked for Labcorp and then Fortrea as Director, then Senior Director, and finally Executive Director of Technology Engagement for nearly 21 years. ¶72. FE1 participated in weekly TSA Steering Committee meetings to discuss the TSA Exit Strategy and track the projected costs for each individual TSA, and personally sent budget overage requests regarding Cognizant to McConnell for approval. ¶¶145-149. FE2 worked as Category Manager for IT, Procurement Director, or Director of Purchasing from July 2016 to June 2024. ¶152. FE2 oversaw IT management and the purchasing of certain hardware, software, and other applications, many of

- 20 -

which were covered by the TSAs.  *Id.*  And, in or about July 2023, FE2 was shown cost models approved by McConnell showing that the Cognizant deal would take ***three or more years*** before the Company would realize SG&A savings after exiting the TSAs.  ¶¶153-159.  Accordingly, the AC more than adequately alleges "the roles occupied by the witnesses with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Lottery.com, Inc. Sec. Litig.*, 765 F. Supp. 3d 303, 328 (S.D.N.Y. 2025).

Against this factual backdrop, Defendants' citations are inapposite.  MTD at 23.  Defendants cite *Meyer v. Organogenesis Holdings Inc.*, 727 F. Supp. 3d 368 (E.D.N.Y. 2024), for the proposition that FE allegations are deficient where they fail to allege direct communication between the FEs and defendants.  But both FE1 and FE2 recounted specific information made available to the Individual Defendants demonstrating that their statements were false, information the Individual Defendants approved.  ¶¶72-74, 145-159; *contra Organogenesis*, 727 F. Supp. 3d at 396 ("the FEs' statements fail to identify any information that directly contradicted the alleged actionable statements and fail to connect the Individual Defendants to any [such] information").

Defendants' attempt (MTD at 23) to compare the AC's allegations to those in *Local No. 38 International Brotherhood of Electrical Workers Pension Fund v. American Express Co.*, 724 F. Supp. 2d 447 (S.D.N.Y. 2010), is equally misplaced.  There, plaintiffs relied on allegations from "low-level employees" and "outside contractors." *Id.* at 460.  And although one former employee was alleged to have provided reports to the individual defendants, "the Complaint [did] not describe their contents." *Id.* at 457.  Here, both FE1 and FE2 directly reported to C-suite executives (¶¶145, 156), and the AC describes specific reports and their contents, *i.e.*, the cost models and budget overages,[12] that the Individual Defendants received and of which they approved.  ¶¶72-74, 145-159.

---

[12]    Even Defendants' authority recognizes that where, as here, plaintiffs identify "specific, contemporaneous reports or statements showing [d]efendants did not believe their projections when they were made," actual knowledge is alleged.

Defendants, apparently conceding the credibility of the AC's FE allegations, then argue that the FE allegations do not establish scienter even if accepted as true.  MTD at 24.  For the TSA statements, FE1 does not, as Defendants suggest, summarily report that the Company was over-budget to one vendor, nor that "the Company signed off on certain budget overages."  *Id*.  Instead, FE1 reported that McConnell, on multiple occasions (listing the specific time periods), approved budget overages on payments to Cognizant – meaning that McConnell not only knew that Cognizant was charging more than Labcorp, but also knew Fortea was over-budget on SG&A as part of the TSA Exit Strategy.  ¶¶147-149.  FE1 also stated that the TSA Steering Committee had "road maps" that tracked the progress of each TSA exit, including the projected costs and timelines for each individual TSA.  ¶146.  FE1 further reported that exiting the TSAs would produce virtually no infrastructure or hardware costs savings by the end of 2024.  ¶150; *see In re Dentsply Sirona, Inc. Sec. Litig.*, 2026 WL 124581, at *16 (S.D.N.Y. Jan. 16, 2026) (crediting allegations where direct report of defendant instructed confidential witness to create internal reports that would have alerted them to the company's problems).

Similarly, FE2 detailed "cost models" demonstrating that the Cognizant deal would not yield any savings for at least three years, and McConnell saw, and approved of, these cost models.  ¶159; *see also Celestica*, 455 F. App'x at 13 (crediting former employee allegations that defendants saw "spreadsheets . . . detailing the extent" of the company's problems).  FE2 further stated that it would have been more cost-effective and efficient for Fortrea to transition the TSA services from Labcorp in-house or to another provider, as opposed to outsourcing these services to Cognizant, which had higher costs than FE2 believed were necessary.  ¶156.

---

*In re Danimer Sci., Inc. Sec. Litig.*, 2023 WL 6385642, at *7 (E.D.N.Y. Sep. 30, 2023); *see also In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 473 (S.D.N.Y. 2017), *aff'd*, 732 F. App'x 37 (2d Cir. 2018).

As for the PSP statements, FE1 recounted that it was well known throughout the Company that the PSPs had little work left on them, and that, since the Spin-Off, the backlog of PSPs simply was not producing enough revenue to carry the Company. ¶¶73-74; *see also Abengoa*, 156 F.4th at 160. And "courts have found at the pleading stage that the accounts of confidential witnesses support a [c]ompany-wide inference." *AppHarvest*, 684 F. Supp. 3d at 262.

### 3. The Core-Operations Doctrine Supports an Inference of Scienter

The core-operations doctrine, which "simply reflects the commonsense assumption that executives are likely to know more about things central to their business," further buttresses the already-strong inference of scienter. *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 319-20 (S.D.N.Y. 2024). The TSA Exit Strategy and the PSPs were "matters critical to the long term viability of the company and events affecting a significant source of income." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013); *see* ¶¶196, 204, 220, 234, 241, 245, 255. Moreover, SG&A, revenue, and adjusted EBITDA were "key to measuring [Fortrea's] financial performance and was a subject about which investors and analysts often inquired." *Celestica*, 455 F. App'x at 14.

### 4. The AC Alleges Fortrea's Scienter

As this Court has held, "scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants." *DocGo*, 773 F. Supp. 3d at 88. Pike and McConnell were "plainly acting within the scope of [their] employment when speaking on behalf of [Fortrea] at various conferences and corporate events[,]" and therefore their "scienter can be imputed to the [C]ompany." *Id*.

### 5.    Viewed Holistically, the AC's Allegations Support Scienter

The AC's scienter allegations must be considered holistically, not individually. *See In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 138 (2d Cir. 2021).[13] Viewed in totality, the AC's allegations support a strong inference of scienter by alleging: (i) Defendants' repeated statements regarding the TSAs and PSPs; (ii) the importance of the TSAs and PSPs to Fortrea's business; (iii) the high ranking positions of the Individual Defendants within the Company; and (iv) the Individual Defendants' access to, and knowledge of, specific information.[14]

Although Plaintiffs' inference of culpability need only be "at least as compelling" as Defendants' non-culpable inference, *Tellabs*, 551 U.S. at 324, here it is far more compelling. Defendants contend the more compelling inference is that "Defendants set targets, encountered operational challenges, and disclosed results." MTD at 25. Viewed holistically, however, the most compelling inference is that, following the Spin-Off, Defendants sold investors a false bill of goods that they could decrease costs and rely on contracts from their former parent company when they knew they could not, and they delayed telling the truth as long as they could. *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (defendants "conceal[ed] bad news in the hope that it will be overtaken by good news . . . like embezzling in the hope [of] winning at the track").

### D.    The AC Alleges Loss Causation

The loss causation pleading standard is "not meant to impose a great burden upon a plaintiff," and may be pleaded pursuant to Rule 8(a). *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). "Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure

---

[13]    Contrary to Defendants' assertions (MTD at 21-22), Plaintiffs are not required to plead motive. *See Citizens Utils.*, 228 F.3d at 170.

[14]    Pike's resignation after the fraud, which analysts called "sudden," "surpris[ing]," and "unexpected" (¶190), further supports an inference of scienter. *See zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, 792 F. Supp. 3d 407, 442 (S.D.N.Y. 2025).

was the *only* possible cause for decline in the stock price." *Barclays*, 750 F.3d at 233 (emphasis in original).

On the 2Q24 Earnings Call, investors learned that, despite being on track to exit all of the TSAs by the end of 2024, Fortrea would not achieve its previously targeted 13% adjusted EBITDA margin by the end of FY24, nor at all in 2025.  ¶¶265-268.  On this news, Fortrea's share price fell 20.35%.  ¶164.  Even this disclosure, however, concealed the full truth, as Defendants told investors that Fortrea still expects to "begin to see benefits emerge towards the end of the year with other improvements planned for 2025 and beyond as we fully exit the TSA and adopt these more efficient infrastructures[.]"  *Id.*; *Dentsply*, 732 F. Supp. 3d at 325 (earlier corrective disclosure "didn't fully reveal the fraud's scope or continuing effects").

Next, the September 25, 2024 Jeffries Report, which caused a 12% decline in the Company's stock price (¶271), is not "[a] negative . . . characterization of previously disclosed facts" (MTD at 25) (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010)), but is instead a "third-party analys[is] of [Fortrea's] financials, which contradict[ed] representations made by [D]efendants." *Bishins v. CleanSpark, Inc.*, 2023 WL 112558, at *12 (S.D.N.Y. Jan. 5, 2023); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *17 (S.D.N.Y. July 10, 2019) ("[An analyst report] was not, as [d]efendants contend, merely a journalist's negative opinion, but an analysis of how and why [defendant company's] underlying business was weaker than most people realized [and therefore qualified as corrective]."); *see also* ¶¶166-176.  Similarly, the December 6 and 11, 2024 declines provided additional context on the negative connotations of the Company's self-imposed "quiet period."  ¶¶272-274.[15]

---

[15]    There is no corrective disclosure on November 8, 2024 because Defendants stated: "[t]here are some places . . . particularly with our IT infrastructure, where because of the work that we're doing with Cognizant. . . . there will be some improvements, but you'll see more of those come out over the course of next year[.]"  ¶175.

Finally, in a materialization of the concealed risks, on March 3, 2025, Defendants were forced to reveal that, even though they had "essentially exited from the TSAs," they achieved an adjusted EBITDA margin of only 8%, and that SG&A increased compared to the previous quarter. ¶¶181-182.  Defendants also revealed they were now targeting mid-7% EBITDA margins in 2025. ¶183.  Defendants did not merely reiterate that the Company was moving towards a reduced-cost infrastructure, but instead revealed that the TSA Exit Strategy would not contribute to reducing SG&A at all.  MTD at 26.  The market clearly understood this as a revelation of new information, as a Jefferies analyst noted: "TSA exits lay the foundation for SG&A cost reductions, ***but those are not helping '25 margins*.**"  ¶184.  Moreover, Defendants' claim that the slower burn was a "new" discovery, and not a revelation of previously concealed information, MTD at 26, is a factual argument that cannot be determined at the pleading stage.  The AC alleges that Defendants knew about the PSPs no later than their "review" of the backlog before August 2023.  ¶65.  The Court is required to accept these well-pleaded allegations as true.  *DocGo*, 773 F. Supp. 3d at 78.

## E.    The AC Pleads Section 20(a) Control Person Liability

Defendants contend that since the AC fails to plead a predicate Section 10(b) violation or the Individual Defendants' culpable participation, Plaintiffs' Section 20(a) claim fails.  MTD at 26.  As set forth above, however, Plaintiffs have pled a Section 10(b) claim.  *See 380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 231 (S.D.N.Y. 2008).  Furthermore, the AC alleges the Individual Defendants' scienter, and thus their culpable participation.  *DocGo*, 773 F. Supp. 3d at 93-94.

## IV.    CONCLUSION

For the forgoing reasons, Defendants' Motion should be denied in its entirety.[16]

---

[16]    Should the Court find the AC to be deficient in any respect, Plaintiffs respectfully request leave to amend.  *See Barron v. Helbiz, Inc.*, 2021 WL 4519887, at *3 (2d Cir. Oct. 4, 2021) (leave to amend should be "freely give[n]").  Leave to amend is especially warranted should the Court accept any argument that Defendants did not detail in their pre-motion conference letter (ECF 54).

DATED:  March 19, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID A. ROSENFELD
MARK T. MILLKEY
JONATHAN A. OHLMANN


*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
drosenfeld@rgrdlaw.com
mmillkey@rgrdlaw.com
johlmann@rgrdlaw.com

*Counsel for Lead Plaintiffs*

ASHERKELLY
CYNTHIA J. BILLINGS-DUNN
25800 Northwestern Highway, Suite 1100
Southfield, MI  48075
Telephone:  248/746-2710
cbdunn@asherkellylaw.com

*Additional Counsel*

**CERTIFICATE OF WORD COUNT**

I hereby certify that the foregoing memorandum of law complies with the formatting and word-count limitations pursuant to Rule 4.B of Your Honor's Individual Rules of Practice in Civil Cases and Rule 7.1 of the United States District Court for the Southern District of New York because it contains 8,720 words.

/s/ David A. Rosenfeld
DAVID A. ROSENFELD

**CERTIFICATE OF SERVICE**

I hereby certify that on March 19, 2026, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

/s/ David A. Rosenfeld
DAVID A. ROSENFELD